# EXHIBIT 19

Page 1

1           IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF MISSISSIPPI
2                OXFORD DIVISION
3    LORINE MITCHELL, individually
     And on behalf of all others
4    Similarly situated,
5          Plaintiff,
6    vs.                    No.  17-cv-00170-MPM-RP
7    STATE FARM FIRE & CASUALTY
     COMPANY,
8
           Defendant.
9
10
11
                    * * * * * *
12
        CONFIDENTIAL DEPOSITION OF MICHAEL BERRYMAN
13
         TAKEN ON BEHALF OF THE PLAINTIFF
14
           IN OKLAHOMA CITY, OKLAHOMA
15
              ON JUNE 7, 2018
16
                    * * * * * *
17
18
19
20
21
22
23
24
25    REPORTED BY:  KIMBERLY D. IDLEMAN, CSR #01653

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 2

```
1              APPEARANCES
2
   FOR THE PLAINTIFF:
3
       Joseph Snodgrass
4      LARSON KING LLP
       30 East Seventh Street
5      Suite 2800
       Saint Paul, MN 55101
6      651-312-6500
       jsnodgrass@larsonking.com
7
8  FOR THE DEFENDANT:
9      Jacob Kahn
       RILEY SAFER HOLMES & CANCILA LLP
10     70 West Madison Street
       Suite 2900
11     Chicago, IL 60602
       312-471-8701
12     jkahn@rshc-law.com
13
14 ALSO PRESENT:  Scot Spragins
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

CONTENTS

```
                              Page Line
REQUESTED DOCUMENTS/INFORMATION ................ 3   8
STIPULATIONS .................................... 4   1
DIRECT EXAMINATION BY MR. SNODGRASS  ........... 5  13
CROSS EXAMINATION BY MR. KAHN  ............. 200  22
REDIRECT EXAMINATION BY MR. SNODGRASS ........ 209   7
JURAT ........................................ 254   1
REPORTER'S CERTIFICATE ....................... 256   1
```

PLAINTIFF'S EXHIBITS

```
      Description                    Page Line
No. 1 (Printout of website) .................... 23  21
No. 2 (Definitions) ............................ 36   5
Nos. 3 and 4 .................................. 114  17
No. 5 (Expert report of Toby Johnson) ......... 144   9
No. 6 (Declarat on of Alan King) .............. 159  10
No. 7 (Structural Damage Claim Policy) ........ 210  13
No. 8 (Invoices) .............................. 215   5
```

REQUESTED DOCUMENTS/INFORMATION

```
      Description                    Page Line
Billing records ............................... 209  16
```

* * * * * *

## Page 4

```
1           S T I P U L A T I O N S
2       IT IS HEREBY STIPULATED AND AGREED BY and
3   between the parties hereto, through their respective
4   attorneys, that the depos tion of MICHAEL BERRYMAN may
5   be taken on behalf of the Plaintiff, on June 7, 2018, in
6   Oklahoma C ty, Oklahoma, by Kimberly D. Idleman,
7   Certified Shorthand Reporter for the State of Oklahoma,
8   pursuant to agreement.
9       IT IS FURTHER STIPULATED AND AGREED BY and
10  between the parties hereto, through their respective
11  attorneys, that all objections, except as to the form of
12  the question and responsiveness of the answer, are
13  reserved until the time of trial, at which time they may
14  be made with the same force and effect as if made at the
15  time of the taking of this depos t on.
16              * * * * * *
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1        MICHAEL BERRYMAN,
2  being first duly sworn, deposes and says in reply to the
3  questions propounded as follows:
4              * * * * * *
5             PROCEEDINGS
6       MR. KAHN:  Now that we're on the record, I
7  just want to make clear that pursuant to Paragraph 5 of
8  the parties' agreed confidentiality order, we're just
9  going to ask the court reporter to mark the transcript
10 as confidential in its entirety for 30 days until we
11 have an opportunity to make our own designations.
12       Thank you.  Sorry.
13          DIRECT EXAMINATION
14 BY MR. SNODGRASS:
15 Q   Mr. Berryman, I see that you brought -- I'm not
16 sure if that's yours, but there's a stack of documents
17 to your left.  Is that something you brought with you?
18 A   These?
19 Q   Yes.
20 A   No.  I did not bring those.
21 Q   Are those mine?  Got it.  Okay.  Mr. Berryman, can
22 you tell me what your hourly rate is for testimony?
23
24
25
```

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 6



12  Q   Do you have a contract with State Farm for this
13  file?
14  A   By that, do you mean a written contract or?
15  Q   Right.
16  A   I have an engagement agreement with State Farm.
17  Q   And does that engagement agreement set forth your
18  hourly rates and billing requirements, etc.?
19  A   It probably does.  I would have to get it out to
20  look at it to be sure.
21      MR. SNODGRASS:  And we would request that
22  under the rules as a billing document, Counsel, the
23  production of it.
24      MR. KAHN:  If you want to send a request,
25  that's fine.  He's identified for you his rates both for

## Page 7

1   report preparation, inspection, and also for any
2   testimonial work.
3   Q   (By Mr. Snodgrass)  All right.  Can you tell me,
4   Mr. Berryman, what you did to prepare for your
5   deposition?
6   A   Yes.  I reviewed the file information that I was
7   given.  I made a site investigation of Ms. Mitchell's
8   home.  I also crafted a report in this matter.  And I
9   also met with State Farm's counsel in preparation for
10  the deposition.
11  Q   When d d you meet with State Farm's counsel?
12  A   Yesterday and today.
13  Q   And who did you meet with?
14  A   Jake Kahn and Scot Spragins.
15  Q   And how many hours did you meet w th them
16  yesterday?
17  A   Approximately four and a half yesterday.
18  Q   Did you do anything else to prepare for your
19  deposition today?
20  A   I re-reviewed the materials that I'd been given,
21  read my report, looked over my photographs, looked over
22  my site notes, met with State Farm's counsel.  I think
23  that's basically it.
24  Q   And did you meet with any State Farm counsel other
25  than Mr. Kahn and Mr. Sprains?

## Page 8

1   A   No.
2   Q   In your list of material, file materials reviewed,
3   you indicate that you reviewed some pleadings.  Do you
4   know whether or not those pleadings had attached to them
5   the actual insurance pol cy in this case?
6       MR. KAHN:  Just so the record can reflect, he
7   just pulled out a copy of his report.
8       THE WITNESS:  Yes.  As I recall, the State
9   Farm pol cy for Ms. M tchell is part of the documents
10  that I reviewed.
11  Q   (By Mr. Snodgrass)  D d you rely upon that
12  insurance pol cy in forming any of your opin ons in this
13  case?
14  A   Well, it's something that I considered.  Most of
15  what I have relied upon has to do with my own
16  observations and experience as a contractor, not so much
17  on policy interpretations.
18  Q   How d d you use the insurance policy, if at all,
19  in forming your opinions in this case?
20      MR. KAHN:  Object on.  Form.
21      THE WITNESS:  As I said, I'm not a person who
22  interprets policy.  But I do read plain language.  I
23  just wanted to confirm for myself the notion of how RCV
24  is calculated, depreciation, how that results in an ACV
25  value.

## Page 9

1   Q   (By Mr. Snodgrass)  When you said you looked at
2   something to confirm how RCV and ACV are calculated,
3   what specif c provisions of the policy informed your
4   opinion?
5       MR. KAHN:  Objection.  Form.  Mischaracterized
6   his testimony.
7       THE WITNESS:  I don't have any specific
8   portion of the policy that I can point to that informs
9   me about that in and of itself.
10  Q   (By Mr. Snodgrass)  Have you seen any information
11  in the pol cy that tells someone how to calculate
12  replacement cost value?
13      MR. KAHN:  Objection.  Form.  Calls for legal
14  conclusion.
15      THE WITNESS:  I would just need to get it out
16  and go through it to see if it says that specif cally or
17  not.
18  Q   (By Mr. Snodgrass)  Do you recall, as you sit here
19  today, whether or not the pol cy informed someone about
20  how to calculate replacement cost value?
21  A   I don't recall, sitting here, no.
22  Q   Do you recall whether or not the pol cy informed
23  someone about how to calculate actual cash value?
24      MR. KAHN:  Objection.  Form.
25      THE WITNESS:  I don't recall that, as I s t

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 10

1  here. I would be happy to get the policy out and look
2  at it if you would like.
3  Q    (By Mr. Snodgrass) Well, if you can't remember
4  what the policy says, that's okay with me. Your
5  description attached to your report, it didn't look like
6  you ever worked as a claims adjuster in any capac ty.
7  Is that true?
8  A    I have not.
9  Q    Have you ever been -- adjusted a property
10  insurance claim for any insurance company in any
11  jurisdiction?
12  A    No.
13  Q    Okay. Have you ever been employed by an insurance
14  company?
15  A    No.
16  Q    Have you ever been employed by an adjusting
17  company?
18  A    No.
19  Q    Are you a licensed insurance adjuster in the State
20  of Mississippi?
21  A    No.
22  Q    Do you know what a public adjuster is?
23  A    Yes.
24  Q    What is a public adjuster?
25  A    As I understand it, a public adjuster is an

## Page 11

1  **individual who holds himself out as a licensed adjuster**
2  **that often provides services for the policyholder.**
3  Q    Are you a l censed public adjuster in the State of
4  Mississippi?
5  A    No.
6  Q    Are you a l censed insurance adjuster in any state
7  in the Un ted States?
8  A    No, I'm not.
9  Q    Are you a l censed public adjuster in any state in
10  the United States?
11  A    No, I'm not.
12  Q    Do you hold any l censures within the insurance
13  industry?
14        MR. KAHN: Objection. Form.
15        THE WITNESS: I do not hold insurance-related
16  licensure.
17  Q    (By Mr. Snodgrass) Do you know what a manage
18  repair program is?
19  A    I'm not certain of your question. Could you
20  rephrase it?
21  Q    In the property insurance industry, are you
22  familiar w th the concept called a manage repair
23  program?
24        MR. KAHN: Objection. Form.
25        THE WITNESS: Not by that name. No.

## Page 12

1  Q    (By Mr. Snodgrass) Okay. Do you have another
2  name for a manage repair program?
3  A    Well, it depends on what that is. I think you
4  would have to describe it for me first.
5  Q    A manage repair program is a program that
6  insurance companies use to self-direct repairs for
7  pol cyholders?
8  A    By self-direct, do you mean get the work done for
9  them?
10  Q    Correct.
11  A    I do not know of those systems.
12  Q    Okay. I take it then you've never been part of an
13  insurance company's manage repair program?
14        MR. KAHN: Objection. Form.
15        THE WITNESS: Well, I'm getting kind of hung
16  up on your terminology. I have not been involved in an
17  insurance company program where the insurance company
18  provided for the repairs for the policyholder and paid
19  me, for instance, as a contractor to do the work.
20  Q    (By Mr. Snodgrass) D d you talk to any State Farm
21  claims adjuster in rendering your opin ons in this case?
22  A    No.
23  Q    D d you talk to any State Farm employee in
24  rendering your opin ons in this case?
25  A    No, I didn't.

## Page 13

1  Q    Did you talk to any State Farm management
2  personnel in rendering your opinions in this case?
3  A    No.
4  Q    Did you review any State Farm claims handling
5  guidelines in preparing to render your opinions in this
6  case?
7  A    No.
8  Q    I take it because you're not sure what State
9  Farm's policy provides as to replacement cost and actual
10  cash value, you're not rendering an opinion today as to
11  whether or not the policy of insurance at issue is
12  ambiguous?
13        MR. KAHN: I'm objecting to the form. Calls
14  for a legal conclusion.
15        THE WITNESS: I am not here today to opine
16  about as an expert about the State Farm insurance
17  policy.
18  Q    (By Mr. Snodgrass) Similarly, I take it you are
19  not here to render an opinion on how RCV should be
20  calculated under Mississippi law?
21        MR. KAHN: Objection. Form.
22        THE WITNESS: I am not here to offer opinions
23  as an expert concerning Mississippi law.
24  Q    (By Mr. Snodgrass) Are you here to offer an
25  opinion about the meaning of actual cash value under

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 14

1  Mississippi law?
2      MR. KAHN: Objection. Form.
3      THE WITNESS: As I said earlier, I am not here
4  to opine about Mississippi law as it relates to
5  insurance matters.
6  Q    (By Mr. Snodgrass) Are there any opin ons that
7  you plan to express in this case that are not reflected
8  in your May 21st, 2018, report?
9      MR. KAHN: Objection. Form.
10     THE WITNESS: I believe this report
11  encompasses all my opin ons in this matter. Of course
12  during this deposition, if you were to ask me quest ons
13  outside that, I'd be happy to answer them, likewise at
14  trial. And I would reserve the opportunity to form
15  additional opin ons should the plaintiff's expert, Toby
16  Johnson, render additional opinions.
17  Q    (By Mr. Snodgrass) I take it, Mr. Berryman,
18  because you've never worked for an insurance company or
19  adjusted a property claim or hold any licensure for any
20  insurance-related matter, you're not offering opinions
21  on insurance practices or claims handling in this case,
22  are you?
23     MR. KAHN: Objection. Form.
24     THE WITNESS: I am not here to offer opin ons
25  on claim handling pract ces. However, as a construction

## Page 15

1  restorat on contractor, I am here to opine about common
2  practices and industry standards as I have experienced
3  them in my daily business.
4  Q    (By Mr. Snodgrass) Okay. Are you a licensed
5  contractor in the State of Mississippi?
6  **A   Yes, I am.**
7  Q    And when d d you get l censure to be a contractor
8  in the State of Mississippi?
9  **A   I'm not sure of the exact date, but it would have**
10  **been approximately 17 to 18 years ago, plus or minus.**
11  Q    Is that l censure current?
12  **A   Yes.**
13  Q    And when was the last time you, yourself, were
14  involved in a construction project in the State of
15  Mississippi?
16  **A   Again, it would be an approximation as I sit here,**
17  **but probably somewhere on the order of around 1988 or**
18  **1989. I'm sorry --**
19  Q    That was the last time --
20  **A   I'm sorry. I misspoke. Approximately 1998 or**
21  **1999.**
22  Q    That was the last time you, yourself, were
23  involved in a construction project in the State of
24  Mississippi?
25  **A   Yes.**

## Page 16

1  Q    So it's fair to state that you haven't been
2  involved in the construction practices in the State of
3  Mississippi for approximately 20 years?
4      MR. KAHN: Objection. Form.
5      THE WITNESS: As I said, I have not performed
6  a project in Mississippi in that period of time. But I
7  feel certain in saying that the construct on practices
8  that are generally employed from day-to-day in Oklahoma,
9  Texas, Mississippi, Louisiana, Alabama and other states
10  in this general area are same or similar.
11  Q    (By Mr. Snodgrass) Well, then let me ask you
12  this, d d State Farm act similarly presently in the
13  State of Alabama and the State of Mississippi as it
14  relates to the issues in this case?
15     MR. KAHN: Objection. Form.
16     THE WITNESS: I'm not in the pos t on to opine
17  about what State Farm does on a daily basis in various
18  states.
19  Q    (By Mr. Snodgrass) That wasn't my question. You
20  said you were familiar with the construction pract ces
21  in different states. I'm just wondering when you sa d
22  including Mississippi and Alabama, and I'm just
23  wondering whether or not State Farm acts the same way as
24  it relates to the issues in these cases in the states of
25  Mississippi and Alabama. Yes, no, or you don't know?

## Page 17

1      MR. KAHN: Objection. Form.
2      THE WITNESS: Well, I think you're mixing
3  apples and oranges there because I'm opining about what
4  construction companies do as common practices and
5  industry standards. That is the same or similar in the
6  states that we've been discussing. If you're asking me
7  to opine about what the carriers, such as State Farm,
8  do, same or similar or not in those same states, I'm not
9  in a pos t on to opine about that.
10  Q    (By Mr. Snodgrass) Okay. So your opin ons are
11  just limited to the contractor side; what the carriers
12  do, whether they do it differently in different states,
13  that's not you. You're just on the construction side.
14  Is that fair?
15     MR. KAHN: Objection. Form.
16     THE WITNESS: Well, as you can tell from my CV
17  that I've been a construction contractor for 40 years.
18  In that time I have worked heavily in insurance
19  restorat on work. So I intend to offer opin ons about
20  what are the common practices and industry standards in
21  that industry. How are estimates formulated. How is
22  the work done. How is the process of insurance
23  restorat on and the restoration of the pol cyholder's
24  properties, how does that typically work. That's what
25  I'm here to talk about today.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 18

1  Q   (By Mr. Snodgrass)  Well, and that's why I asked.
2  If you're going to testify or render opinions about how
3  insurance companies act in different states, as I
4  understand, you're relying on how insurance companies
5  act in different states.  Because you haven't been
6  active in Mississippi for approximately 20 years, I'm
7  wondering whether or not your client in the State of
8  Mississippi, State Farm, acts the same way in different states.  Do you
9  know?  Yes or no?
10        MR. KAHN:  Object on.  Form.  Compound
11  quest on.
12        THE WITNESS:  When you say, acts, that's a
13  very very -- for the acts of an insurance company,
14  that's very broad.  So I cannot answer that question as
15  broadly as you put t.
16  Q   (By Mr. Snodgrass)  Okay.  As it relates to the
17  issue of labor depreciation specifically, does State
18  Farm act the same in the states that you listed as
19  having extensive experience in?
20        MR. KAHN:  Object on.  Form.
21  Q   (By Mr. Snodgrass)  Yes or no?  Or you don't know?
22  A   Well, you are mischaracterizing my testimony.  I
23  didn't say that I had extensive experience in those
24  states, first of all.  Secondly, I have not made a study
25  of how State Farm might act differently, for instance,

## Page 19

1  in the State of Alabama, than they do in the State of
2  Mississippi.  So I'm not in a position to give you an
3  answer on that.
4  Q   I see.  When you say that I made an assumption
5  that you had extensive experience in those states, how
6  much experience do you have in the State of Alabama?
7  When was the last time you were involved in a
8  construct on project in Alabama?
9        MR. KAHN:  Objection.  Form.
10        THE WITNESS:  I'm not sure that -- I would
11  say, as I sit here, could be about the same time frame,
12  1998 to 2000, plus or minus.  And that's just an
13  approximation.
14  Q   (By Mr. Snodgrass)  Are you licensed as a
15  contractor in the State of Alabama?
16  A   I am not.
17  Q   Okay.  So have you ever operated as a contractor
18  in the State of Alabama?
19        MR. KAHN:  Objection.  Form.
20        THE WITNESS:  I have been l censed in the
21  State of Alabama in the past.
22  Q   (By Mr. Snodgrass)  And so why is your l censure
23  current in the State of Mississippi if you haven't
24  worked on a construction project in the past 20 years?
25  A   Because I've chosen to keep that license active.

## Page 20

1  Q   Why?
2  A   For just good business judgment.
3  Q   Is that just so that you can stay potentially
4  qualified as an expert w tness?
5        MR. KAHN:  Object on.  Form.
6        THE WITNESS:  No.  It's so that I can be
7  prepared to do construction work in the State of
8  Mississippi if one of my clients chooses to have me go
9  there.
10  Q   (By Mr. Snodgrass)  One part of your work right
11  now is presently just working in l tigation on behalf of
12  State Farm?
13  A   I would say -- I haven't made an exhaustive study
14  of it, but I would say my yearly business volume at this
15  point is probably -- State Farm occupies perhaps
16  somewhere around 5 percent of that total, plus or minus.
17  Q   Didn't you testify in other cases that you have up
18  to 50 to 75 active files for State Farm at any given
19  time?
20  A   No.  I think that's a mischaracterization.
21  Q   Well, how many active cases do you have for State
22  Farm right now?
23  A   I don't know.
24  Q   Can you give me a reasonable estimate?  Is it
25  10,000?  Is it zero?

## Page 21

1        MR. KAHN:  Objection.  Form.
2        THE WITNESS:  I would say right now
3  probably -- as I sit here, just to give you a range,
4  somewhere around 10 to 15 files that are open.
5  Q   (By Mr. Snodgrass)  And how many files have you
6  worked on for State Farm since 1998?
7        MR. KAHN:  Objection.  Form.
8        THE WITNESS:  I don't have any way of knowing
9  that with accuracy without going back and counting them.
10  Q   (By Mr. Snodgrass)  Can you give me a reasonable
11  range?  Is it over 500?
12        MR. KAHN:  Objection.  Form.
13        THE WITNESS:  No.
14  Q   (By Mr. Snodgrass)  Is t over 200?
15  A   No.
16  Q   Is t over 100?
17        MR. KAHN:  Objection.  Form.
18        THE WITNESS:  You're talking about in the last
19  20 years?
20  Q   (By Mr. Snodgrass)  Yeah.
21  A   I would say -- as I said before, I can't know with
22  certainty, but it -- for 20 years it may be somewhere on
23  the order of a hundred.
24  Q   Would that be cases where you both testified and
25  consulted?  Or would that just be cases where you

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018
Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 22

1  testified?
2       MR. KAHN:  Objection.  Form.
3       THE WITNESS:  That would be just number of
4  files, number of assignments.
5  Q     (By Mr. Snodgrass)  And how much consulting fees
6  would you say you've generated from State Farm in the
7  past 20 years?  Would you say over a half million?  Over
8  a million?
9       MR. KAHN:  Objection.  Form.
10      THE WITNESS:  I don't know.
11  Q    (By Mr. Snodgrass)  Can you give me a reasonable
12  range?
13      MR. KAHN:  Objection.  Form.
14      THE WITNESS:  I don't feel like I could with
15  very much accuracy, because the files are, you know,
16  they have different levels of involvement.  They take
17  different times.  They were on different rates,
18  different times depending on what year it was.  There's
19  just so many variables in there, I don't feel like I
20  could give you a good approximation of that.
21  Q    (By Mr. Snodgrass)  Well, would you know it's
22  above a certain level for certain?  In other words, I
23
24
25

## Page 23

1
2
3
4
5
6
7  Q     (By Mr. Snodgrass)  From your CV I take it you
8  never took any college classes on the subject matter of
9  property insurance?
10  A    That's correct.
11  Q    And you're not a member of any insurance-related
12  professional societies?
13      MR. KAHN:  Objection.  Form.
14      THE WITNESS:  That's correct.
15  Q    (By Mr. Snodgrass)  You hold no professional
16  designations in the insurance industry?
17  A    That's correct.
18      MR. SNODGRASS:  Court reporter, if you could
19  please mark Exhibit -- or Document B as Exhibit 1, and
20  hand that to the witness and attorney, please?
21      (Exhibit No. 1 was marked for identification
22          purposes)
23  Q    (By Mr. Snodgrass)  Are you ready to go?
24  A    Yes.
25  Q    I'm showing you what's been marked as Deposition

## Page 24

1  Exhibit No. 1.  I'll represent to you that this is
2  a document that was copied off of and from Exact Word
3  Solutions' website.  First off, do you know what Exact
4  Word Solutions is?
5  A    Yes.
6  Q    Okay.  And are you familiar with one of their
7  software products called Xactimate?
8  A    Yes.
9  Q    Do you claim to have expertise in Xactimate
10  software?
11      MR. KAHN:  Objection.  Form.
12      THE WITNESS:  Yes, I do.
13  Q    (By Mr. Snodgrass)  Can you tell me whether or not
14  you had any -- strike that.  Can you tell me whether or
15  not you passed the level three certification user test
16  in Xactimate?
17  A    I have not taken this test.
18  Q    And have you taken the level two certification in
19  Xactimate?
20  A    No, I haven't.
21  Q    Have you taken the level one certification test in
22  Xactimate?
23  A    No, I haven't.
24  Q    You claim to have attended any professional
25  courses in Xactimate?

## Page 25

1  A    No, I haven't.
2  Q    Do you believe you're an expert in Xactimate
3  because of being self-taught?
4       MR. KAHN:  Objection.  Form.
5       THE WITNESS:  Absolutely.
6       MR. KAHN:  Give me a second to get my
7  objection out.
8  Q    (By Mr. Snodgrass)  What current Xactimate
9  software product are you proficient in?
10      MR. KAHN:  Objection.  Form.
11      THE WITNESS:  Xactimate 28.
12  Q    (By Mr. Snodgrass)  And do you hold a software
13  license from Xactimate for its software?
14  A    And by that, do you mean a license to operate the
15  program?
16  Q    Correct.
17  A    Yes, I do.
18  Q    How long have you held that licensure?
19  A    Well, that license is renewed on a yearly basis.
20  But I have had that license, renewing it each year, for
21  approximately 17 years now.
22  Q    I think you mentioned that you had a copy of your
23  report with you?
24  A    Yes.
25  Q    Can you take it out, please?

**Benchmark Reporting Agency
612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



Page 26

1  **A  (Witness complies)**
2      MR. KAHN:  He's got it.
3  Q    (By Mr. Snodgrass)  There's one last question on
4  the last subject matter.  Other than you telling us
5  you're an expert in Xactimate, is there any objective
6  information that exists to actually prove you're an
7  expert in Xactimate?
8      MR. KAHN:  Objection.  Form.
9      THE WITNESS:  Well, yes.  I think so.  I think
10 if a person was to take a look at how we operate our
11 business, the fact that we've been in business as a
12 restoration contractor for 40 years, using Xactimate on
13 a daily basis for at least 17 of those years, and not
14 just using it as a consulting expert, but using it as a
15 practicing general contractor, using it as a tool to
16 provide bid proposals to the marketplace, for which we
17 sign contracts to actually perform work, I think that
18 that would demonstrate that I am highly proficient in
19 using Xactimate, because it has been tested in the
20 marketplace to see if I use it competitively and
21 accurately, because I'm successful in landing
22 construction projects with it and making a profit while
23 using that program.
24 Q    (By Mr. Snodgrass)  To be fair, you're not the
25 only one at your company that uses Xactimate; right?

Page 27

1  **A  That's right.**
2  Q    Okay.  So how can we objectively determine whether
3  or not you're an expert if you've never passed any test
4  and hold no -- have never had any training on it.  How
5  do we objectively know, other than taking your word,
6  that it's made you wildly successful?
7      MR. KAHN:  Objection.  Form.  Asked and
8  answered.
9      THE WITNESS:  Yeah.  I think I answered that
10 for you in the sense that the ultimate test of a
11 person's abil ty to use this program properly can be
12 tested in the compet tive marketplace.  If you cannot
13 operate it well enough to be prof cient to get
14 everything into an estimate that's required in order to
15 make a profit, you're not going to stay in business very
16 long.  If you operate it conversely in the opposite
17 direction and put things in it that shouldn't be in
18 there, you're not going to be competitive in the
19 marketplace, and you're not going to secure work.
20      So being successful w th this program, using
21 it on a daily basis to run a successful construct on
22 company, is the ultimate test, in my opinion, as to a
23 person's proficiency in the program.
24 Q    (By Mr. Snodgrass)  Well, how wildly successful is
25 your company?  What's your gross profits per year?

Page 28

1      MR. KAHN:  Object on.  Form.
2      MR. SPRAGINS:  Who sa d he was wildly
3  successful?

Page 29

9  Q    (By Mr. Snodgrass)  So it might not be that you're
10 all that successful as a businessman, maybe you're just
11 successful as a testifier?
12      MR. KAHN:  Objection.  Form.  Sorry.  Go
13 ahead, Joe.
14      THE WITNESS:  I'm sorry.  You got cut off.
15 Q    (By Mr. Snodgrass)  Because we don't know what
16 amount of the gross revenue comes from your testifying,
17 it's really hard to determine whether or not you have a
18 successful company.
19      MR. KAHN:  Objection.  Form.
20      THE WITNESS:  Is that a statement or a
21 quest on?
22 Q    (By Mr. Snodgrass)  I'm just wondering, you're the
23 one that said the reason why you're proficient in
24 Xactimate is because your construction company is
25 prof table.  So I started asking you some questions

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 30

1 about the profitabil ty of your company.

2     You told me that your gross revenue and

3 prof ts include your work for State Farm as a testifying

4 expert. I've asked you a series of quest ons before

5 about how much money you made from State Farm, and you

6 told me you really couldn't say because you didn't keep

7 track.

8     So I'm wondering, how do we know that your

9 company is successful versus you being successful in

10 testifying on behalf of State Farm and getting them to

11 pay you a lot of money?

12     MR. KAHN: I'm going to object to form. It

13 mischaracterizes the last half hour of testimony. But

14 go ahead and answer.

15     THE WITNESS: Yeah. That's an incredibly

16 convoluted quest on with all sorts of port ons to the

17 quest on that mischaracterized my testimony. There's a

18 lot of non-sequ turs in there. So I'm going to have to

19 ask you to rephrase t.

20

21

22

23

24

25

## Page 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16 Q   (By Mr. Snodgrass) Where does your construct on

17 company operate?

18     MR. KAHN: Object on. Form.

19     THE WITNESS: It's domiciled in Oklahoma C ty.

20 Licensed in several different states. So it operates in

21 those states from time to time.

22 Q   (By Mr. Snodgrass) What percentage of your work

23 is in Oklahoma?

24 **A   I would say right now nearly 100 percent.**

25 Q   And the year before, what percentage of your work

## Page 32

1 was in Oklahoma?

2     MR. KAHN: Objection. Form.

3     THE WITNESS: Likewise probably close to 100

4 percent.

5 Q   (By Mr. Snodgrass) What about the year before

6 that?

7     MR. KAHN: Objection. Form.

8     THE WITNESS: I'm not sure. I'd probably have

9 to go back and check my records to be able to be

10 accurate on that.

11 Q   (By Mr. Snodgrass) When is the last time a big

12 percentage of your business was outside of Oklahoma?

13     MR. KAHN: Objection. Form.

14     THE WITNESS: What are you characterizing as a

15 big percentage?

16 Q   (By Mr. Snodgrass) Let's say more than 10

17 percent?

18     MR. KAHN: Objection. Form. Joe, just so

19 I -- are you asking about construction projects? Are

20 you asking about expert witness work?

21     MR. SNODGRASS: No. I'm not talking about

22 State Farm work. I'm talking about his construction

23 business.

24     THE WITNESS: Well, as best I can recall

25 sitting here, probably somewhere in the order of 10 to

## Page 33

1 15 years ago.

2 Q   (By Mr. Snodgrass) So you really don't get around

3 the country that much any more?

4     MR. KAHN: Objection. Form.

5     THE WITNESS: I'm not sure what you mean by

6 that.

7 Q   (By Mr. Snodgrass) Where do you advertise?

8     MR. KAHN: Objection. Form.

9     THE WITNESS: Did you say where do I

10 advertise?

11 Q   (By Mr. Snodgrass) Yes.

12 **A   I generally do not have to advertise.**

13 Q   And when you have, where do you advertise?

14 **A   Perhaps magazines, newspapers.**

15 Q   Where are these magazines and newspapers located?

16     MR. KAHN: Objection. Form.

17     THE WITNESS: Do you mean the ones that might

18 have advertisements in them?

19 Q   (By Mr. Snodgrass) Yes.

20 **A   I probably have some back in my office. Is that**

21 **what you mean?**

22 Q   No. I mean, where -- like, you advertise in a

23 newspaper. What newspaper?

24 **A   If I -- if I did use the newspaper at some time in**

25 **the past, it probably would have been here in Oklahoma**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 34

1 **City.**
2 Q And you said you advertised in magazines. What
3 magazines did you advertise in?
4 MR. KAHN: Objection. Form.
5 THE WITNESS: If I did advertise in magazines,
6 it would have been likely here in Oklahoma City.
7 Q (By Mr. Snodgrass) So tell me why again you're
8 keeping the Mississippi license active. Do you ever
9 advertise your services in Mississippi?
10 MR. KAHN: Objection. Form. Asked and
11 answered.
12 THE WITNESS: I don't recall a time when I
13 advertised in Mississippi.
14 Q (By Mr. Snodgrass) So why would you keep the
15 license? Why would you have an expectation that you'll
16 ever do work there again?
17 MR. KAHN: Objection. Form. Asked and
18 answered.
19 THE WITNESS: I just believe it's a good
20 business decision to keep the license. A license is
21 difficult to get. And I have earned that license with
22 going through the proper steps, testing that's required
23 and so forth. And so I've chosen to keep the license
24 over the years.
25 Q (By Mr. Snodgrass) For the test in Mississippi,

## Page 35

1 did you waive it under reciprocal licensure laws?
2 MR. KAHN: Objection. Form.
3 THE WITNESS: I did not.
4 Q (By Mr. Snodgrass) Did you take a test?
5 **A Yes.**
6 Q Was it a national standardized test or was it a
7 test specific for Mississippi?
8 MR. KAHN: Objection. Form.
9 THE WITNESS: I think it was, as best I can
10 recall, it was portions of each.
11 Q (By Mr. Snodgrass) You can't really remember one
12 way or the other?
13 MR. KAHN: Objection. Form. Not what he
14 said.
15 THE WITNESS: Well, as I said -- as I said
16 earlier in this deposition, I got the license
17 approximately 18 years ago, plus or minus. As best I
18 can recall what I did 18 years ago, I think the testing
19 was both, part national and part concerning Mississippi
20 itself, its laws, business laws, and so forth.
21 Q (By Mr. Snodgrass) All right. On Page 3 of your
22 May 21, 2018, opinion, you have some definitions that
23 you put forth. Do you see that?
24 MR. KAHN: Joe, do you want to go ahead and
25 mark this or no?

## Page 36

1 MR. SNODGRASS: Sure. If you want, I can have
2 the court reporter mark Exhibit A in the folder as
3 Exhibit 2 in the deposition. And I'll stop talking so
4 she can do that.
5 (Exhibit No. 2 was marked for identification
6 purposes)
7 Q (By Mr. Snodgrass) Page 3 of your report, you
8 purport to define RCV, ACV, and depreciation. Do you
9 see that?
10 MR. KAHN: Objection. Form.
11 THE WITNESS: Which paragraph are you pointing
12 to?
13 Q (By Mr. Snodgrass) The paragraph that starts, "It
14 is standard," all the way to the bottom of the page,
15 including footnotes 3 and 4.
16 **A Yes. I see that.**
17 Q Is it your understanding that this case involves a
18 challenge to the sufficiency of an actual cash value
19 payment?
20 **A Yes.**
21 Q So you would agree with me, would you not, that it
22 is critical before anybody renders an opinion that we
23 actually know what the phrase actual cash value means;
24 correct?
25 MR. KAHN: Objection. Form.

## Page 37

1 THE WITNESS: Yes. I think that's right.
2 Q (By Mr. Snodgrass) Okay. And you have testified
3 in another labor depreciation class action, have you
4 not, that a judge, and not you, should properly
5 interpret these words and phrases; correct?
6 MR. KAHN: Objection. Form.
7 THE WITNESS: I have testified in another
8 labor depreciation case, but I'm not sure what a judge
9 has or has not done.
10 Q (By Mr. Snodgrass) No. But you testified in
11 another labor depreciation class act on that a judge,
12 and not you, should properly interpret the phrase,
13 actual cash value; correct?
14 MR. KAHN: Objection. Form.
15 THE WITNESS: Probably as it pertains to legal
16 matters. I mean, what I'm doing here on Page 3 is
17 giving the reader an idea, based on my experience of
18 common practices and industry standards, working in the
19 business, what my understanding of actual cash value is.
20 Q Well, I will get to that. But first, I'm just
21 wondering whether or not you believe you, versus a
22 judge, should properly interpret the phrase, actual cash
23 value?
24 MR. KAHN: Objection. Form.
25 THE WITNESS: I think it depends on the venue

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 38

1  and the subject matter.  Of course if it's a quest on of
2  legal ty or the legal interpretation of that word, yes,
3  I think that would be best done by others.  But as far
4  as giving the reader an idea of how it works in the real
5  world out here, common pract ces and industry standards,
6  I feel very qualified from my experience to offer an
7  opinion as to what that -- what the interpretation of
8  actual cash value is.
9  Q    (By Mr. Snodgrass)  Okay.  Well, then let's get to
10  your expert interpretation of the phrase, actual cash
11  value.  Can you tell me, what the -- how State Farm
12  interprets actual cash value in the different
13  jurisdictions that you claim to be an expert in?
14        MR. KAHN:  Objection.  Form.
15        THE WITNESS:  I have not made a study, a
16  careful study, of what State Farm, how they define it on
17  various pol cies in various states in which I've worked.
18  All I can tell you is what I know from my daily travels
19  as a construction restoration contractor how that phrase
20  is readily interpreted in real word situat ons.
21  Q    (By Mr. Snodgrass)  Would you agree that it might
22  change depending on the insurance policy language
23  itself?
24        MR. KAHN:  Objection.  Form.
25        THE WITNESS:  I think the contractual

## Page 39

1  definition and maybe the legal definition may change.
2  But my understanding, as I have expressed here, about
3  what actual cash value is and how that is readily
4  interpreted on a daily basis in the market place, I've
5  expressed that on Page 3.
6  Q    (By Mr. Snodgrass)  I understand that.  So I'm
7  wondering if your interpretation is different than the
8  insurance policy interpretation, which one should we
9  use?
10        MR. KAHN:  Objection.  Form.
11        THE WITNESS:  I guess it would depend on which
12  insurance policy.  I would need to take a look at that
13  to try to give you an opinion on that.
14  Q    (By Mr. Snodgrass)  So before you render an
15  opinion on which interpretation you want to use, you
16  would agree you should first look at the insurance
17  policy?
18        MR. KAHN:  Objection.  Form.  Mischaracterizes
19  testimony.
20        THE WITNESS:  No.  I think I've stated it
21  pretty clearly in my report that what my understanding
22  is based on my experience of the term actual cash value.
23  Q    (By Mr. Snodgrass)  Okay.  Can you tell me whether
24  or not actual cash value is intended to be an amount of
25  money necessary to return the policyholder's home or

## Page 40

1  business back to where t was immediately before the
2  loss?  Is that what actual cash value is or is that
3  replacement cash value?  Or don't you know?
4        MR. KAHN:  I'm going to object to the form,
5  but can you read that question back to me, please?
6        (Court reporter read back)
7        MR. SNODGRASS:  You d dn't read it exactly
8  right.  I will state it again.
9  Q    (By Mr. Snodgrass)  Do you know if actual cash
10  value, or ACV, is intended to be an amount of money
11  necessary to return the policyholder's home or business
12  back to where it was before the loss?
13        MR. KAHN:  Object on.  Form.  Asks for a legal
14  conclus on.
15        THE WITNESS:  No.  I don't think that that's
16  an accurate characterization of what actual cash value
17  is readily interpreted as.
18  Q    (By Mr. Snodgrass)  Okay.  Do you know whether or
19  not replacement cost value, or RCV, is intended to be an
20  amount of money necessary to return the policyholder's
21  business or home back to where it was immediately before
22  the loss?  False?  Or you don't know?
23        MR. KAHN:  Object on.  Form.  Calls for a
24  legal conclus on.
25        THE WITNESS:  I do not think that that's an

## Page 41

1  accurate description of replacement cost value, as I
2  understand t.
3  Q    (By Mr. Snodgrass)  Okay.  So the standard of
4  returning the home back to its pre-loss condition, you
5  don't think that has any relationship to how RCV or ACV
6  should be interpreted; correct?
7        MR. KAHN:  Objection.  Form.
8        THE WITNESS:  Well, that's a different
9  quest on.  That's very broad.  Of course, what existed
10  pr or to the loss, what exists after the loss, what
11  needs to be done to repair the home, all of those things
12  factor into the formulation of RCV and ACV.
13  Q    (By Mr. Snodgrass)  So what is ACV intended to do?
14  What's its purpose, Mr. Berryman, as far as you know as
15  a contractor from Oklahoma City?  What's it supposed to
16  do?
17        MR. KAHN:  Objection.  Form.
18        THE WITNESS:  Well, could you be more specif c
19  about what it's supposed to do?
20  Q    (By Mr. Snodgrass)  Yeah.  I mean, what's it
21  supposed to accomplish?
22        MR. KAHN:  Objection.  Form.
23  Q    (By Mr. Snodgrass)  What's the purpose behind an
24  actual cash value payment?  Do you know?
25        MR. KAHN:  Objection.  Form.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 42

1  THE WITNESS: It may have several purposes.
2  Could you be more specif c?
3  Q  (By Mr. Snodgrass) No, I can't. If you don't
4  know, that's fine. But do you know what the purpose of
5  an actual cash value payment is?
6  MR. KAHN: Objection. Form.
7  THE WITNESS: The purpose in deriving an
8  actual cash value is to determine what the value of a
9  particularly damaged component, such as a roof, what was
10  the actual -- just says, what is the actual cash value
11  of that component as it was situated right before the
12  loss occurred.
13  Q  (By Mr. Snodgrass) Okay. Is actual cash value
14  supposed to be amount of money to return the
15  policyholder, that policyholder's home or business to
16  the condition it was immediately before the loss? Is
17  that what you are saying?
18  MR. KAHN: Objection. Form.
19  THE WITNESS: No. That's not what I'm saying.
20  Q  (By Mr. Snodgrass) So describe it again. What is
21  the purpose behind an actual cash value payment?
22  MR. KAHN: Objection. Form. Asked and
23  answered.
24  THE WITNESS: There may be several purposes.
25  But I can tell you in the industry how it is formulated,

## Page 43

1  it's a value that's derived to express the actual cash
2  value of a particular component, such as a roof on a
3  home, immediately before a loss occurred, such as a hail
4  loss from a hailstorm.
5  Q  (By Mr. Snodgrass) Well, I'm trying to figure out
6  what the purpose is. Because, you've come up -- correct
7  me if I'm wrong, but you've told me what you think ACV
8  is in your report in terms of a formula; correct?
9  MR. KAHN: Objection. Form.
10  THE WITNESS: I'm not so sure I would
11  characterize it that way. But, I mean, I have expressed
12  exactly what I mean on Page 3.
13  Q  (By Mr. Snodgrass) Well, you say that ACV is
14  calculated using the following general process, and then
15  you talk about multiplication, and talk about
16  depreciation factor or percentage to arrive at an ACV.
17  Do you see that formula? In fact, in footnotes 3 and 4,
18  you are using multiplication and subtract on to get to
19  actual cash value; correct?
20  MR. KAHN: Is that a quest on?
21  Q  (By Mr. Snodgrass) right. I'm just -- if he's
22  denying -- let's strike everything. Let's start over.
23  Are you claiming that there is a proper
24  formula, a proper math formula, to determine what actual
25  cash value is? Yes or no.

## Page 44

1  MR. KAHN: Objection. Form.
2  THE WITNESS: It's not that simple. I would
3  describe it more as a step-by-step process that does
4  include mathematics, as you described. I wouldn't term
5  it a formula. It's more of a process and taking certain
6  things into consideration, and going through it step by
7  step to arrive at what we call in the industry an actual
8  cash value.
9  Q  (By Mr. Snodgrass) Okay. And in this case, and
10  in your experience, State Farm uses Xactimate to run
11  these calculations; correct?
12  MR. KAHN: Objection. Form.
13  THE WITNESS: Well, definitely State Farm uses
14  Xactimate as a software estimating platform. And it's
15  involved, I'm sure, to some degree in these
16  calculations. Yes.
17  Q  (By Mr. Snodgrass) I don't understand what you're
18  saying. Is that a yes or a no?
19  MR. KAHN: Objection. Form.
20  THE WITNESS: I believe my answer is on the
21  record exactly like I intend it to be.
22
23
24
25

## Page 45

1
2
3
4
5
6
7
8  Q  Okay. In this case, was total intended by you to
9  include both labor and materials?
10  MR. KAHN: Objection. Form.
11  THE WITNESS: Yes.
12  Q  (By Mr. Snodgrass) Okay. So I want to talk to
13  you about that. So you and I have a disagreement about
14  the use of the word "total" in your second bullet point.
15  As it relates to the word "total," let me ask you this;
16  does Xactimate software allow different options as it
17  relates to this formula?
18  MR. KAHN: Objection. Form.
19  THE WITNESS: It depends on what software,
20  what generation. It's very difficult for me to answer
21  that question as you've posed t.
22  Q  (By Mr. Snodgrass) Okay. Well, do you know
23  whether or not Xactimate software has options to allow
24  the formula to change from what you've wr tten here on
25  Page 3?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 46

1    MR. KAHN: Objection. Form.
2    THE WITNESS: I'm not sure if t does or not.
3  Q    (By Mr. Snodgrass) So certainly you're not here
4  to say that Xactimate doesn't have different ways of
5  calculating actual cash value than you have; correct?
6    MR. KAHN: Objection. Form.
7    THE WITNESS: I'm not here to opine about what
8  Xactimate or Xactware can and cannot do.
9  Q    (By Mr. Snodgrass) Do you know off the top -- do
10  you consider yourself an expert on what Xactware can and
11  can't do as t relates to depreciation?
12    MR. KAHN: Objection. Form.
13    THE WITNESS: I do not consider myself to be
14  an expert on what Xactware can and cannot do. There may
15  be funct ons of the Xactimate program for which I have
16  not been involved and do not know what it can and cannot
17  do.
18  Q    (By Mr. Snodgrass) So certainly you're not saying
19  that Xactware, itself, doesn't have different
20  interpretations of actual cash value; correct?
21    MR. KAHN: Objection. Form.
22    THE WITNESS: I don't know that Xactware would
23  make such a determination. And again, I don't know what
24  Xactware can and cannot do.
25  Q    (By Mr. Snodgrass) That's why I think it's

## Page 47

1  important that we get somebody that's an Xactimate
2  expert. Because it seems to me, based on your
3  experience in the Oklahoma City geographic region, that
4  perhaps those folks use Xactimate one way to come up
5  with actual cash value, but perhaps folks in different
6  parts of the country use Xactimate a different way to
7  come up with their calculation of actual cash value. Is
8  that possible?
9    MR. KAHN: Objection. Form.
10    THE WITNESS: Well, certainly anything is
11  possible, but it's not probable.
12  Q    (By Mr. Snodgrass) Okay. Well, if I told you,
13  for example, that State Farm does not use Xactimate in
14  the way that you set forth on Page 3 in the State of
15  Alabama, would you believe me?
16    MR. KAHN: Objection. Form.
17    THE WITNESS: I don't know if I would or not.
18  Q    (By Mr. Snodgrass) Okay. Well, certainly have
19  you ever seen State Farm act unreasonable or have an
20  unreasonable interpretation in a case?
21    MR. KAHN: Objection. Form.
22    THE WITNESS: I don't think so.
23  Q    (By Mr. Snodgrass) So if State Farm interpreted
24  actual cash value different than you did in the State of
25  Alabama, you're not here to say that that interpretation

## Page 48

1  is unreasonable, are you?
2    MR. KAHN: Objection. Form. To what extent I
3  understand, it calls for a legal conclusion. You can
4  answer.
5    THE WITNESS: I'm not here in a posit on to
6  opine about State Farm's business practices whether they
7  are right, wrong, what have you, in the State of
8  Alabama.
9  Q    (By Mr. Snodgrass) Okay. I understand that. But
10  you're not here -- so you're not here to say that there
11  can't be more than one reasonable interpretation of
12  actual cash value, are you?
13    MR. KAHN: Objection. Form. Calls for legal
14  conclusion.
15    THE WITNESS: What I am able to tell you is
16  that based on my experience, 40 years as a general
17  contractor working in Oklahoma and other states, that my
18  understanding and description of ACV, as I've written at
19  the bottom of Page 3, is accurate, t's an industry
20  standard, and it's what I see done as a common pract ce.
21  Q    (By Mr. Snodgrass) But you don't even really
22  understand how the Xactimate software would do the
23  calculation different then you did; correct?
24    MR. KAHN: Objection. Form. Mischaracterizes
25  testimony.

## Page 49

1    THE WITNESS: Yes. That's mischaracterizing
2  what I sa d. I mean, I said that I'm not sure what
3  Xactware, the company, can and cannot do.
4  Q    (By Mr. Snodgrass) What about Xactimate software
5  itself? Can you change the definition of the formula
6  for the definition of ACV in Xactimate software?
7    MR. KAHN: Object on.
8    THE WITNESS: You may be able to do that, yes,
9  on certain vers ons.
10  Q    (By Mr. Snodgrass) Can you do it on Vers on 28?
11    MR. KAHN: Object on. Form.
12    THE WITNESS: I'm not sure.
13  Q    (By Mr. Snodgrass) Have you ever analyzed whether
14  or not there's different vers ons of the ACV formula in
15  Xactimate?
16    MR. KAHN: Object on. Form.
17    THE WITNESS: I don't think there's a
18  different formula, as you describe t, inside Xactimate.
19  Q    (By Mr. Snodgrass) Okay. Well, do you understand
20  that Xactimate might apply different depreciat on
21  settings in arriving at actual cash value?
22    MR. KAHN: Object on. Form.
23    THE WITNESS: Well, it isn't the program that
24  applies anything. It's the operator that would be
25  making some sort of distinction.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 50

1    Q    (By Mr. Snodgrass)  Right.  But the program allows
2    you and has different interpretations of the formula;
3    right?  An operator can put in whatever interpretation
4    he or she wants to calculate ACV as it relates to
5    depreciation settings; correct?
6         MR. KAHN:  Objection.  Form.
7         THE WITNESS:  I'm not sure if it gives this
8    wide of a choice selection as you just described or not.
9    Q    (By Mr. Snodgrass)  What depreciation settings
10   does Xactimate version 28 have?
11        MR. KAHN:  Objection.  Form.
12        THE WITNESS:  I would have to review that.  I
13   have not reviewed that for this matter.
14   Q    (By Mr. Snodgrass)  I understand that.  But you --
15   I know that you testified earlier you were an Xactimate
16   expert.  I think later you said maybe you weren't an
17   Xactimate expert.  But let me just ask you this, we're
18   sitting right here, you issued an expert report, it
19   touches on Xactimate software, it touches on
20   depreciation, it touches on labor depreciation.  Do you,
21   as an alleged expert, know what depreciation settings
22   are in Xactimate 28?
23        MR. KAHN:  Objection.  Form.
24        THE WITNESS:  When you say, know what the
25   settings are, I'm not sure what you mean by that.  Like,

## Page 51

1    settings on my own computer right now at this moment?
2    Or what the options are?  What do you mean by that?
3    Q    (By Mr. Snodgrass)  What options do you have for
4    depreciation settings in Xactimate 28?
5         MR. KAHN:  Objection.  Form.
6         THE WITNESS:  As I said before, I would need
7    to go to my office to check that in detail to be able to
8    answer your quest on.
9    Q    (By Mr. Snodgrass)  You don't know one way or the
10   other?
11        MR. KAHN:  Objection.  Form.  Mischaracterizes
12   his testimony.
13        THE WITNESS:  Yes.  I stand by my previous
14   answer.  I can answer that question, but I would have to
15   study the program itself to be able to give you an
16   answer.
17   Q    (By Mr. Snodgrass)  Do you know whether or not one
18   of Xactware's options is to interpret actual cash value,
19   just like the Plaintiffs contend in this case?
20        MR. KAHN:  Objection.  Form.
21        THE WITNESS:  As I said before, I'm not sure.
22   It's something that I would have to check to verify.
23   Q    (By Mr. Snodgrass)  Have you ever heard the word
24   indemnity?
25   **A    Yes.**

## Page 52

1    Q    What does the word "indemn ty" mean to you?
2         MR. KAHN:  Object on.  Form.
3         THE WITNESS:  Well, as I sa d before, I am not
4    here to opine as an attorney or the legal implications
5    of that word.  But as I understand it as a contractor,
6    as a lay person, I would interpret it to mean to make a
7    person whole in case of a loss.
8    Q    Would that mean returning them to their same
9    cond t on as it was immediately before the loss?
10        MR. KAHN:  Object on.  Form.
11        THE WITNESS:  Are you now extending that word
12   to property coverage?
13   Q    (By Mr. Snodgrass)  I'm just -- yeah.  I'm not
14   talking about property coverage specif cally.  I'm just
15   talking about indemnity as  t relates to a property
16   loss?
17        MR. KAHN:  Object on.  Form.
18        THE WITNESS:  I thought you were asking for a
19   general interpretation of the word indemnity.
20   Q    (By Mr. SNODGRASS)  I was asking for your
21   interpretat on of the word indemn ty.
22   **A    My general interpretation as a contractor working**
23   **in the industry is that it means to correct something**
24   **and make it right, or make a person whole from a loss.**
25   Q    And do you believe that your interpretation of the

## Page 53

1    word indemnity has the same meaning as the term actual
2    cash value?
3         MR. KAHN:  Objection.  Form.  Calls for legal
4    conclusion.
5         THE WITNESS:  I'm not an attorney, and I'm not
6    a claim's handling expert, or a policy interpretation
7    expert.  So I don't feel qualified to answer that
8    question.
9    Q    (By Mr. Snodgrass)  I'm not asking you as an
10   attorney or -- you have come here and said you've got an
11   interpretation of ACV based on your broad experience,
12   and you've got insurance restoration business or
13   something along those lines in Oklahoma City.  So I'm
14   wondering, you've given me your definition of indemnity.
15   I'm asking whether or not your definition of indemnity
16   matches your definition of actual cash value.  Yes, or
17   no.
18        MR. KAHN:  Objection.  Form.  Asked and
19   answered.
20        THE WITNESS:  I'm not sure.
21   Q    (By Mr. Snodgrass)  Would that make a difference
22   to you?
23        MR. KAHN:  Objection.  Form.
24        THE WITNESS:  If indemnity is the same thing
25   as actual cash value?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 54

1  Q   (By Mr. Snodgrass)  Yes.
2  **A   Well, in my business, all I'm trying to define for**
3  **the reader, or for those interested parties, would be**
4  **out here in the real world where people define actual**
5  **cash value on a day-to-day basis working in and around**
6  **the industry as common practice and industry standard,**
7  **that's what I've scribed here on Page 3.  Whether that's**
8  **the same as indemnity, I'm really not qualified to draw**
9  **that distinction.**
10  Q   So if I was to say -- if I was to ask you whether
11  or not the pol cyholder's interpretat on of ACV is
12  closer to indemn ty than your interpretation of ACV, you
13  would have no opin on one way or the other?
14       MR. KAHN:  Objection.  Form.
15       THE WITNESS:  What policy holder and what is
16  their definition?
17  Q   (By Mr. Snodgrass)  Do you know what the
18  policyholder's defin t on of ACV is in this case?
19       MR. KAHN:  Object on.  Form.
20       THE WITNESS:  What policy holder?
21  Q   (By Mr. Snodgrass)  Ms. Mitchell.
22  **A   What her interpretation is?**
23  Q   Yes.
24  **A   I read her deposition.  I didn't see her**
25  **interpretation in there.**

## Page 55

1  Q   Well, you read her pleadings in the case in
2  response to State Farm's mot on to dismiss; right?
3  **A   I likely did.  But if it's in there, I did not**
4  **focus on it.**
5  Q   Do you know whether or not the purpose of actual
6  cash value is to make -- is to form complete indemnity?
7       MR. KAHN:  Objection.  Form.  Calls for legal
8  conclusion.
9       THE WITNESS:  Again, I'm not an attorney.  I
10  can't -- I'm not in a pos t on to opine about the legal
11  defin t ons or nature of those words, as well as I'm not
12  a person here to interpret the policy itself.
13  Q   (By Mr. Snodgrass)  What depreciat on settings
14  should be used in Xactimate 28 to calculate the amount
15  of actual cash value in your world?
16       MR. KAHN:  Objection.  Form.
17       THE WITNESS:  I believe that both labor and
18  nonmaterial depreciation should be taken when
19  formulating an estimate.
20  Q   (By Mr. Snodgrass)  Do you know how many insurance
21  companies interpret t the way you do?
22       MR. KAHN:  Objection.  Form.  Mischaracterizes
23  testimony.
24       THE WITNESS:  No.  I don't know that.
25  Q   (By Mr. Snodgrass)  You're certainly not here then

## Page 56

1  to testify that a majority of insurance companies
2  calculate ACV like you recommend in this report;
3  correct?
4       MR. KAHN:  Objection.  Form.
5       THE WITNESS:  Well, what I can tell you is
6  that in all my experience as a restoration contractor
7  working in and around many different carriers, I see
8  material and nonmaterial depreciation being taken on a
9  regular and routine customary practice basis.
10  Q   (By Mr. Snodgrass)  Have you seen it done where
11  it's not done?
12       MR. KAHN:  Objection.  Form
13       THE WITNESS:  I may have on occasion.
14  Q   (By Mr. Snodgrass)  So you understand in the
15  insurance industry there are two competing definitions
16  then?
17       MR. KAHN:  Objection.  Form.
18       THE WITNESS:  I don't know that -- I don't
19  know that that's accurate.  I mean, I can only tell you
20  what I've seen in the majority of the times, both
21  material and nonmaterial depreciation is taken.
22  Q   (By Mr. Snodgrass)  And in some cases it's not;
23  correct?
24       MR. KAHN:  Objection.  Form.
25       THE WITNESS:  As I said, on rare occasion it

## Page 57

1  may not have been.
2  Q   (By Mr. Snodgrass)  What carriers are you familiar
3  with that do not depreciate labor?
4       MR. KAHN:  Objection.  Form.
5       THE WITNESS:  I don't know of one.
6  Q   (By Mr. Snodgrass)  What cases have you seen?  Who
7  are the carriers and when you've seen them?
8       MR. KAHN:  Objection.  Form.
9       THE WITNESS:  It happens so rarely that I
10  don't remember when I saw it.  And I don't remember the
11  carrier that was involved.
12  Q   (By Mr. Snodgrass)  Do you get involved in
13  disputes?
14       MR. KAHN:  Sorry, Joe.  Whenever -- I don't
15  want to interrupt, but whenever you get a minute for a
16  break, if we can take one, t would be good.  But go
17  ahead.
18       THE WITNESS:  I'm sorry.  Could you restate
19  that?
20  Q   (By Mr. Snodgrass)  One thing about your formula
21  that confuses me is that you didn't give any temporal
22  informat on.  In other words, you described the process
23  for how you calculate actual cash value, but you haven't
24  described anywhere in your report when actual cash value
25  is supposed to be calculated.  W th your Oklahoma C ty

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 58

1 area experience, when are you supposed to calculate
2 actual cash value?
3      MR. KAHN: Objection. Form.
4      THE WITNESS: Do you mean as an insurance
5 carrier, when are you supposed to?
6 Q    (By Mr. Snodgrass) Well, no. I mean, based on
7 your experience, when are you supposed to calculate
8 actual cash value?
9      MR. KAHN: Objection. Form. Calls for a
10 legal conclusion.
11      THE WITNESS: When is who supposed to do it?
12 Q    (By Mr. Snodgrass) Well, I guess -- I don't know.
13 Let's take it one step at a time. Maybe you don't know.
14 Who calculates actual cash value usually?
15      MR. KAHN: Objection. Form.
16      THE WITNESS: Many times it's the insurance
17 adjuster. On occasion the restoration contractor might
18 be involved in calculating it.
19 Q    (By Mr. Snodgrass) Okay. Let's just talk about
20 the insurance adjuster. When, in your Oklahoma City
21 experience, does an insurance adjuster calculate actual
22 cash value?
23      MR. KAHN: Objection. Form
24      THE WITNESS: In the process of adjusting the
25 claim.

## Page 59

1 Q    (By Mr. Snodgrass) I understand that. But when
2 is that supposed to happen?
3      MR. KAHN: Objection. Form.
4      THE WITNESS: I do not know the legal or
5 contractual requirements of when an insurance carrier is
6 supposed to do that.
7 Q    (By Mr. Snodgrass) Well, isn't that critical to
8 understanding your opinions? Because you render a lot
9 of opinions in this case that talk about facts and
10 circumstances long after the loss. So I guess I'm kind
11 of confused. Is actual cash value supposed to be
12 calculated as of the date of the loss? Or is it
13 something that can change over the years?
14      MR. KAHN: Objection. Form. Calls for a
15 legal conclusion.
16      THE WITNESS: Yeah. I think there's two or
17 three questions in there. Could you break it down a
18 little bit?
19 Q    (By Mr. Snodgrass) When you do this process of
20 calculating ACV, are you supposed to use a certain time
21 period in making that calculation?
22      MR. KAHN: Objection. Form. Calls for a
23 legal conclusion.
24      THE WITNESS: Again, I think that goes to my
25 answer before. I do not know the contractual or legal

## Page 60

1 responsibilities of an insurance carrier to calculate
2 actual cash value.
3 Q    (By Mr. Snodgrass) So you don't know, for
4 example, whether or not you're just supposed to look at
5 the circumstances on the date of the loss, or whether
6 you're allowed to look at circumstances months or years
7 after the fact; correct?
8      MR. KAHN: Object on. Form.
9      THE WITNESS: You mean as to when  t has to be
10 calculated?
11 Q    (By Mr. Snodgrass) Yeah.
12 **A    Again, I do not know what the legal requirements**
13 **are on the time frame in which ACV has to be calculated.**
14 **I know neither the legal requirements nor the**
15 **contractual requirements.**
16 Q    Well, can actual cash value change over time? In
17 other words, let's say I have a loss on January 1st,
18 2017, can that ACV change over the years of that loss?
19      MR. KAHN: Object on. From. Incomplete
20 hypoth cal.
21      THE WITNESS: Well, I'm a l ttle b t hung up
22 on when you say years after the loss. I'm not sure what
23 you mean by that.
24 Q    (By Mr. Snodgrass) In other words, can the actual
25 cash value of a January 1st loss be $10,000 on March

## Page 61

1 1st, and be $12,000 on June 1st, and be $13,000 on
2 August 1st, and be $7,000 on December 1st? In other
3 words, does actual cash value flow and change over time?
4      MR. KAHN: Objection. Form. Incomplete
5 hypothetical.
6 Q    (By Mr. Snodgrass) If you don't know,  t's fine.
7      MR. KAHN: Let him answer the question.
8      THE WITNESS: It certainly can change over
9 time. In my experience as a restoration contractor
10 working in the industry, it typically does change over
11 time, depending on the circumstances which have to be
12 examined on a claim-by-claim basis.
13 Q    (By Mr. Snodgrass) Okay. And so some of the
14 circumstances that might change actual cash value of a
15 January 1st loss are, for example, if the labor rate
16 goes through the roof in June, that might drive the
17 actual cash value January 1st loss up; correct?
18      MR. KAHN: Objection. Form. Incomplete
19 hypothetical.
20      THE WITNESS: I haven't ever experienced that.
21 I've not seen a labor rate go up that in and of itself
22 affected actual cash value.
23 Q    (By Mr. Snodgrass) Well, sure. But you
24 understand that in a catastrophe labor rates might be
25 driven up in a certain geographic area; correct?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 62

1     **A**   That can certainly happen from time to time.
2   Q   Right. So if we have a January 1 loss and don't
3 get around to repairing it for a few months then a
4 catastrophe hits an area, that might drive the labor
5 rate up in a market; correct?
6     MR. KAHN: Objection. Form.
7     THE WITNESS: As I said before, a catastrophe
8 may change the labor rates in a various locale.
9   Q   (By Mr. Snodgrass) Right. So under your
10 interpretation, you can have an actual cash value loss
11 of $10,000 on January 1st, 2017, but based on
12 circumstances after the loss, that actual cash value
13 might go up or down; right?
14     MR. KAHN: Objection. Form. Asked and
15 answered.
16     THE WITNESS: Yes. I think it's depends on
17 the circumstances following the loss. There are a lot
18 of variables in there in your question. That would have
19 to be analyzed on a claim-by-claim basis.
20   Q   (By Mr. Snodgrass) Right. So if for example
21 somebody has a $10,000 loss on January 1, maybe by
22 October 1 it's really not $10,000 any more, it's $9,000;
23 right? According to you?
24     MR. KAHN: Objection. Form. Incompetent
25 hypothetical.

## Page 63

1     THE WITNESS: Well, as we've said, there might
2 be some circumstances in there that would -- that would
3 change the actual cash value up or down, or perhaps it
4 would be the same. That would have to be examined on a
5 claim-by-claim basis.
6   Q   (By Mr. Snodgrass) Right. So you're opin on is
7 because over time actually cash value can go up and down
8 over the years of a January 1, 2017, loss, t's really
9 impossible for the plaintiff's to have their claim;
10 right? Because all these different things can happen
11 that can change the ACV over the years; right?
12     MR. KAHN: Objection. Form. Mischaracterizes
13 testimony.
14     THE WITNESS: Yeah. I'm not sure I understand
15 your quest on.
16   Q   (By Mr. Snodgrass) Well, give me some examples
17 about how actual cash value of a said January 1st, 2017,
18 loss, how that can change over the years?
19     MR. KAHN: Objection. Form.
20     THE WITNESS: Well, I'm really hung up on when
21 you continue to say over the years, because you're
22 recitation of the different months did not even go over
23 one year. So how does that square with over the years?
24 Can you clarify that?
25   Q   (By Mr. Snodgrass) Sure. I'm just asking you,

## Page 64

1 can actual cash value of a loss change over the years?
2     MR. KAHN: Objection. Form. Asked and
3 answered.
4     THE WITNESS: I would be comfortable saying,
5 as I have said, actual cash value can change depending
6 on certain circumstances that are claim specific, and
7 that that can happen over time. Yes. That occurs.
8   Q   (By Mr. Snodgrass) Give me some of the
9 circumstances that can change the actual cash value over
10 time.
11     MR. KAHN: Objection. Form.
12     THE WITNESS: Well, one would be the -- once
13 the project work starts, add tional damages which were
14 unforeseen at the time that the first initial estimate
15 was written, additional damages are discovered and need
16 to be added to the claim in the form of a supplemental
17 estimate.
18   Q   (By Mr. Snodgrass) Okay. So t can go up.
19 Actual cash value can go up. What other circumstances
20 might change an actual cash value calculation over the
21 year?
22     MR. KAHN: Objection. Form.
23     THE WITNESS: Perhaps an item that was
24 originally in an estimate, estimated to be, let's say,
25 $75. We'll say the cleaning of a bathtub after a fire

## Page 65

1 had occurred, that it was later learned that the bathtub
2 needed to be replaced for $750, that would cause the
3 actual cash value to change.
4   Q   (By Mr. Snodgrass) Another example of it going
5 up. So could market prices change the actual cash value
6 amount over the years?
7     MR. KAHN: Objection. Form.
8     THE WITNESS: Well, I mean, it kind of depends
9 on how -- a variable in there that we don't have control
10 over is, how long it might take for a pol cyholder to
11 actually get started with the work.
12   Q   (By Mr. Snodgrass) It's a good one. Okay. Good
13 example. So if a policyholder doesn't start working on
14 the loss right away, that can change the actual cash
15 value amount over the years; right?
16     MR. KAHN: Objection. Form.
17     THE WITNESS: Again, I'm still hung up on your
18 use of over the years. That's really not an appropriate
19 characterizat on.
20   Q   (By Mr. Snodgrass) Is there a point in time when
21 actual cash value becomes fixed or can it change over
22 years?
23     MR. KAHN: Objection. Form.
24   Q   (By Mr. Snodgrass) In your opinion and under your
25 formula, is there a 12-month limitation on actual cash

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 66

1  value changes?  Or what is the temporal limitations that
2  you believe exist?
3  　　　MR. KAHN:  Objection.  Form.
4  　　　THE WITNESS:  I don't know.
5  Q   (By Mr. Snodgrass)  Okay.  So actual cash value --
6  how far out do you know for sure it can change?  Five
7  years?  The actual cash value change over five years?
8  Or is that too far out?
9  　　　MR. KAHN:  Objection.  Form.
10  　　　THE WITNESS:  Well, there may be provisions of
11  the policy that -- among carriers that govern that.  And
12  that time limit or time frame is beyond what I'm
13  qualified to testify about.
14  Q   (By Mr. Snodgrass)  Okay.  So you believe there
15  might be a time limit, but you're not really sure?
16  　　　MR. KAHN:  Objection.  Form.  Mischaracterizes
17  testimony.
18  　　　THE WITNESS:  The policies in effect may
19  govern that.  But that's not something that I focused
20  on.
21  　　　MR. KAHN:  John, would this be a good time for
22  a break now?
23  　　　MR. SNODGRASS:  Couple more questions.
24  Q   (By Mr. Snodgrass)  Based on your Oklahoma City
25  experience, how far out has it gone in your experience

## Page 67

1  with the actual cash value changing?  In other words,
2  have you seen actual cash value change over three or
3  four or ten years?  What have you seen in your
4  experience?
5  　　　MR. KAHN:  Objection.  Form.
6  　　　THE WITNESS:  The vast majority of my
7  experience in working with insurance-related losses is
8  that that time frame at which the ACV might change, is
9  primarily within the first six months following a loss.
10  Q   (By Mr. Snodgrass)  Fine.  I'm getting at the
11  majority of cases --
12  　　　MR. KAHN:  Joe, hang on.  Let him finish his
13  answer.
14  　　　THE WITNESS:  As I was trying to say, the
15  majority of those -- if the ACV is going to have any
16  sort of movement at all, that that would play itself out
17  in the first six months, and then from that point it
18  continues to taper off.  Probably it goes to zero or
19  near zero at about two years.
20  Q   (By Mr. Snodgrass)  So the furthest you've seen
21  ACV change is over a period of two years?
22  　　　MR. KAHN:  Objection.  Form.
23  　　　THE WITNESS:  I don't know.  I mean, I haven't
24  ever really taken notice of that to be able to give you
25  an answer.

## Page 68

1  Q   (By Mr. Snodgrass)  So ACV could change even
2  longer than two years perhaps?
3  　　　MR. KAHN:  Objection.  Form.
4  　　　THE WITNESS:  As I sa d, I really can't give
5  you much insight on that because I haven't focused on
6  that as a contractor.
7  Q   (By Mr. Snodgrass)  Well, the reason I'm focusing
8  on it is you render some opin ons in this case, and we
9  talk about some claim files where you have an ACV
10  changing over time.  And I'm just wondering, in your
11  interpretat on, how far out you that can go.  But it
12  doesn't sound like you know for sure there's a lim t.
13  　　　MR. KAHN:  Objection.  Form.  Mischaracterizes
14  his testimony.  You can answer.
15  　　　THE WITNESS:  Is that a question?
16  Q   (By Mr. Snodgrass)  Yes.
17  A   What is the question?
18  Q   You don't know how many years out ACV can change,
19  as you sit here today; right?
20  　　　MR. KAHN:  Objection.  Form.  Asked and
21  answered.
22  　　　THE WITNESS:  I think I've already answered
23  that.
24  Q   (By Mr. Snodgrass)  Then please tell me, you don't
25  know how many years ACV can change; correct?

## Page 69

1  　　　MR. KAHN:  Objection.  Form.  Asked and
2  answered.
3  　　　THE WITNESS:  As I told you before, I do not
4  interpret the insurance policies.  I do not know what
5  provisions are in there that would govern how long
6  into the future that the ACV may change.  So I'm really
7  not in a position to answer that.
8  　　　MR. SNODGRASS:  Okay.  That's good.  We can
9  take a break.
10  　　　(A break was had; after which the following
11  　　　took place:)
12  Q   (By Mr. Snodgrass)  Mr. Berryman, can you please
13  turn to Page 17 of your opinion?
14  A   Yes.
15  Q   If I can try to explain the format of your report.
16  It looks to me like you have primary opinions, and then
17  you list subsidiary opin ons.  At least I think that's
18  how  t is because you have an Opinion 1, then you have
19  subsidiary opin ons through 1.7.9.  And then for Opin on
20  2, for example, you have subsidiary opin ons through 2.7
21  and so on.  Do I have that generally right?
22  A   Yes.  Those could be considered to be subsidiary
23  opinions, or further basis in support of the main
24  opinions, such as Opinion Number 1 or Opinion Number 2.
25  Q   Okay.  Now, looking at Opin on Number 1, I'm

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 70

1  assuming a few things, and you please correct me if I'm
2  wrong.  I'm assuming for Opinion 1 you are using your
3  own defin t ons of ACV, RCV, and depreciation for
4  Opin on 1; is that correct?
5      MR. KAHN:  Objection.  Form.
6      THE WITNESS:  Yes.  I am using the -- as I use
7  the words ACV, RCV in the Opin on Number 1, I am using
8  those according to the definition as I understand them.
9  How they are used on a day-to-day basis in the real word
10  where I do my work on a daily basis.
11  Q     (By Mr. Snodgrass)  And that specifically you're
12  using the same definitions used on Page 3 that we've
13  discussed before; correct?
14  **A     If you want to call that Page 4, definitions or**
15  **characterizations and/or processes by which they are**
16  **established, then yes, they are related to that.**
17  Q     Well, I just want to make sure that I understand.
18  First off, t's Page 3 where you have these definitions.
19  I think I forgot to ask you.  Are the opin ons you give
20  for RCV, ACV, and depreciat on on Page 3, are they the
21  same terms as you define them in Opinion 1?
22      MR. KAHN:  Objection.  Form.
23      THE WITNESS:  The ones I describe on Page 3,
24  the processes, how they are arrived at, what they are,
25  and how I speak about them, starting on Page 17 with

## Page 71

1  Opinion 1 and opinions thereafter, yes, I mean them to
2  be the same or very similar.
3  Q     (By Mr. Snodgrass)  And in particular, in addition
4  to the way you define ACV, RCV, and depreciation,
5  Opinion 1 also relies upon your theory that actual cash
6  value can change over the years; correct?
7      MR. KAHN:  Objection.  Form.
8      THE WITNESS:  Well, again, I don't know that
9  it changes over the years.  But I do believe that RCV
10  and ACV does change as ongoing until completion.
11  Q     (By Mr. Snodgrass)  Well, I think you said that
12  ACV can change up to two years, in your experience;
13  correct?
14      MR. KAHN:  Objection.  Form.  Mischaracterizes
15  the testimony.
16      THE WITNESS:  Yes.  I think I characterized it
17  differently than that but.
18  Q     (By Mr. Snodgrass)  Well, let me ask you this, are
19  you still of the opinion after lunch as you were before
20  lunch that ACV can change over time?
21      MR. KAHN:  Objection.  Form.
22      THE WITNESS:  Yes, I am.
23  Q     (By Mr. Snodgrass)  Okay.  Does Opinion 1, is it
24  based upon your opinion that ACV can change over time?
25      MR. KAHN:  Objection.  Form.

## Page 72

1      THE WITNESS:  I'm kind of hung up on you
2  saying is  t based on it.  I mean,  t does take into
3  consideration my experience that ACV does change over
4  time.

## Page 73

11      MR. SNODGRASS:  Move to strike as
12  non-responsive.
13  Q     (By Mr. Snodgrass)  Mr. Berryman, I'm asking you,
14  does Opinion 1, is it based upon your theory that actual
15  cash value can change over the years?  Yes or no?
16      MR. KAHN:  Objection.  Form.  Asked and
17  answered.
18      THE WITNESS:  Yes.  I think I've already
19  answered that.
20  Q     (By Mr. Snodgrass)  So is it a yes or a no?  Or
21  you can't answer yes or no?
22      MR. KAHN:  Objection.  Form.  Asked and
23  answered.
24      THE WITNESS:  It's the answer that I gave
25  before when you asked that question.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 74

1 Q   (By Mr. Snodgrass)  And I don't know.  Is that
2 answer an affirmative or in the negative or something
3 else?
4       MR. KAHN:  Objection.  Form.
5       THE WITNESS:  It's what I answered before.  We
6 could have the court reporter read it back.
7 Q   (By Mr. Snodgrass)  I don't want the court
8 reporter to read back.  I'm trying to understand.
9 That's why I asked you another question.  Is Opinion 1
10 based upon your theory that ACV can change over the
11 years.  Yes or no?  Or you don't know what your opinion
12 is?
13       MR. KAHN:  Objection.  Form.  Asked and
14 answered.  And it's argumentative.
15       THE WITNESS:  It's neither of those three
16 choices that you gave me.
17 Q   (By Mr. Snodgrass)  Do you know what your opinion
18 is in Opinion 1?
19 A   Yes.  Would you like for me to read it?
20 Q   No.  I would like to know whether or not it is
21 based in whole or in part on your theory that actual
22 cash value can change over the years.
23       MR. KAHN:  Objection.  Form.  Asked and
24 answered.
25       THE WITNESS:  Well, the changing of RCV and

## Page 75

1 ACV over time as additional informat on is brought forth
2 during the claims process is not a theory.  It's what
3 I've actually seen on a day-to-day basis working in the
4 industry.
5 Q   (By Mr. Snodgrass)  I say theory, I mean --
6 A   I'm not finished with my answer yet.  So first of
7 all it's not a theory.  And then secondly, that opinion
8 does take into account, in part, my experience that RCV
9 and ACV can change over time as new information comes
10 forth on what actual costs really are, of what the
11 actual damages really are.  When further information is
12 put forth on what will actually be required to restore
13 the property, that can cause changes in the RCV and the
14 originally estimated RCV and the originally estimated
15 ACV.
16 Q   Let me ask you a quest on; does what a
17 policyholder actually spends to repair his or her
18 property affect the suff ciency of the actual cash value
19 payment in your mind?
20       MR. KAHN:  Objection.  Form.  Calls for legal
21 conclusion.
22       THE WITNESS:  Well, again, I'm opining as a
23 contractor.  But based on my experience working in and
24 around State Farm as well as other carriers, t's my
25 understanding, day-to-day, that they pay to a

## Page 76

1 policyholder the reasonable and necessary costs of what
2 it -- the actual reasonable and necessary costs to
3 restore damages to their property.  So that's the
4 real -- the real test as to whether or not property
5 amount of money has been provided to restore the
6 property or not.  Not so much on the estimate.  Because
7 as I've said repeatedly in my report, the estimate is
8 exactly that, it's an estimate.  It's a starting point.
9 Q   (By Mr. Snodgrass)  Let me read a sentence to you
10 and you can tell me whether you agree with this opinion
11 or disagree with this opinion.  Quote:  What the insured
12 actually spends to repair its property does not affect
13 its right to recover the actual cash value of its loss,
14 as actual cash value is not calculated based upon what
15 the insured ultimately pays to repair its property.
16 Unquote.
17       I can read that back if you want.
18 A   Could you?
19 Q   Sure.  Quote:  What the insured actually spends to
20 repair its property does not affect its right to recover
21 the actual cash value of its loss.  As actual cash value
22 is not calculated bossed upon what the insured
23 ultimately pays to repair its property, unquote.
24       Do you agree with that opinion or disagree
25 with that opinion?

## Page 77

1       MR. KAHN:  Objection.  Form.  Calls for a
2 legal conclusion.
3       THE WITNESS:  Yes.  I think it calls for me to
4 try to interpret someone's policy.  But I can tell you
5 that my experience on a day-to-day basis is that State
6 Farm and other carriers endeavor to pay the necessary
7 and reasonable costs to restore the damages.
8 Q   (By Mr. Snodgrass)  Okay.  So does what a
9 policyholder actually pay affect his or her right to an
10 actual cash value payment?  Yes or no or you don't know?
11       MR. KAHN:  Objection.  Form.  Calls for a
12 legal conclusion.
13       THE WITNESS:  Too many variables in there when
14 you talk about somebody's rights.  I don't know what
15 their rights are under a policy.
16
17
18
19
20
21
22
23
24
25

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 78

1

2    Q    (By Mr. Snodgrass)  So that isn't your opinion

3    that the actual costs of repair can determine the actual

4    cash value of a loss?

5         MR. KAHN:  Objection.  Form.

6         THE WITNESS:  It's my understanding that

7    actual cash value is determined very early on, most of

8    the time on an estimated basis before the work ever

9    starts.  But then after the work starts and the real

10   costs come in, then the real cost becomes, in my

11   experience, a more definitive statement of what it

12   actually took to repair the property and restore the

13   property for the policyholder.

14   Q    (By Mr. Snodgrass)  That's what I'm asking.  I'm

15   asking you, does that affect the right to recover actual

16   cash value payment?  Yes or no or you don't know?

17        MR. KAHN:  Objection.  Form.  Calls for legal

18   conclusion.

19        THE WITNESS:  Again, I'm not here to opine

20   about what policyholder's rights are under a particular

21   policy.

22

23

24

25

## Page 79

1

2

3    Q    So you know that we've challenged the sufficiency

4    of the initial actual cash value payment for that

5    policyholder; right?

6         MR. KAHN:  Objection.  Form.  Calls for legal

7    conclusion.

8         THE WITNESS:  I suppose you have.

9    Q    (By Mr. Snodgrass)  Okay.  So I'm wondering in

10   your world, based on all your experience, what is the

11   policyholder entitled to?  Full actual cash value

12   payment for the actual costs of repairs, or something

13   else?

14        MR. KAHN:  Objection.  Form.  Calls for legal

15   conclusion.

16        THE WITNESS:  As I've said, I'm not in a

17   position to interpret the policies or the legality of

18   any matter.  I'm simply saying from my experience on a

19   day-to-day basis with State Farm and other carriers,

20   working out in what I'm going to call the "real world,"

21   as a construction restoration person, what I see

22   routinely done is that the actual cost of the repair is

23   what takes precedence over having fully paid for the

24   restoration of property.

25   Q    (By Mr. Snodgrass)  That wasn't my question.  My

## Page 80

1    quest on was, are you saying that actual cost takes

2    precedent over the actual cash value calculation?

3         MR. KAHN:  Object on.  Form.  Calls for legal

4    conclus on.

5         THE WITNESS:  When you say actual cash value,

6    are you talking about what was estimated very early on

7    in the loss?

8    Q    (By Mr. Snodgrass)  Right.  When State Farm takes

9    a position as to what actual cash value is, I'm

10   wondering whether or not that takes precedent over lower

11   actual costs of repair in your world?

12        MR. KAHN:  Object on.  Form.  Calls for legal

13   conclus on.

14        THE WITNESS:  And by that do you mean what is

15   a carrier obligated to do?

16   Q    (By Mr. Snodgrass)  No.  I mean, I know that if I

17   ask you that, you'll tell me you don't have an opin on

18   on that.  So I'm asking you, based upon your Oklahoma

19   C ty area experience.

20        MR. KAHN:  Object on.  Same objection.

21        THE WITNESS:  Based on my experience over the

22   last 40 years working in as many as 22 different states,

23   I've routinely seen carriers pay for the actual cost,

24   the actual necessary cost, necessary and reasonable

25   cost, to restore property.  That's the ultimate measure

## Page 81

1    of what should be pa d.

2    Q    (By Mr. Snodgrass)  Well, do you understand that

3    that's what should be paid for RCV or ACV?

4         MR. KAHN:  Objection.  Form.  Calls for legal

5    conclusion.

6         THE WITNESS:  Again, I'm talking about

7    necessary and reasonable cost.  I've worked -- t was

8    actually performed and needed to be performed to restore

9    the property, that and my experience has been that the

10   ultimate measure of what carriers typically pay.

11   Q    (By Mr. Snodgrass)  That's fine.  But I'm just

12   trying to figure out, is that then RCV or ACV?

13   A    I think that would be considered RCV.

14   Q    Okay.  Do you understand that there could be

15   circumstances where the actual cost to repair could be

16   less than ACV?

17        MR. KAHN:  Objection.  Form.

18        THE WITNESS:  And by that, do you mean the

19   initially estimated ACV?

20   Q    (By Mr. Snodgrass)  Yes.  I mean the initial

21   estimated ACV.

22   A    Yes.  Sometimes the actual cost of restoring a

23   property can be less than the initially estimated ACV.

24   Q    Okay.  So does that mean then the policyholder has

25   to give the insurance company back the extra money that

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 82

1  they policyholder received as an ACV payment?
2      MR. KAHN: Objection. Form. Calls for legal
3  conclusion.
4      THE WITNESS: Again, I don't know what the
5  duties of the policyholder might be under the insurance
6  contract. But I can tell you that I -- routinely I have
7  not seen that done. I have not seen carriers, State
8  Farm or others, ask for any money back.
9  Q   (By Mr. Snodgrass) You've never seen that; right?
10     MR. KAHN: Objection. Asked and answered.
11     THE WITNESS: In my experience, I have not
12 seen that.
13 Q   (By Mr. Snodgrass) Okay. So a policyholder then
14 would want to get as much money as possible for an
15 actual cash value payment; correct? Because insurance
16 companies don't ask for that money back; right?
17     MR. KAHN: Objection. Form. Speculation.
18     THE WITNESS: I'm not sure that I can opine
19 for all policyholders to speculate what they might want
20 at various times and why.
21 Q   (By Mr. Snodgrass) Do you know why insurance
22 companies don't ask for that money back?
23     MR. KAHN: Objection.
24 Q   (By Mr. Snodgrass) Do you know why that it could
25 be that they have to pay actual cash value as a minimum

## Page 83

1  payment?
2      MR. KAHN: Objection. Form. Calls for a
3  legal conclusion. Foundation.
4      THE WITNESS: I don't know why insurance
5  companies do not ask for that money back.
6  Q   (By Mr. Snodgrass) Does that seem to make sense
7  that in your 40 years, because in 40 years you've never
8  ever seen an insurance company ask for money back that
9  was paid as an actual cash value payment? Does maybe
10 that trigger the possibility in your mind that actual
11 cash value is always a minimum payment owned under
12 insurance policy? Is that possible?
13     MR. KAHN: Objection. Form. Calls for legal
14 conclusion.
15     THE WITNESS: I don't feel like I'm in a
16 position to answer that. I don't feel like I'm
17 qualified to interpret the policy or talk about
18 carrier's rights or responsibility, or the
19 policyholder's rights or responsibilities under the
20 contract.
21 Q   (By Mr. Snodgrass) I know, but you've come here
22 with your 40 years of experience, the last few years
23 exclusively in Oklahoma City, and not having been in
24 Mississippi for over 20 years, but you've come here and
25 you've made some opinion about sufficiency of ACV

## Page 84

1  payments, et cetera. Haven't you ever had curios ty as
2  to why insurance companies always pay a minimum of
3  actual cash value?
4      MR. KAHN: Objection. Form. Mischaracterizes
5  testimony. You can answer.
6      THE WITNESS: I really can't remember ever
7  being cur ous about it. I'm not saying that perhaps
8  that hasn't crossed my mind. But I never have pursued
9  t further than that if it ever d d.
10 Q   (By Mr. Snodgrass) But you would agree with me
11 your 40-year experience, it's crystal clear, minimum
12 payment is always actual cash value; correct?
13     MR. KAHN: Objection. Form. Calls for legal
14 conclusion.
15     THE WITNESS: As I said before, the
16 replacement cost value as expressed by what the
17 reasonable and necessary cost was to restore the
18 property is easily what's most important about
19 determining whether a pol cyholder has been properly
20 compensated or not for a loss.
21 Q   (By Mr. Snodgrass) Now, you also, I'm sure, dealt
22 w th actual cash value payments -- actual cash value
23 pol cies. In other words, policies that don't have
24 replacement cost coverage; correct?
25 A   I have been involved in some losses that have that

## Page 85

1  type of policy from time to time.
2  Q   And in those cases when there's only an actual
3  cash value policy, the minimum payment's always actual
4  cash value; correct?
5      MR. KAHN: Objection. Form. Calls for legal
6  conclusion.
7      THE WITNESS: I don't know that I was ever
8  close enough to the policies themselves and what they
9  said, what the provisions of the policies were, what
10 they required to be able to answer that.
11 Q   (By Mr. Snodgrass) So it would be fair to state
12 that certainly you don't have a lot of experience with
13 actual cash value policies; correct?
14     MR. KAHN: Objection. Form. Mischaracterizes
15 testimony.
16     THE WITNESS: Certainly not as much as I have
17 with replacement cost policies.
18 Q   (By Mr. Snodgrass) Okay. And to be more
19 specific, as a contractor you're almost always dealing
20 with replacement cost coverage, because one of the
21 things replacement cost coverage is for is for the cost
22 of the contractor to come in and fix property; correct?
23     MR. KAHN: Objection. Form.
24     THE WITNESS: I want to be careful, because I
25 don't -- I don't often get involved in the policy

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 86

1  itself.  But it is true that the majority of the
2  projects that I've done as restoration contractor
3  involve replacement cost policies.
4  Q  (By Mr. Snodgrass) Okay.  Have you ever been
5  involved in a policyholder dispute about actual cash
6  value other than your work in the labor depreciation
7  class actions?
8  A  **I'm not sure.  I just don't -- there are lots of**
9  **different insurance disputes.  And I don't recall one**
10  **that involved an actual cash value policy.**
11  Q  Okay.  All right.  What percentage of your work do
12  you think even deals with actual cash value policies?
13  A  **I'm not able to estimate that.**
14  Q  Okay.  So you would agree with me that when it
15  comes to actual cash value payments and actual cash
16  value policies, you really don't have a lot of
17  experience?
18  MR. KAHN:  Objection.  Form.  Mischaracterizes
19  testimony.
20  THE WITNESS:  You're asking really two
21  questions in one.  Can you split that into two pieces?
22  Q  (By Mr. Snodgrass) Sure.  As you sit here today,
23  you can't ever recall being involved in a dispute over
24  an actual cash value payment, other than the lawsuits
25  involving labor depreciation; correct?

## Page 87

1  MR. KAHN:  Objection.  Form.
2  THE WITNESS:  Well, again, that's a convoluted
3  question because I've been obviously involved in, many
4  times, many insured losses where actual cash value is at
5  work.  I've also been involved in some construct on
6  matters where there was an actual cash value versus
7  actual cash policy -- cash value policy versus
8  replacement cost value policy.  I've done that as well.
9  Q  (By Mr. Snodgrass) So have you ever -- in any
10  case that you can identify for me, have you ever opined
11  about an actual cash value payment before?
12  MR. KAHN:  Objection.  Form.
13  THE WITNESS:  I believe that I have given
14  testimony and have cases where there are issues
15  concerning actual cash value and actual cash value
16  payments.
17  Q  (By Mr. Snodgrass) What cases are those?
18  A  **The ones that come to mind are Dennington et al**
19  **versus State Farm; Lebriar versus State Farm; Bailey et**
20  **al versus State Farm.**
21  MR. KAHN:  Mike, before you go further, I just
22  want to caut on you not to disclose any cases where
23  you've not been disclosed as an expert.  Go ahead.
24  Q  (By Mr. Snodgrass) First off, I think my
25  question, Mr. Berryman, was, other than the labor

## Page 88

1  depreciation class actions for State Farm, have you ever
2  testified about actual cash value payments and the
3  sufficiency thereon.  So you've identified all the State
4  Farm labor depreciation class act ons.  I'm asking you
5  exclusive of those, have you ever testified before about
6  actual cash value payments?
7  MR. KAHN:  Object on.  Form.
8  THE WITNESS:  Yes, I have.
9  Q  (By Mr. Snodgrass) Can you identify those cases
10  for me?
11  A  **I can't with specificity.  But I can say that many**
12  **times the cases that I testify in have to do with the**
13  **sufficiency of the calculated RCV, and the sufficiency**
14  **of the calculated ACV as part of the -- as part of the**
15  **factors to be examined and considered.**
16  Q  As you sit here today, can you identify any case
17  for me where you've testified as to the sufficiency of
18  an ACV payment, other than the labor depreciation class
19  act ons?
20  MR. KAHN:  Object on.  Asked and answered.
21  Q  (By Mr. Snodgrass) And by identify, I mean point
22  to me in any one of the cases identified in your report
23  where you actually dealt with actual cash value,
24  sufficiency of that same, in your report.
25  MR. KAHN:  Object on.  Form.

## Page 89

1  THE WITNESS:  There isn't one that I can
2  identify and be certain of.
3  MR. KAHN:  Joe, give me one second.  I think
4  they shut off the air in this room.  Going to ask them
5  to turn it back on.
6  (A short break was had; after wh ch the
7  following took place:)
8  Q  (By Mr. Snodgrass) Mr. Berryman, do you know what
9  depreciation settings you use when you calculate actual
10  cash value?
11  MR. KAHN:  Objection.  Form.
12  THE WITNESS:  When you mean deprecia on
13  settings, do you mean what percentages?
14  Q  (By Mr. Snodgrass) No.  I mean the deprecia on
15  opt ons in Xactimate version 28?
16  MR. KAHN:  Objection.  Form.
17  THE WITNESS:  Whenever I'm called upon to
18  calculate depreciation, I depreciate both material and
19  nonmaterial  tems.
20  Q  (By Mr. Snodgrass) What about the other  tems?
21  Do you depreciate anything else?
22  MR. KAHN:  Objection.  Form.
23  THE WITNESS:  Such as what?
24  Q  (By Mr. Snodgrass) Well, you tell me.
25  MR. KAHN:  Objection.  Form.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 90

1      THE WITNESS:  Well, the -- I don't think there
2   is anything else bes des material or nonmaterial  tems.
3   Q     (By Mr. Snodgrass)  And you're saying that based
4   on your experience with Xactimate?
5   **A     I suppose there may be attendant sales taxes and**
6   **or overhead and profit that flows along with the**
7   **depreciation of material and nonmaterial items.**
8   Q     Do you depreciate those items?
9      MR. KAHN:  Objection.  Form.
10      THE WITNESS:  Yes.  Generally speaking.
11   Q     (By Mr. Snodgrass)  Is there any other category of
12   items that you depreciate?
13      MR. KAHN:  Objection.  Form.
14      THE WITNESS:  Not that comes to mind, as I sit
15   here.
16   Q     (By Mr. Snodgrass)  Can you think of any
17   justification or depreciating anything else?
18      MR. KAHN:  Objection.  Form.  Calls for legal
19   conclusion.
20      THE WITNESS:  I'm not sure how to answer that.
21   Q     (By Mr. Snodgrass)  Well, I'm just asking you, can
22   you think as you s t here today of all the categories
23   that make up depreciation, can you think of anything
24   else that you think should be depreciated?  It's my one
25   time to depose you.

## Page 91

1      MR. KAHN:  Objection.  Form.
2      THE WITNESS:  Well, I have listed as best I
3   can today as I sit here the things that I think would be
4   subject to depreciation.
5   Q     (By Mr. Snodgrass)  So I assume if you didn't list
6   anything for me today, you would think that it should
7   not be depreciated?
8      MR. KAHN:  Objection.  Form.
9   Mischaracterizes.
10      THE WITNESS:  No.  But if you have something
11   specifically in mind you want to ask me about, I can
12   answer it.
13   Q     (By Mr. Snodgrass)  No.  I don't want -- I don't
14   want -- I don't want me to suggest something to you.  I
15   want you to think what makes sense, what should or
16   should not be depreciated and tell me.  And if you don't
17   know, that's fine.  You don't know what should or
18   shouldn't be depreciation.  If you do know, tell me.
19      MR. KAHN:  Objection.  Form.
20      THE WITNESS:  What I typically depreciate are
21   material and nonmaterial items, and the sales tax and
22   overhead profit that flows along with those on a
23   proportional basis.
24   Q     (By Mr. Snodgrass)  Anything else?
25   **A     That's all I can think of as I sit here.**

## Page 92

1   Q     Can you think of anything else that should be
2   depreciated?  That you can justify being depreciated?
3      MR. KAHN:  Objection.  Form.  Asked and
4   answered.  Calls for legal conclusion.
5      THE WITNESS:  I typically depreciate material
6   and nonmaterial items.  And the sales tax and overhead
7   and profit that flows along with those on a proportional
8   basis.
9   Q     (By Mr. Snodgrass)  And so that is your
10   experience.  Your Oklahoma C ty experience is those four
11   items are the items that should be depreciated in
12   Xactimate 28; correct?
13      MR. KAHN:  Objection.  Form.
14      THE WITNESS:  Those are the items that in my
15   40 years experience having worked in 22 different
16   states, that's been my experience on what is routinely
17   depreciated by State Farm and most carriers that I've
18   worked in and around.
19
20
21
22
23
24
25

## Page 93

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



Page 94

21  Q    So I'm assuming that's dealing with your
22  experience as a contractor in Oklahoma City the last
23  three years; correct?
24      MR. KAHN:  Objection.  Form.
25      THE WITNESS:  No.  That's a wrong assumption.

Page 95

1  Q    (By Mr. Snodgrass)  Okay.  Let's make it true or
2  false.  True or false, you haven't handled a
3  construction project in Mississippi in over 20 years;
4  correct?
5      MR. KAHN:  Objection.  Form.
6      THE WITNESS:  That's correct.
7  Q    (By Mr. Snodgrass)  Do you have any basis to know
8  whether or not insurance companies are forcing the
9  policyholders to pay in the State of Mississippi for the
10  RCV as required by the terms and conditions of the
11  insurance policies?
12      MR. KAHN:  Objection.  Form.
13      THE WITNESS:  I'm sorry.  That question
14  doesn't make any sense.
15  Q    (By Mr. Snodgrass)  Do you know whether or not,
16  for example, Ms. Mitchell's policy requires State Farm
17  to advance funds on her behalf?  Or if it requires her
18  to advance funds on her behalf for RCV coverage?
19      MR. KAHN:  Objection.  Form.  Calls for legal
20  conclusion.
21      THE WITNESS:  That would require me to try to
22  interpret her policy and the obligations of State Farm
23  under that policy.  I'm not here to do that.  I'm not
24  qualified to render an opinion on the policy
25  interpretation.

Page 96

1  Q    (By Mr. Snodgrass)  I'm not asking you to.  I'm
2  asking you, do you know whether or not the policy
3  requires her to come out-of-pocket or State Farm to come
4  out-of-pocket?
5      MR. KAHN:  Objection.  Form.  Calls for a
6  legal conclusion.
7      THE WITNESS:  Again, I'm not here to opine
8  about provisions of her policy.  I'm not a pol cy
9  expert.  I don't feel like I'm qualified to say what
10  State Farm's obligations are or what the policy tells
11  the pol cyholder to do and to not do.
12  Q    (By Mr. Snodgrass)  What have you done in the
13  State of Mississippi to determine whether or not this
14  opinion in the second sentence of Opin on 2 applies?
15      MR. KAHN:  Objection.  Form.
16      THE WITNESS:  Based on my experience, working
17  in the industry, including Mississippi, I believe that
18  my second sentence that starts with the word "except" is
19  factual.  And forms part of my opinion in Opinion Number
20  2.
21  Q    (By Mr. Snodgrass)  And I understand that.  I'm
22  asking you what specifically.  You told me earlier you
23  haven't worked in Mississippi in over 20 years.  So I'm
24  trying to figure out what you did.  In other words, did
25  you conduct a survey of claim files to try to determine

Page 97

1  if your opinion is true or not?
2      MR. KAHN:  Object on.  Form.
3      THE WITNESS:  No, I did not.
4  Q    (By Mr. Snodgrass)  Did you survey contractors to
5  determine whether or not -- d d you survey Mississippi
6  contractors to determine whether or not your opinion is
7  relevant to the State of Mississippi in the past 20
8  years?
9      MR. KAHN:  Object on.  Form.
10      THE WITNESS:  No.  I d d not conduct a survey.
11  I'm simply opining from my 40-year basis of knowledge of
12  having worked in 22 states, and what I've routinely seen
13  over that time span.
14  Q    (By Mr. Snodgrass)  That's okay.  But I'm focusing
15  now on Mississippi and what you've done.  Did you talk
16  to any State Farm employees to find out what they do and
17  whether or not this opinion is val d?
18      MR. KAHN:  Object on.  Form.
19      THE WITNESS:  No.  I d d not talk to State
20  Farm employees.  Rather I drew upon my 40-year
21  experience as a general contractor having worked in 22
22  states, including Mississippi, to offer an observation
23  under Opinion Number 2, which is factual and part of my
24  opin on.
25  Q    (By Mr. Snodgrass)  Did you find any published

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 98

1  work or statistical information that would tend to
2  support your statement in Opinion Number 2?
3      MR. KAHN: Objection. Form.
4      THE WITNESS: No. Because I didn't feel like
5  I needed to have anything to bolster my 40-year
6  experience working as a restoration contractor in 22
7  states, including the State of Mississippi. In order to
8  render this observation, you see in Opinion Number 2, as
9  factual and that it is part of my opin on.
10  Q    (By Mr. Snodgrass) Okay. Is there anything other
11  than your experience that you're relying on for Opin on
12  Number 2?
13      MR. KAHN: Objection. Form.
14      THE WITNESS: I am relying on all of my
15  knowledge, experience, and prev ously acquired in the
16  business for 40 years, to offer a factual statement
17  wh ch forms part of my opinion shown on Page 22 at
18  Opinion Number 2.
19  Q    (By Mr. Snodgrass) Do you know whether or not any
20  insurance companies refused to pay pol cyholders for
21  their work until t's completed in the State of
22  Mississippi in the past 20 years?
23      MR. KAHN: Objection. Form.
24      THE WITNESS: I really am not in a position to
25  answer what all insurance carriers have done in the

## Page 99

1  State of Mississippi from one end of the state to other
2  over a 20-year period.
3  Q    (By Mr. Snodgrass) So what insurance company are
4  you comfortable knowing that they always will pay when
5  the policyholder starts construction work in the State
6  of Mississippi in the past 20 years?
7      MR. KAHN: Objection. Form.
8      THE WITNESS: I'm not sure I understand your
9  question.
10  Q    (By Mr. Snodgrass) In other words, do you think
11  state -- if the policyholder presents a signed contract,
12  will State Farm 100 percent of the time always advance
13  funds?
14      MR. KAHN: Objection. Form. Foundation.
15      THE WITNESS: Well, there's too many variables
16  in that for me to answer that question. I guess your
17  question goes to nationwide over a 40-year time period
18  and 100 percent. Too many variables. Too many other
19  factors that would have to be considered to be able to
20  answer that.
21  Q    (By Mr. Snodgrass) Would you agree with me that
22  State Farm personnel would be in a much better position
23  to tell us what State Farm's practices have been in the
24  State of Mississippi over the past 20 years as it
25  relates to advancing of costs?

## Page 100

1      MR. KAHN: Objection. Form.
2      THE WITNESS: I just don't feel like I'm in a
3  position to even answer that question.
4  Q    (By Mr. Snodgrass) Do you think you have more
5  informat on than the State Farm employees that actually
6  adjust claims and make the decision whether or not to
7  advance funds?
8      MR. KAHN: Objection. Form.
9      THE WITNESS: I'm simply saying here today at
10  this deposition and in wr tten Opinion Number 2 what my
11  experience has been, someone who's worked in and around
12  the industry for 40 years, in 22 states, including
13  Mississippi. This is what I've observed. This is
14  factual. This is my opinion.
15  Q    (By Mr. Snodgrass) I understand that. But
16  unfortunately we know that you haven't spoken to anybody
17  about this issue from the State of Mississippi. You
18  haven't worked in the State of Mississippi. You have
19  never worked for an insurance company. You've never
20  adjusted a claim. You don't hold any l censure. So I'm
21  just wondering, wouldn't it have made sense for State
22  Farm to have somebody to offer this opinion if t was
23  truly the case in the State of Mississippi?
24      MR. KAHN: Objection. Form.
25      THE WITNESS: I would think that question

## Page 101

1  would be better put to someone else besides me.
2  Q    (By Mr. Snodgrass) I would think so, because
3  you've never talked to anybody from State Farm about
4  this issue, have you?
5      MR. KAHN: Objection. Form. Asked and
6  answered.
7      THE WITNESS: As we've established earlier in
8  the deposition, I have not talked to State Farm
9  personnel about these matters.
10  Q    (By Mr. Snodgrass) In fact, you haven't talked to
11  any insurance personnel in preparation for your opinions
12  here from any company; correct?
13      MR. KAHN: Objection. Form. Asked and
14  answered.
15      THE WITNESS: Well, as I said, I've been in
16  the business for 40 years. I've worked alongside
17  adjusters in and around the insurance adjustment
18  community as a restoration contractor for 40 years,
19  working in 22 states, including Mississippi. So of
20  course, during that time period I've interacted with
21  policyholders, insurance adjusters. And I am here to
22  offer testimony today on how the industry works on a
23  day-to-day basis, industry standards, and common
24  practices.
25  Q    (By Mr. Snodgrass) I can't remember. Let's go

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 102

1  back because you keep relying on your industry standard.
2  I think we've established that you d d not -- you
3  haven't worked out of state for the past three years,
4  out of the Oklahoma City area; correct?
5      MR. KAHN: Objection. Form.
6      THE WITNESS: Yes.
7  Q   (By Mr. Snodgrass) And when was the last time you
8  did substantial business outside of the Oklahoma C ty
9  area?
10     MR. KAHN: Objection. Form.
11     THE WITNESS: I think I answered that before.
12 Somewhere in the last 10 to 15 years.
13 Q   (By Mr. Snodgrass) Okay. So when you talk about
14 possibly this 40 years of experience, for the last 10 to
15 15 years, you've been exclusively in the Oklahoma City
16 area; correct?
17     MR. KAHN: Objection. Form. Mischaracterizes
18 testimony.
19     THE WITNESS: I would say in the last 10 to 15
20 years I've primarily worked inside the State of
21 Oklahoma.
22 Q   (By Mr. Snodgrass) In the last 10 to 15 years,
23 what other states have you worked besides the State of
24 Oklahoma?
25 **A   My company has done business in the last 10 to 15**

## Page 103

1  **years in Oklahoma, Texas, Louisiana, Arkansas,**
2  **Mississippi, Missouri, and there may be others.**
3  Q   Okay. How many projects have you done in Texas?
4      MR. KAHN: Objection. Form.
5      THE WITNESS: I don't know. I've never
6  counted them.
7  Q   (By Mr. Snodgrass) In the last 10 to 15 years,
8  how many projects have you done in Texas?
9      MR. KAHN: Objection. Form.
10     THE WITNESS: Again, I've never counted them.
11 Q   (By Mr. Snodgrass) Is it under one?
12 **A   No.**
13 Q   Is it more than one?
14 **A   Yes.**
15 Q   Is it two?
16 **A   I'm not sure. I haven't counted them.**
17 Q   How many projects have you done in Missouri?
18     MR. KAHN: Objection. Form.
19     THE WITNESS: I haven't counted those either.
20 Q   (By Mr. Snodgrass) Is it under one?
21 **A   No.**
22 Q   Is it two?
23 **A   I'm not sure. I haven't counted them.**
24 Q   What other state did you claim you've done work in
25 in the past 10 to 15 years?

## Page 104

1  **A   What I said is my company has done work in**
2  **Oklahoma, Texas, Arkansas, Missouri, Louisiana, and**
3  **there may be others.**
4  Q   Where have you done work in the last 10 to 15
5  years?
6  **A   What do you mean when you say, you have done work?**
7  Q   I mean, you've worked in the construction world.
8  **A   I'm not often involved in construction work any**
9  **more, by swinging a hammer if that's what you mean.**
10 Q   No. I mean on-s te though. When was the last
11 time you were on-site out of state on a project?
12     MR. KAHN: Object on. Form.
13     THE WITNESS: I don't know.
14 Q   (By Mr. Snodgrass) Is t, in the last ten years
15 have you been on-site on a project?
16     MR. KAHN: Objection. Form.
17     THE WITNESS: Perhaps.
18 Q   (By Mr. Snodgrass) So have you, yourself, set
19 foot in the State of Texas in the last 10 to 15 years
20 for a project?
21     MR. KAHN: Object on. Form.
22     THE WITNESS: I have been in Texas on company
23 business in the last 10 to 15 years. Yes.
24 Q   (By Mr. Snodgrass) Not company business. Have
25 you been there for a construction project in the last 10

## Page 105

1  to 15 years?
2  **A   Not that I can recall with certainty.**
3  Q   When is the last time you can recall being out of
4  state on a construction project?
5  **A   I wouldn't be able to give you a specific date.**
6  Q   Is it possible you haven't been out of state on a
7  construct on project in the last 10 to 15 years?
8  **A   Been on the site myself?**
9  Q   Yes.
10 **A   That might be possible.**
11 Q   Do you consider yourself semi-retired,
12 Mr. Berryman?
13 **A   No. Not at all.**
14 Q   Is that primarily because you're still doing this
15 State Farm testifying work?
16     MR. KAHN: Objection. Form.
17     THE WITNESS: Could you restate the question?
18 Q   (By Mr. Snodgrass) Yeah. Is your primary work
19 now, not your company, but you're own primary work, is
20 that State Farm?
21     MR. KAHN: Objection. Form.
22     THE WITNESS: Absolutely not.
23 Q   (By Mr. Snodgrass) You're just not on-site on the
24 ground so-to-speak on any of these construction projects
25 any more?

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 106

1    MR. KAHN:  Objection.  Form.
2    THE WITNESS:  Most of my role now in the
3  construction business is on the administration side,
4  wh ch is off ce based.
5    Q    (By Mr. Snodgrass)  So when you opined in this
6  case that your company could do the work in Mississippi
7  for the amount calculated by State Farm, when was the
8  last time you, yourself, was actually on-s te and
9  creating an estimate?
10    MR. KAHN:  Objection.  Form.
11    THE WITNESS:  I have been on-site to create
12  estimates for construction within the last year.
13    Q    (By Mr. Snodgrass)  I understand that.  But not
14  for purposes of testifying for State Farm.  I'm
15  wondering, when was the last time you were on-site in
16  the State of Mississippi, not related to litigat on,
17  creating an Xactimate estimate?
18    MR. KAHN:  Objection.  Form.  Asked and
19  answered.
20    THE WITNESS:  I can't recall a time, as I sit
21  here.
22    Q    (By Mr. Snodgrass)  Do you think you ever created
23  an Xactimate estimate for a Mississippi project in your
24  life?
25    **A    I have created estimates concerning damages to**

## Page 107

1  **structures in Mississippi.  Yes.**
2    Q    When?
3    **A    Within the last 10 to 15 years.**
4    Q    For what?
5    **A    For damages to structures.**
6    Q    Are we talking about Ms. Mitchell's home?
7    **A    No.**
8    Q    You've done it for something else?
9    **A    Yes.**
10    Q    And what was that?
11    **A    One thing that comes to mind is a condominium**
12  **complex.**
13    Q    Why were you creating an estimate for a
14  condominium complex?
15    **A    To determine the extent of the damages.**
16    Q    And why were you trying to determine the extent of
17  the damages?
18    **A    Because that's what I was hired to do.**
19    Q    By who?
20    MR. KAHN:  I'm going to object to the extent
21  this is a case where you were retained as a consulting
22  expert and hadn't yet been disclosed.  Remind you, you
23  probably shouldn't disclose it.  But go ahead.
24    THE WITNESS:  I can't recall in that case if I
25  was a testifying expert or a consulting expert.

## Page 108

1    Q    (By Mr. Snodgrass)  So you were in Mississippi but
2  it was for forens cs, it was for testifying; correct?
3    MR. KAHN:  Objection.  Form.
4    THE WITNESS:  It was to determine the extent
5  of damages to a condominium structure.
6    Q    (By Mr. Snodgrass)  Right.  But it wasn't because
7  you were making a bid for your company, it was because
8  you were testifying in a case on behalf of an insurance
9  company; correct?
10    MR. KAHN:  Objection.  Form.
11    THE WITNESS:  I was not there to make a b d
12  for my construction company.
13    Q    (By Mr. Snodgrass)  Okay.  When was the last time
14  you were on-site creating an Xactimate estimate for your
15  own construction company in the State of Mississippi?
16    **A    I can't recall a time.**
17    Q    So it's fair to state you've never -- for your own
18  construction company, ever put together a bid in the
19  State of Mississippi using Xactimate?
20    MR. KAHN:  Objection.  Form.  Mischaracterizes
21  testimony.
22    THE WITNESS:  No.  I don't think that's
23  accurate.
24    Q    (By Mr. Snodgrass)  Okay.  When was the last time
25  you created a bid in the State of Mississippi for your

## Page 109

1  own construction company to do the work?
2    **A    Probably some time in the last 15 to 20 years.**
3    Q    Well, 20 years ago, at least from your prior
4  testimony, you weren't using Xactimate; correct?
5    MR. KAHN:  Objection.  Form.
6    THE WITNESS:  As best I can recall, I was
7  using it 17 years plus ago.
8    Q    (By Mr. Snodgrass)  Do you know, and we
9  established earlier the last time you were in
10  Mississippi actually doing construction work was 1988,
11  1998 time frame; correct?
12    **A    I think I said 1998, 1999 approximately.**
13    Q    That was before you ever started using Xactimate
14  in your life; correct?
15    MR. KAHN:  Objection.  Form.
16    THE WITNESS:  Well, I'm not exactly sure
17  because all I can tell you is that I've been using
18  Xactimate for 17-plus years.  I'm not -- I can't tell
19  you with certainty if it was 18, 19, 20.  I just don't
20  have -- I don't have the records or the memory to
21  recall.
22    Q    So if you testified in the past as to -- with more
23  precision as to when you started using Xactimate, would
24  that testimony be accurate or your testimony today?
25    MR. KAHN:  Objection.  Form.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 110

1 THE WITNESS: I'm testifying as best I can
2 with the records and memory that I have. I'm just not
3 able to determine with any more certainty when I first
4 started using Xactimate besides to say that it was
5 17-plus years ago.
6 Q (By Mr. Snodgrass) It's completely possible
7 though that you've never created an Xactimate estimate
8 in the State of Mississippi for your own construction
9 for a bid; correct?
10 MR. KAHN: Objection. Form. Mischaracterizes
11 testimony. Asked and answered.
12 THE WITNESS: I suppose that's possible. But
13 I don't think it's probable.
14 Q (By Mr. Snodgrass) Well, we don't know one way or
15 the other because if you ever did such an act, you
16 certainly don't remember it; correct?
17 MR. KAHN: Objection. Argumentative.
18 THE WITNESS: As I've already established,
19 it's not -- it is difficult for me to remember what I
20 did 19 or 20 years ago.
21 Q (By Mr. Snodgrass) Let me ask you a couple of
22 questions based on your contracting experience. If an
23 insurance company calculates the actual cash value of a
24 property the day after a loss at $2,000, but decides
25 that it only wants to pay $1,000 because the adjuster

## Page 111

1 just doesn't like the policyholder, from your
2 experience, does anybody owe anybody any money at that
3 point in time?
4 MR. KAHN: Objection. Form. Incomplete
5 hypothetical. Calls for a legal conclusion.
6 THE WITNESS: I think that requires me to
7 interpret the policy. And there are a lot of variables
8 in there from what you've described. So I really don't
9 feel like I'm in a position to answer that.
10 Q (By Mr. Snodgrass) In the same question with
11 respect to the case here, let's assume that the State
12 Farm adjuster calculates the loss at $2,000, but simply
13 decides to pay only $1,000 because it wants to have a
14 real expansive view of depreciation. In your insurance
15 restoration experience, does anybody owe anybody any
16 money?
17 MR. KAHN: Objection. Form. Incomplete
18 hypothetical. Calls for a legal conclusion. You can
19 answer.
20 THE WITNESS: Based on your question as you've
21 posed it, I think there are a lot of variables in there,
22 and also requires me to interpret the insurance contract
23 to see what's owed and not owed. And I don't feel
24 qualified to do that.
25 Q (By Mr. Snodgrass) Do you think that you need to

## Page 112

1 interpret the insurance policy in order to determine the
2 sufficiency of an actual cash value payment?
3 MR. KAHN: Objection. Form. Calls for legal
4 conclusion.
5 THE WITNESS: I think, as I've outlined on
6 Page 3 of my report, that is what I believe RCV
7 depreciation, ACV to be. I feel like that's typically
8 how those -- as I've expressed on Page 3, that's how
9 those numbers are arrived at in the industry on a
10 day-to-day basis.
11 Q (By Mr. Snodgrass) In your experience can an
12 insurance company just decide not to pay the full ACV
13 and kind of wait and see what happens? Is that okay?
14 MR. KAHN: Objection. Form. Calls for a
15 legal conclusion.
16 THE WITNESS: Again, I don't feel like I'm in
17 a position to opine as to whether that's, quote, okay.
18 I guess okay would be an interpretation of whether the
19 policy is being followed, or if legal statutes are being
20 followed. I'm not in a position to opine as to whether
21 it would be, quote, okay.
22 Q (By Mr. Snodgrass) Wasn't that your opinion in
23 this case that even if State Farm didn't fully pay ACV,
24 it's okay because certain events might have happened
25 after the fact, and it made the actual cash value

## Page 113

1 payment made okay. Isn't that kind of your opinion in
2 this case that an insurance company can short an ACV
3 payment and kind of see how it goes? Isn't that your
4 opinion in this case?
5 MR. KAHN: Objection. Form. Mischaracterizes
6 testimony. But you can answer.
7 THE WITNESS: No. That's not my opinion.
8 Q (By Mr. Snodgrass) In fact, you believe the
9 opposite; an insurance company should make a full ACV
10 payment as it should properly interpret the contract to
11 the extent the law requires and make a full ACV payment
12 right away. That's what you believe; right?
13 MR. KAHN: Objection. Form. Calls for legal
14 conclusion. You can answer.
15 THE WITNESS: I don't think I've offered an
16 opinion on what I think the insurance company should or
17 should not do.
18 Q (By Mr. Snodgrass) Well, you're offering opinions
19 on the sufficiency of the ACV payment; true?
20 **A Yes. According to the framework that I've**
21 **outlined on Page 3, which is what I see using as a**
22 **customary practice in the industry.**
23 Q (By Mr. Snodgrass) Well, okay. So if we're going
24 to render an opinion on sufficiency of the ACV payment,
25 I don't think you can keep going back and hiding behind

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 114

1  this policy interpretat on issue. The sufficiency of
2  the ACV payment, should the insurance company make a
3  sufficient ACV payment after a loss?
4       MR. KAHN: Objection. Form. Argumentative.
5  Calls for a legal conclusion. And asked and answered.
6       THE WITNESS: I've outlined on Page 3 how I
7  understand how ACV, RCV and depreciation. In the
8  marketplace, as I've seen t routinely used in the
9  process that I've seen routinely used to calculate those
10  values, that's the process which I use to make -- to
11  render the conclusions and opin ons that I have in this
12  report. I'm not here to testify or offer opinions about
13  what a carrier should and should not do.
14       MR. SNODGRASS: Okay. Could you please, court
15  reporter, mark Document C as Exhib t 3 and Document D as
16  Exhibit 4.
17       (Exhibits Nos. 3 and 4 were marked for
18        identif cat on purposes)
19       MR. KAHN: While she's doing that, Joe, can we
20  take a two-minute break?
21       MR. SNODGRASS: Sure. Let's keep it short
22  though.
23       (A brief break was had; after wh ch the
24        following proceedings took place:)
25  Q    (By Mr. Snodgrass) Let's keep dealing w th the

## Page 115



## Page 116

15  Q    (By Mr. Snodgrass) Let me ask you this, when
16  people buy an ACV only policy, in your experience, do
17  they have the expectation that after the loss they'll
18  have enough money to be able to fix their roof?
19       MR. KAHN: Object on. Form. Foundation.
20       THE WITNESS: It's hard for me to say what --
21  I cannot say what, in some general statement, what
22  pol cyholders across all points in space and time would
23  expect.
24  Q    (By Mr. Snodgrass) What should somebody with a
25  actual cash value policy line up with? Should it be an

## Page 117

1  amount sufficient to fix their roof or not?
2       MR. KAHN: Objection. Form. Calls for legal
3  conclusion.
4       THE WITNESS: I think I'd have to see the
5  policy and try to interpret it in order to give you an
6  answer.
7  Q    (By Mr. Snodgrass) And in this case, should the
8  policy of insurance at issue in this case, should it
9  prov de enough money for Ms. M tchell to be able to fix
10  her home to the point where it was immediately before
11  the loss based on the ACV policy provisions?
12       MR. KAHN: Objection. Form. Calls for legal
13  conclusion.
14       THE WITNESS: Yes. I think that requires me
15  to interpret the policy, which I don't feel like I'm
16  qualified to do.
17  Q    (By Mr. Snodgrass) Well, wouldn't that
18  interpretat on be key in determining how broad you apply
19  depreciation? Because if for example the Court in this
20  case holds that ACV should be enough to put Ms. Mitchell
21  back in the place she was immediately before the loss,
22  if that's what the Court holds, won't we then have to
23  say, okay, if that's what we're going to do, we're going
24  to have to interpret depreciation to allow that to
25  happen?

**Confidential Pursuant to Protective Order – Deposition of Michael Berryman – 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 118

1  MR. KAHN: Objection. Form. Calls for legal
2  conclusion.
3  THE WITNESS: I just don't think I'm in a
4  position to give you an opinion on that.
5  Q  (By Mr. Snodgrass) Okay. That's fair. As it
6  relates to Number 3, ▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 Q  (By Mr. Snodgrass) And, in fact, you know from
17 your limited experience with Xactimate, that Xactimate
18 can be used to quickly and easily separate depreciation
19 of labor and materials versus depreciation of materials
20 only; correct?
21 MR. KAHN: Objection. Form.
22 THE WITNESS: I have not used that function to
23 separate the depreciation of material from nonmaterial.
24 So I'm not in a position to opine, as I sit here, about
25 how easy that is to do.

## Page 119

1  Q  (By Mr. Snodgrass) So if someone says this is
2  really easy to do it, you're not in a position to
3  challenge that; right?
4  MR. KAHN: Objection. Form. Incomplete
5  hypothetical.
6  THE WITNESS: And by that, do you mean easy to
7  do on a single loss?
8  Q  (By Mr. Snodgrass) I mean on the Xactimate
9  computer software program.
10 MR. KAHN: Same objection.
11 THE WITNESS: By that, do you mean on a
12 calculation of a single loss?
13 Q  (By Mr. Snodgrass) I don't know what you mean by
14 calculation of a single loss?
15 **A  Like a single loss like Ms. Mitchell's.**
16 Q  As compared to what? What's a double loss?
17 **A  As opposed to hundreds or tens or scores or**
18 **hundreds or thousands of losses?**
19 Q  I'm taking it one at a time. Is it really easy,
20 first of all, to do an Xactimate?
21 MR. KAHN: Objection. Form.
22 THE WITNESS: Well, I'm trying to answer your
23 question. I'm asking you to narrow it down. Are you
24 talking about on a single loss? Or are you talking
25 about on thousands of losses?

## Page 120

1  Q  (By Mr. Snodgrass) Have you ever used Xactimate
2  to estimate thousands of losses at one time?
3  **A  No.**
4  Q  When you use Xactimate, is it always to analyze a
5  single loss?
6  **A  I usually do analyze them one at a time.**
7  Q  You do?
8  **A  Usually, yes.**
9  Q  Okay. So that's what I'm talking about, usually.
10 Is  t usually easy to separate out labor and materials
11 in Xactimate?
12 MR. KAHN: Objection. Form.
13 THE WITNESS: Are you talking about on a
14 single loss or on hundreds?
15 Q  (By Mr. Snodgrass) Yeah. Let's start w th a
16 single loss.
17 **A  On a single loss, I don't think it would be that**
18 **difficult to do.**
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 Q  Okay. In coming up with this conclusion, did you
25 speak with any active Mississippi contractor?

## Page 121

1  **A  No.**
2  Q  Okay. Was this just based exclusively on your own
3  use of Xactimate?
4  **A  No. It's based on my use of Xactimate, my**
5  **understanding about the industry, as well as claim file**
6  **information in there about bid proposals and actual**
7  **costs or actual proposals to do the work, et cetera.**
8  Q  D d you talk with any contractors then?
9  **A  No.**
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



### Page 122

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15     Q   D d Ms. M tchell's ACV change over time?
16     MR. KAHN: Objection. Form.
17     THE WITNESS: By that, do you mean the
18 estimated ACV?
19     Q   (By Mr. Snodgrass) Just whatever you call ACV,
20 d d that ever change over time for Ms. Mitchell?
21     MR. KAHN: Objection. Form.
22     THE WITNESS: The estimated ACV in this
23 matter, as was ever expressed by any party, has remained
24 the same as far as I understand  t.
25     Q   (By Mr. Snodgrass) Did you change the pr ce list

### Page 123

1 of Xactimate to determine whether or not the ACV was
2 still the same?
3     MR. KAHN: Objection. Form.
4     THE WITNESS: Well, if you were to ask what is
5 the present replacement cost value and estimated ACV
6 today, is it different from what it was shortly after
7 the loss occurred, at the time State Farm looked at it?
8 There could be some changes. I did not assess that.
9     Q   (By Mr. Snodgrass) Okay. So if you
10 Ms. Mitchell's ACV went up since the date of loss, is
11 she entitled to that sum of money from State Farm?
12     MR. KAHN: Objection. Form. Calls for a
13 legal conclusion. Incomplete hypothetical.
14     THE WITNESS: I really cannot give you an
15 opinion on what should be done by a carrier or should be
16 done by a policyholder under this insurance contract.
17     Q   (By Mr. Snodgrass) Well, shouldn't ACV as you
18 define it on Page 3, should that be calculated now or
19 should it be calculated based on the date of the loss?
20     MR. KAHN: Objection. Form. Calls for a
21 legal conclusion.
22     THE WITNESS: Well, I can tell you what's
23 customary in the industry, and that it's calculated at
24 the time of the loss.
25     Q   (By Mr. Snodgrass) Okay. So does it? Are you

### Page 124

1 changing your testimony? Does ACV change over time?
2     MR. KAHN: Objection. Form. Argumentative.
3     THE WITNESS: I have said in my report and
4 during this deposition that estimated ACV can change
5 over time.
6     Q   (By Mr. Snodgrass) Okay. So wouldn't, in order
7 to know how much Ms. M tchell is owed for ACV, we have
8 to run the numbers again today?
9     MR. KAHN: Objection. Form.
10     THE WITNESS: I feel comfortable in examining
11 the estimated RCV and ACV in real time, at the time that
12 it was done in the typical process of processing the
13 claim.
14     Q   (By Mr. Snodgrass) Well, I'm confused. I thought
15 you said ACV could change over time. So can you explain
16 to me why we shouldn't use the ACV calculated as of
17 today's date as the amount owed to Ms. M tchell?
18     MR. KAHN: Objection. Form. Calls for a
19 legal conclusion.
20     THE WITNESS: Estimated ACV and estimated RCV
21 can change over time. But in this matter, I don't see
22 any -- I don't see any reason why it would need to be
23 recalculated since I've run the numbers, examined it on
24 how  t was calculated initially. It appears to me to be
25 sufficient at the time.

### Page 125

1     Q   (By Mr. Snodgrass) So but you d dn't run the
2 numbers today; right? You d dn't run it based on a
3 price list for today; correct?
4     MR. KAHN: Objection. Form.
5     THE WITNESS: What I did was analyze what --
6 what occurred when  t occurred to see if at that time I
7 felt like the estimated RCV and the estimated ACV were
8 sufficient.
9     Q   (By Mr. Snodgrass) Right. And I'm trying to get
10 to the point, why d dn't you use the price list as of
11 the date of your inspect on? Because if ACV can change
12 over time, as you've testified, why aren't we using the
13 changed number?
14     MR. KAHN: Objection. Form. Calls for legal
15 conclusion.
16     THE WITNESS: I wasn't trying to determine if
17 ACV had changed over time. I was trying to determine if
18 the RCV and estimated ACV that was created by State Farm
19 during the typical timing and typical process, whether
20 that in and of  tself was sufficient.
21     Q   (By Mr. Snodgrass) So you're not -- so the ACV
22 might be different today. You don't dispute that;
23 right?
24     MR. KAHN: Objection. Form.
25     THE WITNESS: If a person was to recalculate

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 126

1 the RCV today, the estimated ACV today, it might be
2 different.
3 Q     (By Mr. Snodgrass)  And if that results in a
4 higher potential payment to Ms. Mitchell, that would be
5 the amount that she would be owed under their ACV
6 covering; correct?
7         MR. KAHN:  Objection.  Form.  Incomplete
8 hypothetical.  Calls for a legal conclusion.
9         THE WITNESS:  I'm not in a position to opine
10 about what she's owed or not owed.
11 Q     (By Mr. Snodgrass)  But I'm just having a hard
12 time understanding.  If you've testified already, you
13 have, that ACV can change over time, if her ACV is
14 higher today than it was on the date of the loss, why
15 wouldn't she be entitled to that payment?
16         MR. KAHN:  Objection.  Form.  Incomplete
17 hypothetical.  Calls for a legal conclusion.
18         THE WITNESS:  As I said before, I am not here
19 to opine about what she's entitled to or what State
20 Farm's obligations or her obligations may be under the
21 insurance contract.
22 Q     (By Mr. Snodgrass)  But you have because you've
23 testified that ACV changes over time, to calculate her
24 true ACV today, you would have to run her ACV with the
25 current price list; correct?

## Page 127

1         MR. KAHN:  Objection.  Form.  Incomplete
2 hypothetical.
3         THE WITNESS:  If a person was going to
4 endeavor to do that, that's one of the things that would
5 have to be done.  Yes.
6 Q     (By Mr. Snodgrass)  Okay.  And specifically on
7 Page 3, the formula that you have on Page 3 as you
8 understand it, in order to recalculate Ms. Mitchell's
9 ACV, we need to use the current price list to calculate
10 the ACV; correct?
11         MR. KAHN:  Objection.  Form.  Mischaracterizes
12 testimony.
13         THE WITNESS:  That's one of the things that we
14 would need to do.  There's probably a lot of things that
15 would need to be done.  A person would probably have to
16 make another site inspection to make sure to see what
17 work perhaps she's done in the last few months that was
18 not done when I was last there.
19 Q     (By Mr. Snodgrass)  And if she put -- even if she
20 didn't do any work, even if it's just the same as it
21 was, we know we need to keep running that price list
22 because ACV, as you've said, changes over time; right?
23         MR. KAHN:  Objection.  Form.  Incomplete
24 hypothetical.
25         THE WITNESS:  I would probably want to see if

## Page 128

1 the damages that are unmitigated have gotten any worse.
2 Q     (By Mr. Snodgrass)  That's fine.  Regardless of
3 whether they got worse or not, we are going to need to
4 use that new price list; right?
5         MR. KAHN:  Objection.  Form.  Incomplete
6 hypothetical.
7         THE WITNESS:  You would probably need to run
8 it with a new price list, which may have some figures
9 that are higher, some are going to be lower.
10 Q     (By Mr. Snodgrass)  So it may result in a
11 supplemental payment to Ms. Mitchell; right?
12         MR. KAHN:  Objection.  Form.  Incomplete
13 hypothetical.  Calls for legal conclusion.
14         THE WITNESS:  I don't know if it would
15 generate a supplemental payment.  Because again, that's
16 interpretation of the policy and what's owed under the
17 policy.
18 Q     (By Mr. Snodgrass)  Well, again, I don't want you
19 to interpret the policy.  But under your interpretation
20 that ACV changes over time, and I think you've testified
21 several times now that you need to use the current price
22 list of June of 2018, if that results in a higher ACV
23 calculation, that's what the ACV calculation would be;
24 right?
25         MR. KAHN:  Objection.  Form.  Incomplete

## Page 129

1 hypothetical.  Calls for legal conclusion.  And asked
2 and answered.
3         THE WITNESS:  Well, if a person was going to
4 try to reassess the current estimated RCV and current
5 estimated ACV, there would be several steps involved to
6 do that properly.  And many of those would be the same
7 steps that I took in the Mitchell matter so far.  I
8 personally would want to go make another site visit to
9 see what condition the property's in now.  Is it more
10 damage than it was before.  Determine whether she has
11 done any work at all.  What was the cost of that work.
12 What was the necessary and reasonable cost of that
13 component.  And take into account a variety of factors
14 as I have in the Mitchell matter so far, in order to
15 determine what -- to what extent, if any, the estimated
16 RCV and estimated ACV might change.
17 Q     (By Mr. Snodgrass)  So how long should State Farm
18 do the process that you recommend where somebody like
19 you goes out and reassess the loss and recalculates RCV
20 and ACV for Ms. -- assuming that she doesn't do anything
21 with the property, how often should State Farm follow up
22 and keep re-estimating RCV and ACV?  Should that be done
23 every three months?  Every 120 days?  What do you think
24 the time period is for that?
25         MR. KAHN:  Objection.  Form.  Incomplete

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 130

1  hypothetical. Calls for a legal conclus on.
2  THE WITNESS: I don't feel like I'm in a
3  position to answer that.
4  Q (By Mr. Snodgrass) I don't want your position. I
5  just want your experience. So in your experience when
6  somebody doesn't repair their loss and then would the
7  insurance company go out every, what, 90 days, every 180
8  days to reassess and recalculate RCV and ACV?
9  MR. KAHN: Object on.
10  Q (By Mr. Snodgrass) How long -- what's your
11  experience on that, Mr. Berryman?
12  MR. KAHN: Object on. Form. Incomplete
13  hypothetical.
14  THE WITNESS: Well, it's been my experience
15  that once an insurance company estimates the estimated
16  RCV and estimated ACV, the policyholder usually goes to
17  work on their restoring their home or business. If they
18  continue to wait and do nothing, let the damages get
19  worse, it's been my experience that insurance companies
20  do not come in to estimate the increasing damages or the
21  changes in cost structure over time because a
22  pol cyholder has done nothing to restore their property.
23  Q (By Mr. Snodgrass) Okay. Well, let's just say
24  that the property doesn't get any worse, but the
25  pol cyholder just wants more ACV because of changing

## Page 131

1  circumstances. Can the policyholder -- in your
2  experience, does the policyholder call the insurance
3  company up and say, hey, can you come relook at my
4  property and see if I'm entitled to more ACV because,
5  you know, ACV changes over time?
6  MR. KAHN: Objection. Form. Incomplete
7  hypothetical. Calls for legal conclusion.
8  THE WITNESS: Based on my experience, I have
9  not seen that.
10  Q (By Mr. Snodgrass) But that's certainly possible,
11  because as we know, ACV changes over time. So if I have
12  cosmetic damage to my home, I can wait until the market
13  price is right and call the insurance company back and
14  say, hey, can you please readjust my ACV? That's
15  allowable. That doesn't happen?
16  MR. KAHN: Objection. Form. Incomplete
17  hypothetical. Calls for a legal conclusion.
18  THE WITNESS: I don't know if that's allowable
19  in the pol cy or not.
20  Q (By Mr. Snodgrass) Well, hasn't it been your
21  experience that ACV can change over time?
22  MR. KAHN: Objection. Form. Asked and
23  answered.
24  THE WITNESS: It can change because, as I
25  described earlier, oftentimes the scope of work changes

## Page 132

1  as you move forward w th the restoration process. I
2  have not seen people purposefully just let time get on
3  the clock so that they can call to have their ACV
4  reevaluated.
5  Q (By Mr. Snodgrass) You haven't seen that, huh?
6  **A Like I said before, most people move forward to**
7  **restore their property.**
8  Q I'm just trying to figure t out. It seems to me
9  that if ACV truly changed over time, a lot of people
10  would be calling the insurance company, come back and
11  reevaluate losses over time, wouldn't they?
12  MR. KAHN: Object on. Form. Incomplete
13  hypothetical. Calls for legal conclus on.
14  THE WITNESS: That's -- that's not -- that
15  doesn't comport with my experience. That's not how
16  things happen out there in the real world.
17  Q (By Mr. Snodgrass) And that's what I'm wondering.
18  Maybe your defin tion doesn't fit the real word.
19  Because if you've never seen a policyholder call up an
20  insurance company and say, hey, ACV changes over time.
21  Come reassess my loss. Maybe that means ACV really
22  doesn't change over time. Is that possible?
23  MR. KAHN: Object on. Form. Calls for legal
24  conclus on.
25  THE WITNESS: Sometimes the estimated RCV

## Page 133

1  changes, sometimes the estimated ACV changes. It
2  doesn't necessarily change by virtue of time alone. And
3  it's -- I have never encountered someone who wa ted at
4  home for extended per ods of time hoping that time would
5  change their estimated RCV.
6  Q (By Mr. Snodgrass) Or estimated ACV?
7  **A Either the estimated RCV or the estimated ACV.**
8  Q All right. Let's sw tch to Exhibit No. 3.
9  Exhibit 3 should be a screenshot?
10  **A Yes.**
11  Q Okay. You recognize what this screenshot comes
12  from?
13  **A Yes.**
14  Q Where does this come from?
15  **A It appears to be a screenshot from the Xactimate**
16  **software program.**
17  Q You see the site that says depreciation opt ons?
18  **A Yes.**
19  Q D d you see the reflection of the item called
20  depreciated removal?
21  **A Yes.**
22  Q And do you typically toggle depreciate removal on
23  or off?
24  MR. KAHN: Objection. Form.
25  THE WITNESS: I don't typ cally toggle t

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

Page 134

1  either way.
2  Q   (By Mr. Snodgrass)  Well, it has to be one or the
3  other when you do an estimate, doesn't it?
4  A   **When I typically provide estimates, they are RCV**
5  **estimates.**
6  Q   Okay.  How often have you been called upon to
7  calculate and make an ACV estimate?
8  A   **I would just say on occasion.**
9  Q   Okay.  How many times in your career have you been
10 called upon to calculate actual cash value?
11 A   **I wouldn't be able to tell you how many times in**
12 **40 years.**
13 Q   Once?  Twice?
14 A   **Perhaps in a 40-year period, 40 times.**
15 Q   Okay.  And as it relates to Ms. Mitchell's loss,
16 did you try to calculate her actual cash value?
17 A   **No.  I didn't.**
18 Q   Well, when you testified that you think the actual
19 cash value payment was sufficient, you don't know what
20 that was based on?  Specifically, you don't know what
21 depreciation option, if any, was used by State Farm to
22 calculate her actual cash value; correct?
23      MR. KAHN:  Object on.  Form.
24      THE WITNESS:  No.  That's false.  I mean, by
25 looking at the claim file documents, I can make a

Page 135

1  determination as to what material items and nonmaterial
2  items were depreciated.  And I am able to draw some
3  observations and conclusions from looking at those
4  documents.
5  Q   All right.  Well, let me ask you, which
6  depreciation option items should be checked in your
7  definition of ACV in the Xactimate program?
8      MR. KAHN:  Objection.  Form.
9      THE WITNESS:  What I see routinely selected
10 and depreciated are depreciate material, depreciate
11 nonmaterial, depreciate overhead and profit, depreciate
12 sales tax.
13 Q   (By Mr. Snodgrass)  All right.  So what about the
14 depreciate removal?
15 A   **That, most of the time, is not depreciated.**
16 Q   Is that industry custom and practice that removal
17 should not be depreciated?
18 A   **That's what I routinely see.**
19 Q   And why shouldn't removal labor be depreciated?
20      MR. KAHN:  Objection.  Form.  Calls for legal
21 conclusion.
22      THE WITNESS:  I do not know the reasoning
23 behind what -- what reasoning carriers use when they
24 decide not to depreciate labor.  I'm sorry.  When they
25 decide not to depreciate removal.

Page 136

1  Q   (By Mr. Snodgrass)  Why d d you -- so you opine
2  that labor should be depreciated in this case, but I
3  take it you have a more subtle opinion now, only
4  installat on labor should be depreciated but not removal
5  labor; correct?
6      MR. KAHN:  Objection. Form.
7      THE WITNESS:  Not depreciating removal
8  comports w th my earlier testimony that labor and
9  material are not -- material and nonmaterial  tems
10 should be depreciated because they are part of a
11 constructed system.  I gave an example of a roof system.
12 When you remove -- when you remove roof shingles, you're
13 not constructing a system.  You're removing something.
14 It's -- it's not constructing a system.  It's labor
15 only.  So that -- that squares w th the opinion I gave
16 you before.
17 Q   (By Mr. Snodgrass)  So to the extent State Farm
18 depreciated removal, you're certainly not opining that
19 that was acceptable?
20      MR. KAHN:  Objection.  Form.  Calls for legal
21 conclusion.
22      THE WITNESS:  I do not know what State Farm's
23 obligations are under the insurance contract.
24 Q   (By Mr. Snodgrass)  Well, right.  You don't know
25 what State Farm's obligations are to depreciate

Page 137

1  nonmaterials or not under the insurance contract.
2      I'm asking you, you've come here and you've
3  given your opinions, as I understand it, aren't really
4  related to the insurance policy; correct?
5      MR. KAHN:  Objection.  Form.
6      THE WITNESS:  That's too broad -- that's too
7  broad of a question.
8  Q   (By Mr. Snodgrass)  You didn't look at the
9  insurance policy to try to analyze whether nonmaterial
10 should be depreciated or not; correct?
11      MR. KAHN:  Objection.  Form.
12      THE WITNESS:  I did not try to interpret the
13 policy as to what State Farm's contractual obligations
14 are concerning depreciating nonmaterial.
15 Q   (By Mr. Snodgrass)  And similarly you didn't look
16 at the insurance policy to determine whether or not
17 State Farm should be depreciating removal?
18      MR. KAHN:  Objection.  Form.
19      THE WITNESS:  I did not -- again, did not
20 attempt to interpret the State Farm insurance contract
21 and State Farm's obligations.
22 Q   (By Mr. Snodgrass)  So let me ask you this, why is
23 removal labor not depreciated but installation labor
24 depreciated?  Why is that fine distinction being made by
25 you?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 138

1    MR. KAHN: Objection. Form. Asked and
2  answered.
3    THE WITNESS: Yes. As I've said before, the
4  construction of a roof system, for instance, is a
5  combination of labor and material, deliberately and
6  carefully, specifically put into place to create a
7  system, which has an intended purpose. Without the
8  combination of those two carefully brought together, no
9  such system arises. And so they are inseparable. They
10  are together. It takes both to create the insured
11  system or item. The item for which a policyholder
12  expects performance.
13  Q    (By Mr. Snodgrass) That's fine. But we were
14  talking about removal. Why is removal not depreciated?
15  A  **I think you already asked me that.**
16    MR. KAHN: Objection. Form.
17  Q    (By Mr. Snodgrass) I didn't hear it. You talked
18  to me a lot about inseparable stuff. But I'm trying to
19  figure out why isn't removal being depreciated in your
20  opinion?
21    MR. KAHN: Objection. Form. Asked and
22  answered.
23    THE WITNESS: As I said before, labor removal
24  is to remove shingles for instance. It isn't to
25  construct a system that sheds water, or a system for

## Page 139

1  which a home owner, for instance, expects performance
2  from a system made of labor and material. Tearing off
3  is just -- tearing off shingles,  t doesn't create
4  anything.
5  Q    (By Mr. Snodgrass) D d you see anything in the
6  insurance policy that talked about depreciating removal
7  versus depreciating installation labor?
8    MR. KAHN: Objection. Form. Calls for legal
9  conclus on.
10    THE WITNESS: I did not read the State Farm
11  insurance policy in order to determine what's covered,
12  what's not covered, and what's to be depreciated and
13  what's not because that requires me to start to form
14  legal opinions about what the contract says and does not
15  say. Rather, I'm here to talk about what I've seen in
16  my 40 years of experiences, common pract ces, and
17  industry standards.
18  Q    (By Mr. Snodgrass) Yeah. Can we see -- can you
19  take a look at Exhibit No. 4, please. Now, certainly in
20  your vast Mississippi insurance experience and
21  understanding, you've come across this document before;
22  right?
23    MR. KAHN: Objection. Form. Argumentative.
24    THE WITNESS: I have seen this before.
25  Q    (By Mr. Snodgrass) D d you get shown this

## Page 140

1  document by your attorney? Or did you get shown this
2  document as part of your Mississippi experience?
3    MR. KAHN: Objection. Form.
4    THE WITNESS: I saw this as part of the
5  documents that I reviewed and attached to one pleading
6  or another, as I recall.
7  Q    (By Mr. Snodgrass) So have you experienced --
8  have you experienced this document and this policy in
9  your insurance restoration practices for the State of
10  Mississippi at all?
11    MR. KAHN: Objection. Form.
12    THE WITNESS: No. I haven't.
13  Q    (By Mr. Snodgrass) In looking at the case, did
14  you look to see whether or not the insurer in this case
15  clearly provided for the depreciation of labor in the
16  insurance policy?
17    MR. KAHN: Objection. Form.
18    THE WITNESS: No, I did not.
19  Q    (By Mr. Snodgrass) Did you talk to anybody about
20  the Mississippi Insurance Department's bulletin?
21    MR. KAHN: Objection. Form. To the extent
22  this is seeking communications with counsel, I'm going
23  to instruct you not to answer.
24    If you talked to anybody other than counsel,
25  you can answer.

## Page 141

1    THE WITNESS: No. No one else other than
2  counsel.
3  Q    (By Mr. Snodgrass) Did you ever see State Farm
4  follow the format suggested in the last sentence of the
5  second paragraph where, if material or labor is
6  depreciated, the insurer should clearly set out those
7  amounts in the claim estimate? Did you see any proof
8  that State Farm ever set out the amount of the labor
9  depreciation?
10    MR. KAHN: Objection. Form.
11    THE WITNESS: I did not look into that. That
12  was --
13  Q    (By Mr. Snodgrass) Did you see that in
14  Ms. Mitchell's claim when you reviewed her estimate?
15  Did you see State Farm clearly setting forth and
16  communicating to her the amount of labor depreciation
17  withheld?
18    MR. KAHN: Objection. Form.
19    THE WITNESS: That was not part of my inquiry.
20  Q    (By Mr. Snodgrass) That was -- I don't -- you did
21  look at the estimate Ms. Mitchell was provided by State
22  Farm; right?
23  A  **That was not part of my inquiry.**
24  Q    That wasn't my question. You did look at the
25  estimate Ms. Mitchell was provided by State Farm;

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 142

1  correct?
2  **A   Yes.**
3  Q   Did you see the labor depreciation clearly set
4  forth on that estimate?
5  MR. KAHN:  Objection.  Form.
6  THE WITNESS:  That was not part of my inquiry.
7  Q   (By Mr. Snodgrass)  That doesn't matter, sir.  Did
8  you see it or not?  You have to answer.  You can't just
9  say I don't want to answer.
10  MR. KAHN:  Objection.  Form.  And he's told
11  you what his answer was.  You've asked him the question,
12  he's given you an answer.
13  MR. SNODGRASS:  That's not an answer.  That's
14  non-responsive and I move to strike.
15  Q   (By Mr. Snodgrass)  Did you see that, sir?  Yes or
16  no.
17  MR. KAHN:  Objection.  Form.  Asked and
18  answered.
19  THE WITNESS:  It's not something that I looked
20  for.
21  Q   (By Mr. Snodgrass)  Did you see it?
22  MR. KAHN:  Objection.  Form.  Asked and
23  answered.
24  If you have anything further to say, you can
25  say  t.

## Page 143

1  THE WITNESS:  I feel like I've answered that
2  question.
3  Q   (By Mr. Snodgrass)  No.  No, you haven't, sir.  If
4  you saw it, you have to tell me.  You're under oath.
5  You have to say the truth, the whole truth, and nothing
6  but the truth.  Do you remember taking that oath at the
7  beginning of the deposition?
8  MR. KAHN:  Joe, he's given you an answer to
9  the question.
10  MR. SNODGRASS:  No.  No.
11  MR. KAHN:  If you're going to keep being
12  argumentative and abusive, we can put this off.
13  Q   (By Mr. Snodgrass)  Did you see it, sir?  Just yes
14  or no.
15  MR. KAHN:  Objection.  Asked and answered.
16  THE WITNESS:  I said it wasn't part of my
17  inquiry.  I did not look for it.  So I don't know
18  whether it's on there or not.
19  Q   (By Mr. Snodgrass)  That was the answer I was
20  looking for.  Did you not see it because you weren't
21  carefully looking at the estimate?
22  MR. KAHN:  Objection.  Form.  Argumentative.
23  Asked and answered.
24  THE WITNESS:  I'm not sure why.
25  Q   (By Mr. Snodgrass)  Did you ever try to calculate

## Page 144

1  the amount of labor depreciat on for any State Farm
2  policyholder ever?
3  MR. KAHN:  Objection.  Form.
4  THE WITNESS:  No.
5  MR. SNODGRASS:  Court reporter, can you please
6  mark F as the next exhibit.  And tell me what number it
7  is.
8  THE COURT REPORTER:  We are on No. 5.
9  (Exhib t No. 5 was marked for  dentification
10  purposes)
11  Q   (By Mr. Snodgrass)  Sir, you've seen this document
12  before, I assume?
13  **A   Yes.**
14  Q   I'll talk with you about this.  First off, do you
15  know Mr. Johnson?
16  **A   No, I don't.**
17  Q   Okay.  D d you see that Mr. Johnson made some
18  opin ons in Paragraphs 12 to 21 about Xactimate
19  software?
20  MR. KAHN:  Objection.  Form.
21  THE WITNESS:  I do see starting at his Page 4
22  through Page 6, items 12 through 21.
23  Q   (By Mr. Snodgrass)  And you see that Mr. Johnson,
24  at least in his CV, did you see that he is an Xactimate
25  certified user level three?

## Page 145

1  **A   No.  I didn't see that.**
2  Q   Okay.  Do you dispute any of the statements in
3  Paragraphs 12 to 21, as it relates to the Xactimate
4  estimating software in Mr. Johnson's report?
5  MR. KAHN:  Take as much time as you need.
6  (Witness examines document)
7  Q   (By Mr. Snodgrass)  Let's take it one paragraph at
8  a time, if we could, Mr. Berryman?
9  **A   Hold on.  I'm almost finished.**
10  Q   Okay.
11  **A   Okay.  I'm finished.**
12  Q   Okay.  The question was whether or not you
13  disputed anything in Paragraphs 12 to 21?
14  MR. KAHN:  Objection.  Form.
15  THE WITNESS:  Well, I have a little bit of
16  issue with one of the things that's said in 18, and also
17  20.
18  Q   (By Mr. Snodgrass)  What is your issue with --
19  well, first off, so I take  t 12 through 17 you don't
20  dispute?
21  **A   They seem to be -- they seem to be accurate.**
22  Q   18?  You sa d you question or have a concern.  I
23  couldn't hear what you said.  What's the problem with
24  18?
25  **A   Well, at the very last sentence he says, in other**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 146

1 words, depreciation of building materials can easily be
2 calculated within the software without concurrently
3 applying the same percentage values and future labor
4 costs. And that might be wholly or almost wholly true
5 when you talk about versions of Xactimate that exist
6 today. But I'm not so sure that's accurate when you
7 talk about versions of Xactimate that have been
8 available in years past, in recent years past.
9 Q (By Mr. Snodgrass) Well, Mr. Johnson -- well
10 first off, you understand there's a class per od there;
11 right?
12 A Yes.
13 Q Okay. And so we are only talking about 2014 to
14 the present?
15 MR. KAHN: Objection. Form.
16 THE WITNESS: That, I don't know.
17 Q (By Mr. Snodgrass) Did you remember reading
18 Paragraph 2 where we're talking about a time frame with
19 a date of June 23rd, 2014?
20 A Which Paragraph 2?
21 Q Paragraph 2 of Mr. Johnson's report.
22 A Yes. I see that.
23 Q Okay. So first off, I assume that every vers on
24 of Xactimate since 2014 has allowed the depreciat on
25 opt ons that we discussed earlier; correct?

## Page 147

1 A I don't know that that's accurate.
2 Q You don't know one way or the other?
3 A Not as I sit here. It's something I would have to
4 investigate. It may, as he says in 18, that may be a
5 true statement for available Xactimate platforms today.
6 But I'm not sure that would be a true statement
7 extending back to systems that might have been in use in
8 late '14, '15 and '16. I would just have to investigate
9 it to know.
10 Q So you're not disputing t, you're just saying you
11 would need to investigate it?
12 A Yes. I don't know that it's accurate. That's
13 what I'm saying.
14 Q But t might be completely accurate on the other
15 hand; correct?
16 MR. KAHN: Object on. Form. Asked and
17 answered.
18 THE WITNESS: As I said, I don't know if it's
19 accurate or not.
20 Q (By Mr. Snodgrass) Okay. And certainly you have
21 this opin on pr or to you issuing your opin on; correct?
22 A Which opinion as to whether what he says is
23 accurate or not?
24 Q Well, I'm just trying to establish the simple
25 propos tion that his report was issued long before your

## Page 148

1 report. And we know that because your report refers to
2 his report; correct?
3 A Well, I think his report was issued maybe two
4 weeks before mine, plus or minus.
5 Q Right. So to the extent you wanted to, you had a
6 full and fair opportunity to determine whether or not
7 Paragraph 18 was 100 percent accurate or not; correct?
8 MR. KAHN: Objection. Form.
9 THE WITNESS: I suppose I could have.
10 Q (By Mr. Snodgrass) Okay. What other problems or
11 issues do you have with Paragraphs 12 to 21?
12 A At the end of 20, he says others such as State
13 Farm require their adjuster to depreciate labor. And I
14 don't know if that's a requirement or not. So I don't
15 know -- I don't know if that's accurate or not.
16 Q Anything else in Paragraphs 12 to 21?
17 A I think that's it.
18 Q Okay. Now, in the next sect on of his report,
19 Mr. Johnson talks about claims management software that
20 he used. First off, have you ever used in your life
21 claims management software?
22 MR. KAHN: Objection. Form.
23 THE WITNESS: I have not operated it. I have
24 looked at reports that have been generated by it.
25 Q (By Mr. Snodgrass) When you say you looked at

## Page 149

1 reports generated by it, are you talking about printed
2 documents?
3 A Yes. Printed and electronic documents that are
4 claims management software printouts.
5 Q Okay. But you've never actually used or
6 interfaced with claims management software?
7 MR. KAHN: Objection. Form.
8 THE WITNESS: I have not entered data, but I
9 have seen reports from claims management software.
10 Q (By Mr. Snodgrass) You consider yourself to have
11 an expertise in claims management software?
12 MR. KAHN: Objection. Form.
13 THE WITNESS: No. Not beyond being able to
14 read it for what it says.
15 Q (By Mr. Snodgrass) Okay. Are you familiar w th
16 any types of claims management software?
17 A Not by name. No.
18 Q Have you ever had claims management software on
19 any computer that you've owned?
20 A Objection. Form.
21 THE WITNESS: No.
22 Q (By Mr. Snodgrass) Have you ever had claims
23 management software on any telephone that you've ever
24 owned? When I say phone, I mean cell phone.
25 MR. KAHN: Objection. Form.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 150

1      THE WITNESS:  No.

2  Q   (By Mr. Snodgrass)  Have you ever had any training

3  as it relates to the use of claims management software?

4      MR. KAHN:  Objection.  Form.

5      THE WITNESS:  No.

6  Q   (By Mr. Snodgrass)  Have you ever looked at any of

7  the documents State Farm produced in this case relating

8  to claims management software?

9      MR. KAHN:  Objection.  Form.

10     THE WITNESS:  By when you say document, do you

11  mean printouts from the State Farm claims management

12  software?

13  Q   No.  I mean like training videos, that type of

14  thing, dealing with the claims management software?

15  A   No.

16  Q   Okay.  And I assume that when you say cleaned out

17  some of the claims management software, are you talking

18  about the PDF claim files that you received and printed

19  hard copy?

20  A   Yes.

21  Q   Is that the only thing that you saw that was

22  related to claims management software in this case?

23  A   Yes.

24  Q   Okay.  So let me ask you this, I assume that you

25  have no basis because you're not an expert in the area

## Page 151

1  to dispute anything that Mr. Johnson says relating to

2  Paragraphs 22 to 24?

3      MR. KAHN:  Object on.  Form.

4      THE WITNESS:  What was your quest on again?

5  Q   (By Mr. Snodgrass)  Do you have any basis to

6  dispute anything in Paragraphs 22 to 24 based on the

7  fact you're not an expert on claims management software?

8      MR. KAHN:  Object on.  Form.

9      THE WITNESS:  Well, not on that basis.  But I

10  don't see anything that I dispute about 22 through 24.

11

12

13

14

15

16

17  Q   Mr. Johnson says that in his experience the data

18  points collected by State Farm's claims management

19  software is similar to the data points collected by

20  other property and insurance companies and their

21  respective claims management software.  Do you have any

22  reason to dispute that?

23  A   No.

24  Q   28, he talks about State Farm producing Excel

25  spreadsheets that include claim information for

## Page 152

1  thousands of Mississippi structural damage claims.

2  Information w thin the Excel spreadsheets includes, and

3  then he goes on to discuss different data sets that were

4  produced.  Did you review any Excel spreadsheets in this

5  case?

6  A   Yes.

7  Q   And what spreadsheets did you review?

8  A   (No response)

9  Q   Let me ask you this, are you just going to refer

10  me to the documents reviewed sect on of your opinion?

11  A   I'm going to go through the documents reviewed

12  section to get the Bates number to answer your question

13  with.

14  Q   I'll let it go because if that's what you would

15  do, then I can figure that out myself.  Let me ask you

16  this, have you rendered any opinions based upon the

17  Excel spreadsheets in your report?

18  A   Yes.  I think so.

19  Q   And where are those opinions set forth?

20  A   Well, they are set forth -- I think the

21  spreadsheets are part of the documents that would inform

22  me specifically concerning the following opinions.

23

24

25

## Page 153

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 154



## Page 155

1  Q    Well, first off, how -- in order to determine
2  whether or not damages can be calculated, don't you have
3  to know how the Plaintiffs are claiming damages can be
4  calculated?
5       MR. KAHN:  Objection.  Form.
6  Q    (By Mr. Snodgrass) Let me ask you this, do you
7  understand or have any understanding about how the
8  Plaintiffs' claimed damages can be calculated in this
9  case?
10      MR. KAHN:  Objection.  Form.
11      THE WITNESS:  Yes.  It's my understanding that
12  the Plaintiff is asserting that all you need to do is
13  find those people that fit within the State of
14  Mississippi within a certain time frame who received
15  only ACV payments.  And somehow electronically figure
16  out how much labor depreciation was taken in that
17  process.  And the total of that column, if you will, is
18  the measure of the impact of labor depreciation, and I
19  suspect a measure of the damages.
20  Q    (By Mr. Snodgrass) Okay.  And so when you say
21  that damages can't be calculated, let's step back and
22  see what you know and what you don't know.  Are you
23  aware that State Farm pays for labor depreciation in
24  certain states?  Yes or no.
25      MR. KAHN:  Objection.  Form.

## Page 156

1       THE WITNESS:  I don't know that with
2  certainty.
3  Q    (By Mr. Snodgrass) Okay.  You were asked in a
4  number of depositions so far whether or not you were
5  aware that State Farm engaged in a supplemental payment
6  program to pay for outstanding labor depreciati on on
7  claims in certain states.  You were asked about that in
8  prior deposit ons.  Do you ever ask anybody about how
9  easy it is to determine the damages that the Plaintiffs
10  claim in this case?
11      MR. KAHN:  Objection.  Form.
12      THE WITNESS:  No.
13  Q    (By Mr. Snodgrass) Okay.  And so if it turns out
14  that State Farm went through a process nearly  dentical
15  to what Mr. Johnson says you should do, you have no
16  knowledge of that one way or the other; correct?
17      MR. KAHN:  Objection.  Form.  Incomplete
18  hypothetical.
19      THE WITNESS:  I don't know whether they did or
20  not.  But what I can tell you in this matter is that it
21  wouldn't be accurately done the way  t's been put forth
22  by the Plaintiff.
23      MR. SNODGRASS:  Okay.  Well, let's take  t one
24  step at a time.  First off, do you know how State Farm
25  did it when State Farm wanted to calculate the damages

## Page 157

1  owed to people that were withheld, labor depreciati on,
2  from their structural damages claims in other states?
3  Do you know how State Farm d d those calculations?
4       MR. KAHN:  Object on.  Form.
5       THE WITNESS:  No.
6  Q    (By Mr. Snodgrass) Okay.  So if State Farm did  t
7  the exact way Mr. Johnson says that they should do  t,
8  you wouldn't have any information to dispute that one
9  way or the other; correct?
10      MR. KAHN:  Object on.  Form.
11      THE WITNESS:  Could you ask that again?
12  Q    (By Mr. Snodgrass) Sure.  It would seem to me
13  that if you were going to truly opine that class
14  memberships and damages cannot be accurately determined
15  for insureds the way Toby Johnson says they can, that
16  somebody would have told you, hey, we've done this
17  before, we have done  t in multiple states before, and
18  we d d the same way kind of Toby Johnson just says we
19  should do  t.  Would that be an important fact for you
20  to know?
21      MR. KAHN:  Object.  Form.
22      THE WITNESS:  Depends on what the "kind of"
23  is.
24  Q    (By Mr. Snodgrass) Depends on what?
25  A    **What the kind of is.  We kind of did it like that.**

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 158

1  **What does that mean?**
2  Q   Okay.  That's fair enough.
3        MR. SNODGRASS:  Could you please mark for the
4  witness, exhib t --
5        MR. KAHN:  Is this a good time to take a
6  break, Joe?
7        MR. SNODGRASS:  Not if you want to leave at
8  4:30.
9        MR. KAHN:  We want to leave at 4:30, but we
10 have been going for about an hour.
11       MR. SNODGRASS:  We just took a break.
12       MR. KAHN:  We took a break to open the door.
13 It's pretty steamy in here.  If you've got a couple of
14 quest ons, you're -- you doing okay, Mike?
15       THE WITNESS:  Yeah.
16       MR. KAHN:  Give you another couple of minutes.
17       MR. SNODGRASS:  We wound up taking much longer
18 than a half an hour lunch break and that was the deal.
19 So I don't know --
20       MR. KAHN:  My clock says 40 minutes for lunch.
21       MR. SNODGRASS:  Okay.  Well, that means you're
22 not leaving until 4:40.
23       MR. KAHN:  Joe, we talked about that because
24 we got flights to catch.  I understand you are in
25 Minnesota, we are not.

## Page 159

1        MR. SNODGRASS:  We could limit lunch --
2        MR. KAHN:  Let's just go with whatever you are
3  going to mark.  Let's mark it so we can get moving.
4        MR. SNODGRASS:  That's what I suggest we do.
5  Has it been marked?
6        THE COURT REPORTER:  You didn't tell me what
7  letter.  We've got A, B, C, D and F.  Is 1, 2, 3, 4 and
8  5.
9        MR. SNODGRASS:  E.
10       (Exhibit No. 6 was marked for identification
11       purposes)
12       THE COURT REPORTER:  All right.
13 Q   (By Mr. Snodgrass)  Showing you, sir, what's been
14 marked as Deposition Exhibit No. 6.  This is a
15 declaration of Alan King that was disclosed in the
16 Lebriar case; correct?  You see that?
17 A   Yes.
18 Q   And you were a witness, an expert witness, in that
19 Lebriar case; is that true?
20 A   Yes.
21 Q   You know who Alan King is?
22 A   No, I don't.
23 Q   You on Paragraph 5, that he describes a
24 process to issue supplemental payments?
25       MR. KAHN:  Objection.  Form.  Joe, just making

## Page 160

1  sure this was not filed under seal; right?
2        MR. SNODGRASS:  This was not filed under seal.
3  Q   (By Mr. Snodgrass)  Do you see this Paragraph 5
4  that identifies the steps?
5  A   I'm still reading it.
6        (brief pause)
7  Q   (By Mr. Snodgrass)  Have you had a chance to look
8  at Paragraph 5?
9  A   Yes.  I've read it.
10 Q   Okay.  Do you know whether or not --
11       MR. KAHN:  If you need to read paragraphs in
12 that exhibit, you're welcome to.
13       MR. SNODGRASS:  Just going to ask him about
14 Paragraph 5.
15 A   (By Mr. Snodgrass)  Do you know whether or not the
16 information, the process described in Paragraph 5,
17 whether that can be followed to determine in State
18 Farm's mind, the amount of damages at issue in the case?
19       MR. KAHN:  Objection.  Form.
20       THE WITNESS:  Like, I don't know -- you lost
21 me on the in State Farm's mind.  I don't know what State
22 Farm would do to determine whatever they want to
23 determine.
24 Q   (By Mr. Snodgrass)  Fair enough.  Do you know
25 whether or not the process described by Mr. King in

## Page 161

1  Paragraph 5 can be used to determine class membership
2  and damages in this case?
3        MR. KAHN:  Object on.  Form.  Calls for a
4  legal conclusion.
5        (brief pause)
6  Q   (By Mr. Snodgrass)  Do you, sir?
7  A   Well, you know you really surprise me with this
8  document.  I don't know that I could -- I don't think I
9  could form a conclusion about this in such a short time
10 frame.  I would want to read the entire document.
11 Understand it's context.  Why it came about.  How it
12 came about.  What does it mean.
13 Q   I just want to know -- I just want to know whether
14 or not, those one, two, three, four, five, six bullet
15 points can be used to determine -- not only determine
16 but actually pay for damages in this case?  Do you know
17 whether or not that is true one way or the other?
18       MR. KAHN:  Object on.  Form.  And he told you
19 he needed time to review the document in full and to
20 study it.
21 Q   (By Mr. Snodgrass)  Okay.  Well, let's put it this
22 way so we move on because I know that you want time to
23 consider t.  But certainly this puts in jeopardy all of
24 your opin ons in this case about the inabil ty to
25 calculate damages; correct?

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 162

1      MR. KAHN: Objection. Form.
2      THE WITNESS: Absolutely not.
3   Q   (By Mr. Snodgrass) Well, what specifically --
4   A   **I said calculate damages accurately. That's two**
5   **different things.**
6   Q   What in this paragraph leads you to believe that
7   damages through this process could not be calculated
8   accurately?
9      MR. KAHN: Objection. Form.
10      THE WITNESS: Because it's my experience that
11   the -- in working in the industry on a day-to-day basis,
12   the most that a carrier pays to an insured after
13   deductible is the reasonable and necessary cost to
14   restore the property. This methodology, as I understand
15   it in Exhibit M, Plaintiff's Exhibit 6, I have only had
16   a few minutes to look at it, would not be able to
17   determine if a policyholder, for instance, had already
18   performed the work and done so for the estimated ACV
19   that had already prev ously been paid.
20      And that being the case, it's my
21   understanding, working in the industry, that that is --
22   that is more than sufficient to compensate an insured
23   for a loss because they have been able to complete the
24   restorat on of the property for the amount of money
25   prev ously paid.

## Page 163

1   Q   (By Mr. Snodgrass) So I think I understand what
2   you're saying. Are you saying then what the insured
3   actually spends to repair  ts -- his or her property can
4   affect the right to recover actual cash value of the
5   loss?
6      MR. KAHN: Objection. Form. Calls for legal
7   conclusion.
8      THE WITNESS: Yeah. As I have said throughout
9   this deposition, I did not get into determining what
10   someone is entitled to, or rights, or obligations under
11   the pol cy or under the law. I'm simply telling you
12   from my experience, and I think from a common sensical
13   viewpoint, insurance policies, people have an
14   expectation of, I've seen time and again, a policy pays
15   them the necessary and reasonable costs to restore the
16   property, not more than that. And I think this
17   methodology that I've reviewed in just a few minutes,
18   Plaintiff's Exhibit 6, would, in fact, could very easily
19   compensate a number of people who had already received
20   more than suff cient funds to accomplish the reasonable
21   and necessary repair of their property.
22   Q   (By Mr. Snodgrass) Okay. So that's based on your
23   belief, I guess, and your experience that if the
24   policyholder has enough money to pay somebody to fix
25   their property, that's the cap that they can get. They

## Page 164

1   can't get actual cash value any more; correct?
2      MR. KAHN: Objection. Form. Calls for a
3   legal conclusion.
4      THE WITNESS: As I've said a few times today,
5   it's my experience in the industry, it seems very common
6   sensical to me, that out here in the real world, people
7   expect to be paid the reasonable and necessary
8   replacement value or cost to restore their damaged
9   property, not more than that. And I think this
10   methodology that's been described in Plaintiff's Exhib t
11   6 would compensate a number of people over and above
12   what would actually be required to complete the repairs
13   on their damaged property.
14   Q   (By Mr. Snodgrass) Okay. But you would agree
15   w th me that if actual cash value is the minimum amount
16   that is owed under the policy, this would be a perfectly
17   fine way to calculate damages?
18      MR. KAHN: Objection. Form. Calls for a
19   legal conclusion.
20      THE WITNESS: Before I can answer that, I
21   would want to take more time to review this and
22   understand it in a w der context than you've provided
23   for me the last ten minutes.
24   Q   (By Mr. Snodgrass) Well, I understand that. But
25   as you can see, this isn't something coming from me.

## Page 165

1   This is something coming from State Farm.
2      But let me ask you this, as you s t here
3   today, if  t is determined that actual cash value is the
4   minimum payment owed to the policyholder, can you think
5   of any reason why the steps in Paragraph 5 could not be
6   taken to calculate damages owed to the pol cyholder?
7      MR. KAHN: Object on. Form. Incomplete
8   hypothetical. Calls for speculat on. Calls for legal
9   conclus on. You can answer.
10      THE WITNESS: I would want more time to review
11   it in this context, especially against the backdrop of
12   what is this document, where did  t come from, at what
13   time. I think it's just something that you've put in
14   front of me and asked me to analyze in ten minutes, and
15   I just think that's an unfair approach to ask me
16   quest ons about  t.
17   Q   (By Mr. Snodgrass) No. I understand that. And
18   you can have more time. But I do get to ask you -- as
19   you sit here today, can you think of any reason why if
20   actual cash value is the minimum payment owed, why this
21   cannot be used to determine damages. If you can think
22   of something great, if you can't as you s t here today,
23   that's fair too. You can just say, I can't think of
24   anything, but I need more time to think about it.
25      MR. KAHN: Object on. Form. Asked and

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 166

1   answered.  Calls for speculation.  Calls for legal
2   conclusion.  You can answer.
3       THE WITNESS:  I would like to read  t.
4       THE COURT REPORTER:  I need to change paper as
5   well.
6       MR. KAHN:  You want to take a break, Joe?
7       MR. SNODGRASS:  Let her change paper and then
8   we'll keep going.  We are down to the last hour.
9       MR. KAHN:  Yeah.  But we've been going for a
10  little more than an hour now, hour and 15 minutes.
11      MR. SNODGRASS:  Let's take a few minutes then,
12  boys.  But like I sa d, we have already gotten away
13  from --
14      MR. KAHN:  Off the record.
15     (A short break was had; after which the
16     following proceedings took place:)
17  Q    (By Mr. Snodgrass)  Okay.  Back to the Toby
18  Johnson report.  Paragraphs 32 through 38 he made
19  certain statements about the data points needed to
20  determine membership in a defined group.  You've made
21  some statements that are disputing class membership.
22  But I think all of your primary arguments about
23  Mr. Johnson's opinions are, and correct me if I'm wrong,
24  please, are reflective of the fact that you believe the
25  actual cost of repair, if they are lower than the actual

## Page 167

1   cash value payment, mean that the pol cyholder has been
2   -- the policyholder has suffered no economic damages.
3   So I don't want to get in a fight between -- or keep
4   going with the fight about what's the minimum payment on
5   the policy -- under the policy.  So let me ask you this,
6   if the Court holds that actual cash value is the minimum
7   amount of payment owed under the policy, do you know
8   whether or not the opinions stated by Mr. Johnson in
9   Paragraphs 32 through 38 are accurate?
10      MR. KAHN:  Object on.  Form.  Calls for a
11  legal conclus on.  You may answer.
12      THE WITNESS:  I need to read them first.
13      MR. SNODGRASS:  Please do.
14     (W tness read through documents)
15      THE WITNESS:  Okay.  I've read it.
16  Q    (By Mr. Snodgrass)  Okay.  So for Paragraphs 32
17  through 38, just a reminder, if the Court holds that
18  actual cash value is the minimum payment owed under the
19  pol cy, so putting that dispute aside, is there -- if
20  that's the holding, is there anything in Paragraphs 32
21  through 38 that is inaccurate?
22      MR. KAHN:  Object on.  Form.  Calls for a
23  legal conclus on.
24      THE WITNESS:  I don't think I'm in a position
25  to answer that.

## Page 168

1  Q    (By Mr. Snodgrass)  Okay.  So certainly you're not
2  disputing it, you're just not in a position to say one
3  way or the other?
4      MR. KAHN:  Objection.  Form.
5      THE WITNESS:  Well, as I've said throughout
6  this deposition, I'm not here to opine about legal
7  conclusions or what might be owed under the contract, or
8  what a judge's ruling should be paid or not paid, and
9  wh ch one of the columns would be appropriate.  I'm
10  rather here to talk about what's done on a day-to-day
11  basis in the industry, what are common practices, what
12  are industry standards.
13  Q    (By Mr. Snodgrass)  Right.  And obv ously you and
14  I can disagree about that.  But I'm just wondering, if
15  the Court comes down and says, despite your 40 years of
16  experience, actual cash value is the minimum payment, is
17  there anything in 32 through 38 that's inaccurate?
18  Because I won't get a chance to depose you if the Court
19  holds the way I want it to hold, I need to ask you now.
20  Is there anything that you can think of today that makes
21  32 through 38 inaccurate if that's the holding in the
22  case?
23      MR. KAHN:  Objection.  Form.  Asked and
24  answered.  Calls for legal conclusion.
25      THE WITNESS:  I guess I would want to see the

## Page 169

1   ruling and try to interpret it.  But as I've said,
2   that's not my bailiw ck.  That's not -- I don't try to
3   interpret the legal s de of this, what the obligat ons
4   are, what a court's determined.
5   Q    (By Mr. Snodgrass)  Is there anything factually
6   wrong that you can think of if the Court holds actual
7   cash value is the minimum payment?
8      MR. KAHN:  Objection.  Form.  Calls for legal
9   conclusion.
10      THE WITNESS:  As I've sa d before, I just
11  think that's outside my bailiw ck to be able to answer
12  that.
13  Q    (By Mr. Snodgrass)  That's fair.  I just wanted to
14  give you a chance to dispute something if you wanted to.
15     As  t relates to Paragraphs 39 through 44 of
16  the Johnson report, same question.  If the Court holds
17  that actual cash value is the minimum payment owed under
18  the pol cy, is there anything in Paragraphs 39 through
19  44 of Mr. Johnson's report that you believe is
20  inaccurate?
21      MR. KAHN:  Objection.  Form.  Calls for a
22  legal conclusion.
23     (Witness read documents)
24      THE WITNESS:  Okay.  I've read it.
25  Q    (By Mr. Snodgrass)  Okay.  Again, assuming the

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 170

1  Court rules that actual cash value is the minimum
2  payment -- the minimum amount owed under the policy, is
3  there anything in Paragraphs 39 through 44 that you
4  believe to be inaccurate?
5      MR. KAHN:  Object on.  Form.  Calls for a
6  legal conclus on.
7      THE WITNESS:  Well, again, I don't have any
8  opin on on what the impact of a court ruling might be or
9  might not be.  But as I understand items 39 through 44,
10  these concern -- these fall under the funding of time
11  estimates.  And it seems like Mr. Johnson's trying to
12  say that this isn't going to take very much time to
13  figure out what he thinks he can figure out.  And I can
14  tell you from my analysation of the four claim files
15  that I performed that are part of my report, that I
16  really take issue that he could do this as quickly as he
17  thinks he can.
18  Q    (By Mr. Snodgrass)  Well, let me ask you this, did
19  you attack his time estimates in any of your written
20  opin ons?
21      MR. KAHN:  Object on.  Form.
22      THE WITNESS:  No, I did not.  I did not opine
23  about how much time it would take.
24  Q    (By Mr. Snodgrass)  Okay.  And Mr. Johnson, it
25  doesn't say -- let me ask you this, my understanding was

## Page 171

1  you didn't do what Mr. Johnson said he would do.  He
2  says that he would -- it would only take a certain
3  amount of time about having access to the electronic XLS
4  file -- I'm sorry.  Electronic ESX file and the claims
5  management software.  Did you have access to the ESX
6  file when you did your analysis?
7      MR. KAHN:  Objection.  Form.
8      THE WITNESS:  No.
9  Q    (By Mr. Snodgrass)  Okay.  Did you try to estimate
10  how long  t would take then -- well, obv ously you
11  didn't then make any estimates on how long it would take
12  to manipulate ESX data; correct?
13      MR. KAHN:  Objection.  Form.
14      THE WITNESS:  That's right.
15  Q    (By Mr. Snodgrass)  And did you have access to
16  State Farm's claims management software when you were
17  doing your process of review?
18  **A    No.**
19  Q    In fact, did they just give you a big stack of PDF
20  papers and say, figure it out?
21      MR. KAHN:  Objection.  Form.
22      THE WITNESS:  No.  That's not what they d d.
23  Q    (By Mr. Snodgrass)  What did they do?
24
25

## Page 172

1
2
3  Q    Well, Mr. Johnson does not say that he went
4  through the PDF file.  In fact, he says that he would
5  need the claims management software.  So let's try to be
6  clear.  Mr. Johnson's opinions are based upon access to
7  the software, not a big stack of printed out documents.
8  Do you understand that?
9      MR. KAHN:  Object on.  Mischaracterizes
10  Mr. Johnson's opinion.  And the form of the question.
11      THE WITNESS:  I understand what Mr. Johnson is
12  saying here.  But I've looked at lots of claim files in
13  my life, and lots of estimates.  And if a person wanted
14  to really be accurate -- I mean, I'm not saying he can't
15  come up w th some kind of an answer.  I'm sure he can
16  come up w th an answer in two or three minutes.  But I
17  would really question as to whether it's an accurate
18  answer or not.
19  Q    (By Mr. Snodgrass)  Be that as  t may, first off,
20  you, yourself, never looked at the insurance company's
21  claims management software; right?
22  **A    That's right.**
23  Q    And so whether or not that cuts the time to review
24  a file in half, in tenths, or even quicker, you don't
25  know one way or the other because you've never used the

## Page 173

1  claims management software; correct?
2  **A    I have not used it.  But I really take issue that**
3  **anybody could do that kind of analysis in just two or**
4  **three minutes.**
5  Q    And in fact, Mr. King's declarat on describes the
6  process very similar to Mr. Johnson's process; correct?
7      MR. KAHN:  Object on.  Form.
8      THE WITNESS:  I don't know.
9  Q    (By Mr. Snodgrass)  Okay.  Are you aware of
10  anybody who actually had access to the ESX file, who had
11  access to claims management software, who was a trained
12  insurance adjuster who actually adjusted claims, do you
13  have any idea as to how long it would take someone like
14  that to handle the file?  Or would you just be
15  speculating based on the fact you've never adjusted a
16  claim in your life, you've never used claims management
17  software in your life?  Let me know.
18      MR. KAHN:  Object on.  Form.  Incomplete
19  hypothetical.
20      THE WITNESS:  I think a lot of it would depend
21  on the abil ties of the individual person.
22  Q    (By Mr. Snodgrass)  Well, certainly you would
23  agree with me that you're not an expert on claims
24  management software.  You're not an expert on insurance
25  adjusting.  You've never adjusted a property insurance

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 174

1  claim in your life. And you really have no foundation
2  to determine how long it would take to analyze these
3  issues having full access to that type of software and
4  resources, do you?
5  　　　　MR. KAHN: Objection. Form.
6  　　　　THE WITNESS: I have not used those resources.
7  But based on my own experience and understanding how
8  Xactimate, ESX files work, and having been in ESX files
9  before on my own computer, I still find it kind of
10  laughable that he thinks he can do that in two or three
11  minutes.
12  Q　　(By Mr. Snodgrass) So how long do you think it
13  would take to toggle on and off the depreciation
14  settings? Let's take it one step at a time. Once the
15  ESX file is booted up onto your laptop, how long does it
16  take you to navigate to the depreciation options screen?
17  　　　　MR. KAHN: Objection. Form.
18  　　　　THE WITNESS: I don't know. I've never timed
19  myself.
20  Q　　(By Mr. Snodgrass) You think it takes more than
21  five seconds or less than five seconds?
22  　　　　MR. KAHN: Objection. Form.
23  　　　　THE WITNESS: More than five seconds.
24  Q　　(By Mr. Snodgrass) Ten seconds?
25  **A　　More than ten.**

## Page 175

1  Q　　You think you can get -- once the program's
2  actually loaded with the ESX file, it's going to take
3  you longer than ten seconds to get to the depreciation
4  option screen?
5  　　　　MR. KAHN: Objection. Form.
6  　　　　THE WITNESS: Yes.
7  Q　　(By Mr. Snodgrass) How many seconds is it going
8  to take you to get to the depreciation option screen?
9  　　　　MR. KAHN: Objection. Form.
10  　　　　THE WITNESS: I don't know. I would have to
11  sit down and go through the process to determine it.
12  Q　　(By Mr. Snodgrass) You going to take an hour for
13  you to get to the depreciation option screen?
14  　　　　MR. KAHN: Objection. Form. He said he
15  doesn't know.
16  Q　　(By Mr. Snodgrass) Well, if you don't know how
17  long it's going to take to get the depreciation option
18  screen, why would you challenge Mr. Johnson's opinion
19  that this is going to take a couple, three minutes?
20  　　　　MR. KAHN: Objection. Form.
21  　　　　THE WITNESS: I challenge it based on my
22  experience using Xactimate, ESX files, and analyzing
23  claim files. Trying to make the determination that he's
24  tried to outline here, I don't think that can be done in
25  two to three minutes.

## Page 176

1  Q　　(By Mr. Snodgrass) Okay. Well, let's -- we are
2  still back on the ESX file. How long is  t going to
3  take you to toggle on and off the depreciation opt on
4  setting?
5  　　　　MR. KAHN: Objection. Form. Asked and
6  answered.
7  Q　　(By Mr. Snodgrass) Under a minute?
8  **A　　I'm not sure. I would want to -- I would want to**
9  **test it to be able to answer the question.**
10  Q　　Okay. And you've never tested it; correct?
11  **A　　I haven't timed myself. No.**
12  Q　　Okay. And based on your experience with claims
13  management software, how long does it take you to get to
14  the file notes in claims management software?
15  　　　　MR. KAHN: Objection. Form.
16  　　　　THE WITNESS: I have not used claims
17  management software.
18  Q　　(By Mr. Snodgrass) So would you think that took
19  more than five seconds or under five seconds?
20  　　　　MR. KAHN: Objection. Form.
21  　　　　THE WITNESS: I don't know.
22  Q　　(By Mr. Snodgrass) Is t possible that
23  Mr. Johnson's opinions were rather conservative? In
24  other words, this might take under a minute for a lot of
25  claims?

## Page 177

1  　　　　MR. KAHN: Object on. Form. Speculation.
2  　　　　THE WITNESS: I don't think so based on my own
3  experience.
4  Q　　(By Mr. Snodgrass) Based on your experience. All
5  right. Have you watched an adjuster adjust a claim?
6  **A　　You mean, follow him around from the time he**
7  **showed up on a jobsite all the way until he --**
8  Q　　Yeah. Have you ever shadowed a claims adjuster,
9  watched him do all the entrances in Xactimate and then
10  claims management software?
11  **A　　You mean sit there right beside him and watch**
12  **every entry?**
13  Q　　Yeah.
14  **A　　No. I've never had an occasion to do that.**
15  Q　　You've never even seen anybody adjust a property
16  claim before in your life?
17  　　　　MR. KAHN: Object on. Asked and answered.
18  　　　　THE WITNESS: Sure I have. I've seen it lots
19  of times.
20  Q　　(By Mr. Snodgrass) But never from start to
21  finish?
22  **A　　Well, not every single -- not every single step,**
23  **every piece of paper filed in a file or pencil**
24  **sharpened. I didn't watch the whole thing, but I'm**
25  **familiar with what goes on. I've seen it hundreds of**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 178

1    times.
2    Q    When have you seen it hundreds of times?  I
3    thought you haven't been in the field for 10 to 15
4    years?
5        MR. KAHN:  Objection.  Form.
6        THE WITNESS:  I have been in business now for
7    40 years.  So I've seen lots of things in that 40 years.
8    Q    (By Mr. Snodgrass)  I understand that.  But in the
9    last 10 to 15 years, you haven't seen anybody adjust a
10   claim live, have you?
11   **A    Yes, I have.**
12   Q    When?
13   **A    Pardon me?**
14   Q    When?  If you haven't been in the field, when have
15   you seen somebody adjust a claim?
16   **A    You asked me if I had been on a construction**
17   **project.  That's different from being in the field.**
18   Q    You've been in the field?
19   **A    What do you call the field?**
20   Q    Out of your office.
21   **A    Yes.**
22   Q    Okay.  Have you met with adjusters out of your
23   office?
24   **A    Yes.**
25   Q    Have you done so in other states in the last 10 to

## Page 179

1    15 years?
2    **A    Yes, I have.**
3    Q    In what states?
4    **A    Texas, Louisiana, of course Oklahoma.  Those are**
5    **the only ones I can think of as I'm sitting here right**
6    **now based strictly from memory.**
7    Q    As it relates to the -- as it relates to your
8    review of the exemplar claim files, was your primary
9    task in looking at these claim files to look at what the
10   actual cost of repairs might have been after the payment
11   of the ACV created by the insurance company?
12       MR. KAHN:  Objection.  Form.
13       THE WITNESS:  No.  That wasn't my primary
14   task.
15
16
17
18
19
20
21
22
23
24
25

## Page 180



## Page 181

8    Q    Well, I understand that.  But in your career,
9    having never handled a single claim as an adjuster
10   before in your life, maybe somebody would want to know
11   whether or not these were actually randomly sampled or
12   selected by the attorneys.  Do you know?
13   **A    I don't know.**
14       MR. KAHN:  Objection.  Form.
15   Q    (By Mr. Snodgrass)  Can you tell me why in all of
16   these file reviews, you were looking at the facts and
17   circumstances that took place after the actual cash
18   value payment?  What was relevant about that?
19       MR. KAHN:  Objection.  Form.
20       THE WITNESS:  I guess I don't know whether --
21   I'm not sure I understand your question.
22   Q    (By Mr. Snodgrass)  Well, in other words, why is
23   it relevant what happens after the actual cash value
24   payment in determining whether or not an actual cash
25   value payment was suff cient?

**Confidential Pursuant to Protective Order – Deposition of Michael Berryman – 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



Page 185

```
17    Q    (By Mr. Snodgrass)  You told me that.  I just want
18    to know if the Court rules in our favor, did you
19    determine the amount of labor depreciation withheld?
20    It's a yes or no question.
21          MR. KAHN:  Objection.  Form.  Calls for legal
22    conclusion.  And it's been asked and answered twice
23    already.
24          MR. SNODGRASS:  It's been asked at least
25    twice, I will agree there.
```

**Confidential Pursuant to Protective Order – Deposition of Michael Berryman – 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



### Page 186

1      MR. KAHN: And you've had an answer. If you
2 got anything to add, you can add.
3      THE WITNESS: I don't have anything to add to
4 that.

### Page 188

21   Q   No. I don't need you to do t. Would t take you
22 only seconds to determine nonmaterial depreciat on from
23 that Excel spreadsheet? Is that true?
24      MR. KAHN: Objection. Form.
25      THE WITNESS: I don't know. I guess we could

### Page 187

### Page 189

1   time it.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



### Page 190

16 Q (By Mr. Snodgrass) Well, so let me ask you this,
17 so if a person doesn't to do any work, decides not to do
18 any work, are they entitled to ACV as a minimum?
19 MR. KAHN: Objection. Form. Calls for a
20 logical conclusion.
21 THE WITNESS: As I've said before in this
22 deposition, I don't feel like I'm in a position to
23 render an opinion on what someone's entitled to under
24 the insurance contract.
25 Q (By Mr. Snodgrass) Okay. So let me ask you this,

### Page 191

1 if the policyholder hires a cheap unlicensed contractor
2 and gets the work done for less than the actual cash
3 value, under your analysis, what's the policyholder's
4 damages, as you've figured out damages in your report?
5 MR. KAHN: Objection. Form. Calls for a
6 logical conclusion. Incomplete hypothetical.
7 THE WITNESS: Now again, I don't interpret
8 insurance policies. But I don't think -- I don't think
9 the insurance policy has any -- at least in my
10 experience, the selection of a contractor, who you use,
11 how the work is performed, and under what business
12 arrangement is strictly between the policyholder and
13 whoever they want to hire as a vendor. I've never seen
14 an insurance policy have -- insurance carrier have some
15 sort of responsibility in selecting the contractor for
16 the homeowner or making sure the work was done properly.
20 So let me ask you this, have you seen or
21 heard of the phrase, storm chasers?
22 MR. KAHN: Objection. Form.
23 Ms. Characterizes testimony. Go ahead.
24 THE WITNESS: Yes, I have.
25 Q (By Mr. Snodgrass) Are you familiar that storm

### Page 192

1 chasers can be unlicensed contractors that come by after
2 hailstorms and try to get people to let them do work?
3 A Yes.
4 Q Okay. So if State Farm owes a policyholder
5 $8,000, but an unlicensed storm chaser comes by and
6 drops of a bid to do the work for $5,000, does State
7 Farm get to use the benefit of that unlicensed storm
8 chaser bid to lower the ACV payment? Does that
9 typically happen in your experience?
10 MR. KAHN: Objection. Form. Calls for a
11 legal conclusion.
12 THE WITNESS: I have never seen that -- never
13 seen a carrier adjust the ACV downward because of what
14 you've described.
15 Q (By Mr. Snodgrass) Okay. So if a bid can't
16 adjust -- if a bid from an unlicensed contractor doesn't
17 result in an ACV bid being adjusted down, why would you
18 ever adjust an ACV payment down?
19 MR. KAHN: Objection. Form. Incomplete
20 hypothetical.
21 THE WITNESS: Well, because there are a number
22 of variables involved. As I say in my report, once the
23 work starts, sometimes things are added to the claim for
24 additional damages that are discovered. Sometimes
25 things have been estimated one way or found to be

### Page 193

1 savable, they are cleanable instead of replaceable,
2 being replaced. So the scope of work in my experience
3 remains somewhat fluid in the cost connected thereto
4 until the work is actually completed.
5 Q And if the work's never completed, is it still a
6 fluid situation?
7 MR. KAHN: Objection. Form. Incomplete
8 hypothetical.
9 THE WITNESS: Well, I think if the work is
10 never completed or never started, then we have to go
11 with an estimated RCV and an estimated ACV because
12 that's the best that can be put forth by any person at
13 that time.
14 Q (By Mr. Snodgrass) So you would agree then if no
15 work is ever done, that the ACV should be based on the
16 estimated ACV?
17 MR. KAHN: Objection. Calls for a legal
18 conclusion.
19 THE WITNESS: I would fall back on how I
20 described things in my report under -- in Page No. 3.
21 How it's typically done in the industry. What insurance
22 company decides to pay or not pay, I think involves
23 interpretation of the policy specifically. And that's
24 outs de my expertise to opine about.
25 Q (By Mr. Snodgrass) Were you asked to assume any

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

### Page 194

1  type of insurance policy interpretation in this case by
2  the attorneys?
3  **A    No.**
4  Q    Are you -- you're offering your interpretation of
5  the term ACV based on your, not an assumption of
6  counsel, but based on your experience?
7       MR. KAHN:  Objection.  Form.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  Q    (By Mr. Snodgrass)  You have any -- you're not an
24  expert in accounting; correct?
25  **A    No.**

### Page 195

1  Q    You're not an expert in he econom cs; correct?
2  **A    That's right.**
3  Q    You testified on behalf of State Farm
4  approximately how many times?
5  **A    When you say testified, do you mean at deposition**
6  **or trial.**
7  Q    Yeah.
8  **A    As best I sit here just to try to approximate it,**
9  **it would probably be somewhere in the order of 15 and 30**
10 **times.**
11 Q    (By Mr. Snodgrass)  Well, in your prior
12 deposition, you've testified that you've testified for
13 State Farm over 20 times.  Now your range seems to be
14 getting both bigger and smaller.  Have you testified for
15 State Farm more than 20 times?
16      MR. KAHN:  Object on.  Form.
17      THE WITNESS:  Well, some time has passed since
18 my last depos t on that you've read.  So of course those
19 numbers are going to change.
20 Q    (By Mr. Snodgrass)  Well, right.  One would assume
21 they would go up and not down?
22 **A    Right.  I'm giving you the best approximation that**
23 **I can as I sit here.  So I stand by 15 to 30.**
24 Q    Does your company do residential and commercial
25 construct on work?

### Page 196

1  **A    Yes.**
2  Q    What's the breakdown between the two?
3  **A    It would be impossible for me to give you some**
4  **kind of a percentage or dollar figure.  I just haven't**
5  **measured it that way.**
6  Q    Well, I mean, you must know.  You must have a
7  reasonable range.  Do you do 100 percent commercial and
8  zero percent residential?  Is it 50/50?  You have to
9  know.
10 **A    It varies from year to year.  But I would say**
11 **presently it's probably somewhere in the order of 70**
12 **percent residential and 30 percent commercial.**
13 Q    When you say you do res dential, what percentage
14 is remodeling projects versus what is storm casualty
15 projects?
16 **A    That, I don't know.**
17 Q    Is most of it remodeling?
18 **A    I would just -- best thing I could so is just from**
19 **year to year it's somewhere probably around 50/50.**
20 Q    50/50 remodeling versus storm?
21 **A    Yes.**
22 Q    Are you considered a roofer or a general?  I mean,
23 like the 13 guys that work for you, what's their trades?
24 **A    Then are -- I am considered to be a general**
25 **contractor.  The people that work for me are estimators,**

### Page 197

1  **building consultants, project managers, accounting**
2  **people, superintendents, carpenters, and what would be**
3  **called laborers.**
4  Q    So let me get this straight, if you're a general
5  contractor, you don't have a roofing crew though; right?
6  **A    That's right.  We do not do roofing ourselves.**
7  Q    Okay.  For a simple storm roof project, State Farm
8  usually doesn't pay general contractors to get involved;
9  right?
10      MR. KAHN:  Objection.  Form.
11      THE WITNESS:  It's just a lot of variables
12 there.  It's too hard to answer that.
13 Q    (By Mr. Snodgrass)  Well, do you do routine hail
14 roof claims?
15 **A    From year to year depending on the size, depending**
16 **on if it's a repeat customer.  Still a lot of variables**
17 **in there.**
18 Q    Will you do individual homeowner roofing claims?
19 **A    Yes, we will.**
20 Q    How many have you done in the last five years?
21 **A    I don't know.**
22 Q    Under five?
23 **A    More than that.**
24 Q    What's the smallest project you'll do for a new
25 customer?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 198

1  **A  Depends on who it is and why.**
2  Q  If it's a member of the general public, not your
3  daughter-in-law, what is the smallest project you'll
4  typically take on?
5  **A  Probably $500.  Something like that.**
6  Q  You'll general a project for $500?
7  **A  That's a project that we would take on.**
8  Q  Give me an example of a $500 project where would
9  you act as a general contractor?
10 **A  Where maybe someone's home has been burglarized.**
11 Q  And you'll hire subs and oversee that project for
12 $500?
13 **A  If we need to.  Some of it we would probably do**
14 **ourselves with our own forces.**
15 Q  So that gets back to what trades do you have on
16 staff that can do it w th your own forces?  What do you
17 have?
18        MR. KAHN:  Object on.  Form.  Asked and
19 answered.
20        THE WITNESS:  We have people on our staff that
21 can do general construction work.  They can pour
22 concrete, install cabinets, cabinet tops, doors,
23 baseboard, casing, Sheetrock, texture, painting.  They
24 can do some roofing, landscaping, framing, soft t, facia
25 the gutter, install windows, hang blinds.

## Page 199

1  Q  (By Mr. Snodgrass)  Will any of your guys do
2  roofing?
3  **A  Yes.**
4  Q  Have you ever done a roofing project with your own
5  crew recently?
6        MR. KAHN:  Objection.  Form.
7        THE WITNESS:  No.
8  Q  (By Mr. Snodgrass)  When is the last time you used
9  your own crew to do a roofing project?
10 **A  In the winter of this past year, December, January**
11 **of 2018.**
12 Q  You d d your own crew to do a roofing project?
13 **A  Yes.**
14 Q  In your prior deposition you testified that you
15 didn't know if your vers on depreciated labor.  Do you
16 know if your version of Xactimate depreciates labor?
17        MR. KAHN:  Objection.  Form.
18        THE WITNESS:  The version I have right now, I
19 believe does not.  But I would need to check that.
20 Q  (By Mr. Snodgrass)  And you're saying you're using
21 vers on 28?
22 **A  I use 27.**
23 Q  Wait a second.  I thought you testified earlier
24 that you use vers on 28.
25 **A  My company has both 27 and 28, but I personally**

## Page 200

1  use 27.
2  Q  Are you prof cient in version 28?
3  **A  Yes.**
4  Q  Why do you use 27?
5  **A  I just prefer it.**
6  Q  I take it your company -- you still haven't been
7  surveyed by Xactimate?
8        MR. KAHN:  Object on.  Form.
9        THE WITNESS:  I'm sorry?
10 Q  (By Mr. Snodgrass)  Has your company ever been
11 surveyed by Xactwork Solutions for purposes of Xactimate
12 software pricing?
13        MR. KAHN:  Object on.  Form.
14        THE WITNESS:  Not that I know of.
15        MR. SNODGRASS:  All right.  That's all I've
16 got.
17        MR. KAHN:  All right.  Give me a minute, Joe.
18 I may have a couple of follow-up.  I'm going to step out
19 for a minute.
20        (A short break was had; after which the
21         following proceedings took place:)
22             CROSS EXAMINATION
23 BY MR. KAHN:
24 Q  Mr. Berryman, how are you feeling?
25 **A  Good.**

## Page 201

1  Q  All right.  Couple of questions for you here.
2  Very early on I talked about there are two different
3  rates that you charge in this case; one for preparation
4  of a report, one for testimony either deposition or
5  trial testimony; right?
6  **A  Yes.**
7  Q  Those are the same rates that you're charging
8  State Farm; correct?
9  **A  Yes.**
10 ████████████████████████████████████████
11 ████████████████████████████████████████
12 ████████████████████████████████████████
13 Q  Mr. Snodgrass asked you earlier about your best
14 estimate as the last 20 years how many files you worked
15 on for State Farm and you said maybe 100.  Do you
16 remember that testimony?
17 **A  Yes.**
18 Q  How many files total have you handled since in the
19 last 20 years, if you had to proximate?
20 **A  I would say it's in excess of 1200.**
21 Q  Do you recall Mr. Snodgrass asked you whether or
22 not you talked to State Farm employees to verify what
23 State Farm does in Mississippi?
24 **A  Yes.**
25 Q  And you said you didn't talk to any employees;

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



### Page 202

1    correct?
2    **A    Yes.**
3    Q    Did you review declaration of Juan Guevara in this
4    case?
5    **A    Yes.**
6    Q    And did that declaration discuss any of State
7    Farm's practices in Mississippi?
8    **A    Yes.**
9    Q    Did you rely upon that in forming your opinions in
10   this case?
11   **A    Yes.**
12   Q    You said you also reviewed Ms. Mitchell's claim
13   file that was a Mississippi loss; correct?
14   **A    Yes.**
15   Q    And there was a contractor invoice in that file?
16   **A    Yes.**
17   Q    You also reviewed four exemplar files from members
18   of the punitive class; is that right?
19   **A    Yes.**
20   Q    Were there contract -- Mississippi contractor
21   invoices in those files?
22   **A    Yes.**
23   Q    Did you consider all those materials in forming
24   your opinions as to State Farm and other insurance
25   company practices in Mississippi?

### Page 203

1    **A    Yes.**
2    Q    Mr. Berryman, if you would pull out Exhibit 2, a
3    copy of your report, and turn to Page 19.
4         MR. SNODGRASS:  Excuse me.
5         MR. KAHN:  I'm sorry, Page 19.
6         MR. SNODGRASS:  All right.
7         MR. KAHN:  Let me know when you're there, Joe.
8         MR. SNODGRASS:  Okay.
9
10
11
12
13
14
15
16
17
18
19
20
21   Q    Okay.  Mr. Berryman, you were asked some
22   questions, about whether State Farm's estimate for
23   Ms. Mitchell clearly set out labor depreciation numbers.
24   Do you remember that?
25   **A    Yes.**

### Page 204

1    Q    Were you able to tell by looking at Ms. Mitchell's
2    estimate whether or not State Farm applied depreciation
3    to labor costs?
4    **A    Yes.  I would think so by looking at the line
5    item.  For instance, painting of a room, or replacement
6    of drywall.  That depreciation on that line indicates
7    that that material and labor are both being depreciated.**
8    Q    And is it your view that you need to be an expert
9    to make that determinat on?
10   **A    I don't think so.  I think that that would be common
11   sense for people to read that and understand that.**
12   Q    Let me just make sure.  If you would turn to
13   Exhib t 5.  It's the opinion of Mr. Johnson.
14   **A    Yes.**
15   Q    You were asked some questions about Paragraphs 12
16   through 21.  And I want to direct you in particular to
17   Paragraph 14.
18   **A    Yes.**
19   Q    The end of that, the last sentence in that
20   paragraph states, once all the line tems are entered,
21   the software calculates the amounts of replacement
22   costs, actually cash value, net actual cash value, open
23   paren, ACV minus the deductible, close paren, as well as
24   various categories of depreciation mandated by the
25   insurance company to be depreciated.

### Page 205

1         In your experience do insurance companies
2    mandate that certain repair items be depreciated?
3    **A    I mean, certainly they do from time to time
4    depending on how the policy reads.**
5    Q    And who determines the amount of that
6    depreciation?
7    **A    The adjuster would typically make observations or
8    acquire about the age of a particular component, and
9    then once that age is put into the computer, there's
10   already a typically a lifespan on the product, roof
11   jack, window screen, window, what have you, that has
12   preestablished the expected lifespan of the material.
13   So the computation becomes somewhat automatic after the
14   age of the component is entered into the computer.**
15   Q    And so following on that, might there be
16   certain components as to wh ch t's not necessary to
17   apply depreciat on?  For example a brand new roof that
18   is destroyed the day after it's put on by hail?
19   **A    That's right.**
20   Q    If you turn in the same report to Paragraphs 32
21   through 38 in Exhibit 5.  You were asked some quest ons
22   about whether Mr. Johnson's opin ons in this report
23   would be correct if a court reached a part cular
24   conclus on as to language in State Farm's policy.  Do
25   you remember those quest ons?

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 206

1   **A   Yes.**
2   Q   In your view, what do you believe is necessary to
3   determine whether or not somebody received a suff cient
4   payment of actual cash value?
5   **A   Well, I think, as I've outlined in my report, I**
6   **think you have to do a careful study of what was**
7   **actually required to restore it. Because as I have said**
8   **in my report, different people take different viewpoints**
9   **on how the work should be effectuated. What's**
10   **originally estimated is not always what's actually**
11   **necessary to perform. Sometimes the expected costs come**
12   **in substantially less than were originally estimated.**
13   **So those sorts of things need to be evaluated.**
14   **A person needs to do a site visit to see what was**
15   **actually done, what was not done, what was downgraded,**
16   **what was upgraded. So there's kind of a wide array of**
17   **things that need to be analyzed in order to make that**
18   **determination.**
19   Q   And have you seen, in your experience, instances
20   where an ACV estimate made by the carrier is overstated
21   regardless of whether or not -- I'm sorry. Strike that.
22   Have you seen instances where you've determined that the
23   ACV figure estimated is overstated regardless of whether
24   the insured has had any repairs done?
25   **A   Yes.**

## Page 207

1   Q   And did you come to that conclusion for
2   Ms. M tchell's claim?
3   **A   Yes.**
4   Q   Was there any way for you to determine that except
5   by reviewing the claim file and doing an inspect on?
6   **A   No. It would require reviewing the claim file,**
7   **including the documentation provided from contractors,**
8   **making a site inspection. Everything that I've done in**
9   **that matter would be necessary for me to make an**
10   **accurate determination about the estimated RCV and**
11   **estimated ACV where appropriate.**
12   Q   And that's regardless of whether repairs have been
13   done?
14   **A   Yes.**
15   Q   If you would turn to Paragraph 43 of Mr. Johnson's
16   report. Exhibit 5.
17   **A   Yes.**
18   Q   Do you see it states, even w thout the Xactimate
19   ESX file and access to the insurance company's claims
20   management software, and relying solely on the extracted
21   spreadsheet data and PDF data as prov ded by State Farm,
22   the objective data sought can still be readily obtained
23   to determine the amount of w thheld nonmaterial
24   depreciation for a particular claim. By merely relying
25   on the extractable PDF data and spreadsheet data, I

## Page 208

1   estimate the amount of w thheld nonmaterial depreciation
2   could be calculated in four to six minutes per claim on
3   average. Do you see that?
4   **A   Yes.**
5   Q   Do you believe t's possible, Mr. Berryman, to
6   determine with accuracy whether or not a payment of ACV
7   was suff cient using solely a PDF claim file and
8   spreadsheet?
9   **A   No. Absolutely not. And I also dispute that it**
10   **would take four to six minutes, because based on my own**
11   **experience in this matter, analyzing claim files,**
12   **without the ESX files as he describes, I would certainly**
13   **spend a lot more time than four to six minutes doing it.**
14   Q   Last question, Mr. Berryman. You've testified
15   that in the course of your experience, you testified
16   somewhere between 15 and 30 times for State Farm; is
17   that right?
18   **A   Yes.**
19   Q   How many years does that cover?
20   **A   That would be over a 20-year period.**
21   Q   In the last four to five years, how many times
22   would you estimate you've testified for State Farm?
23   **A   In the last four or five years, I would say**
24   **probably somewhere on the order of six to seven. But I**
25   **can count those to be sure.**

## Page 209

1   Q   How many other depositions or testimony have you
2   given during that same time frame?
3   **A   In the last four to five years, I would say it's**
4   **on the order of 55 to 60 times.**
5   MR. KAHN: Okay. I have no further -- hang on
6   a second. That's all we got.
7   REDIRECT EXAMINATION
8   BY MR. SNODGRASS:
9
10
11
12
13
14
15
16   MR. SNODGRASS: Again, Counsel, we would ask
17   for all the billing records. This didn't show up. And
18   especially for O'Conner and McAfee, we're going to want
19   that engagement letter ASAP. And we're going to want
20   for this guy too.
21   Q   (By Mr. Snodgrass) You talked about 1200 files.
22   And I d dn't understand what you were talking about.
23   What's this 1200 files you were referring to?
24   **A   In the course of career as a building consultant**
25   **expert that I've been involved or hired in at least 1200**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 210

1  occasions. I've been hired on 1200 matters, 1200 files
2  that I've been involved in analyzing and opining about.
3  Q    So what percentage of your work in the past five
4  years has been on behalf of insurance companies when you
5  do forensic work?
6  A    Just generally speaking it's about nine to one;
7  nine for defense, one for plaintiffs.
8  Q    Can you look at your CV and tell me wh ch cases
9  you've testified for on behalf of the policyholder?
10 A    (Witness complies)
11       MR. SNODGRASS:  Court reporter, you can
12 marking as an exhib t, Exhibit J, as the next exhibit.
13       (Exhib t No. 7 was marked for  dentif cat on
14       purposes)
15       THE WITNESS:  I've looked at my CV and I've
16 testified on six occasions where the party I was working
17 for may have been a plaintiff or a defendant where an
18 insurance policy see was involved and providing
19 testimony for the pol cyholder.
20 Q    (By Mr. Snodgrass)  What's the first one?  You can
21 go by the number.
22 A    I should point out that some of these depositions
23 are trial testimony.  Don't involve -- may not involve
24 insurance.  So there is no policyholder on either side.
25 Q    Well, I want where you represented the

## Page 211

1  pol cyholder.  Identify those, please.
2  A    Okay.  On Number 9, Cynthia Stokes versus Asian
3  Restaurant.  I've testified on behalf of Asian
4  Restaurant where a policy -- where an insurance policy
5  defending Asian Restaurant LLC was involved.
6  Q    Wa t a second.  Were you representing a 9, a
7  pol cyholder seeking coverage under a property policy?
8  A    Number 9 I was representing Asian Restaurant who
9  had a policy in place to defend against Cynthia Stokes.
10 Q    Okay.  I'm looking for where you represented the
11 pol cyholder seeking coverage under a property policy?
12 A    Seeking coverage?
13 Q    Yep.
14 A    You mean where coverage had been denied?
15 Q    Well, seeking coverage or you're trying to expand
16 coverage.  In other words, you're representing the
17 pol cyholder going against the insurance company.
18 A    Number 14.
19 Q    Any others?
20 A    I think that's it.
21 Q    In the Lander case, what was the nature of the
22 dispute?
23 A    A fire had occurred to a residential structure
24 that was owned by the Landers.  And they were seeking to
25 have that repaired by the American National Property

## Page 212

1  Insurance & Casualty and/or Armstrong Bank, et al.
2  Q    What type of -- so they had a fire, they were
3  seeking coverage.  What was your opinion?
4  A    I was hired to determine the extent of the fire
5  damage and what would be required to restore it.  That
6  was my role.
7  Q    Did you do an estimate?  An Xactimate estimate?
8  A    Yes.
9  Q    Who was the Plaintiff's attorney in that case?
10 A    Fella named Doug Terry.
11 Q    Do you know whether or not you did an ACV or an
12 RCV, or just an RCV only claim?
13 A    I don't remember.
14 Q    And there's no other case on this list where you
15 represented an pol cyholder against the insurance
16 company?
17 A    Not when you say it exactly like that.  I mean,
18 there are insurance companies in here that were involved
19 where I was either working as -- on the plaintiff's side
20 or the defense side.  And there are cases in here where
21 there are no insurance companies involved either as --
22 Q    I just was trying to get my quest on answered.
23 Was there any other cases in here where you were a
24 pol cyholder against an insurance company?
25 A    I think I answered it.

## Page 213

1  Q    You answered  t no?
2  A    No.  I don't think that's what I said.
3  Q    Okay.  Are there any other cases in here where you
4  were a policyholder directly adverse to an insurance
5  company other than the Sander's case?
6        MR. KAHN:  Object on.  Asked and answered.
7        THE WITNESS:  I don't think so.
8  Q    (By Mr. Snodgrass)  Okay.  So these 1200 files,
9  these date back to '98?
10 A    Yes.
11
12
13
14
15
16
17
18
19
20
21 Q    So what's the gross revenue that you have for all
22 your forensic files in 2017?
23 A    I don't know that number specifically.
24 Q    Well, how many active files do you have at any
25 given one time?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 214

1   A   I would have to approximate that too. Somewhere
2   between probably 50 and 80 at any given time.
3   Q   Okay. And so what would you approximate to be
4   your gross revenue from forensics on an annual basis?
5   A   For my entire company or just for me?
6   Q   Well, let's take it one step at a time. Just for
7   you first.
8   A   Well, I don't know for me, just me. And it would
9   just be a --
10  Q   You can give me a reasonable range, if you want?
11  A   No. It would just be a -- gross revenues not
12  including experiences and so on and so forth. It's
13  probably somewhere between 900,000 and $1 million per
14  year.
15  Q   And didn't you tell me that your net profit for
16  your company was about $1 million a year?
17  A   I think I estimated it at that. Yes.
18  Q   So your construction business is pretty much a
19  break even?
20  A   No. Because you're mixing apples and oranges.
21  When I tell you the expert side, there's expenses
22  connected to that, just like there are expenses
23  connected to construction revenue. There's cost of
24  doing business, internal overhead. You know, all sorts
25  of --

## Page 215

1   Q   But you bill for your expenses. I'm looking at
2   your invoices right now. We can, in fact, mark those as
3   Exhibit, let's say, K. And let's mark that as the next
4   exhibit?
5       (Exhibit No. 8 was marked for identification
6       purposes)
7   Q   (By Mr. Snodgrass) Are these your invoices in
8   this case?
9   A   Yes. They appear to be.
10  Q   Did you bill for your expenses in this case?
11  A   Well, certain kinds of expenses. But you don't
12  see on here the cost of health insurance or FICA
13  matching or paper or electricity or rent or I could
14  just --
15  Q   Let's kind of go through for this, your forensic
16  practice. Do you have a separate office for your
17  forensic practice versus your construction practice?
18  A   No.
19  Q   You have separate health insurance policies versus
20  your construction practice?
21  A   No.
22  Q   Okay. Do you buy paper separately for your
23  forensic practice and your construction practice?
24  A   Ask that again.
25  Q   Do you buy paper separately for you construction

## Page 216

1   business versus your forens c practice?
2   A   No.
3   Q   You use computers mostly for your forens c
4   practice so that t's not so much paper that you use?
5   A   We use both as necessary.
6   Q   And you bill for your travel time; correct?
7   A   When it's reimbursable. Yes.
8
9
10
11
12
13
14
15
16  Q   (By Mr. Snodgrass) Yes?
17  A   Yes.
18  Q   Okay. So in this case the, expenses turned out to
19  be rather profitable; right?
20      MR. KAHN: Object on. Form.
21      THE WITNESS: I'm not sure what you mean by
22  that? How could expenses be profitable?
23
24
25

## Page 217

1
2
3
4
5
6   Q   (By Mr. Snodgrass) Maybe -- do you fly there?
7   A   See where it says Southwest Airline?
8   Q   Let's see. Yeah.
9   A   That's an airplane.
10  Q   Oh, okay. So not only did you change for you
11  plane t cket, you separately charged for the time
12  s tting on the plane?
13  A   Yes.
14  Q   So I'm wondering why you believe that your
15  company's profit is not wholly dependent on your
16  forens c pract ce, sir?
17      MR. KAHN: Objection. Form. Mischaracterizes
18  testimony.
19      THE WITNESS: What would make you wonder that?
20
21
22
23
24
25

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 218



11  A    Yes.
12  Q    And are those people getting assignments through
13  you that you hand out the work too?
14  A    Sometimes.
15  Q    Is that most of the time?
16  A    Well, assignments come in in different ways.  It
17  would be hard for me to generalize, you know, how it
18  always happens.
19  Q    Which people from your company help you w th your
20  forensic assignments?
21  A    A guy named Derrick VanDorn and William Bean.
22  Q    Did Mr. VanDorn or Mr. Bean help you with this
23  assignment?
24  A    No.
25

## Page 219

22  Q    You testified a moment ago that -- well, you
23  didn't talk to anybody, you relied upon the declarat on
24  of Juan Guevara.  Do you remember that?
25  A    Yes.

## Page 220

1   Q    And do you know whether or not Mr. Guevara even
2   works for State Farm any more?
3       MR. KAHN:  Objection.  Form.
4       THE WITNESS:  It's my understanding he does
5   not.
6   Q    (By Mr. Snodgrass)  Do you know when the last time
7   in the last 15 years Mr. Guevara handled a property
8   claim in the State of Mississippi?
9       MR. KAHN:  Objection.  Form.
10      THE WITNESS:  I don't know.
11  Q    (By Mr. Snodgrass)  Okay.  So to say that you
12  relied on Mr. Guevara is a little deceptive in that we
13  don't know how often Mr. Guevara was handling claims in
14  the State of Mississippi to begin with; right?
15      MR. KAHN:  Objection.  Form.
16      THE WITNESS:  I don't think  t's deceptive at
17  all.  I mean, I feel like I can rely as an expert on
18  whoever I feel like is relied -- can be relied upon.
19  Q    (By Mr. Snodgrass)  Well, I guess you could.  But
20  wouldn't you want to know whether or not what you're
21  relying on is applicable to the issues?
22      MR. KAHN:  Objection.  Form.
23      THE WITNESS:  I know of Mr. Guevara and I'm
24  familiar with his experience overall, and I've met him
25  before.  And so I've chose to rely on him.

## Page 221

1   Q    (By Mr. Snodgrass)  Where did Mr. Guevara live?
2   A    I don't know.  I don't know his address or where
3   he lived.
4   Q    What city does he live in?
5       MR. KAHN:  Objection.  Form
6       THE WITNESS:  I don't know that either.
7   Q    (By Mr. Snodgrass)  Where did you meet him?
8   A    I think on a claim years ago.
9   Q    You think on a claim.  How long ago d d you meet
10  him?
11  A    I would stay probably between 15 to 20 years ago.
12  Q    What was he doing at that time?  Was he working in
13  Mississippi?
14  A    I don't recall even where it was.
15  Q    Do we have any reason to believe that Mr. Guevara
16  has ever handled a claim in the State of Mississippi?
17      MR. KAHN:  Objection.  Form.
18      THE WITNESS:  I don't know.
19  Q    (By Mr. Snodgrass)  Okay.  You talk about
20  Ms. Mitchell's estimate.  And I think you rendered a new
21  opin on that she should have been able to determine from
22  her estimate that the State Farm was depreciating labor.
23  Do you remember that opin on?
24  A    Yes.
25  Q    And marked as her estimate as deposition Exhibit

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 222

1  Number 7.
2      MR. SPRAGINS:  7.
3      MS. SNODGRASS:  7?
4      MR. SPRAGINS:  Yes.
5  Q    (By Mr. Snodgrass)  Does this look to you look an
6  Xactimate estimate?
7  A    Yes.
8  Q    Okay.  And what line items do you believe would
9  show that she should know that --
10     MR. KAHN:  Joe.  Joe.  I don't know what
11  document you intended to mark.  I'm looking at one that
12  has a couple of pages from one estimate, and then it has
13  claim rep draft on top of it.  It looks like two
14  different dates.  Two different times for the estimate.
15     MR. SNODGRASS:  It should be Bates 63 through
16  97.
17     MR. KAHN:  I'm sorry.  What was that?
18     MR. SNODGRASS:  63 through --
19     MR. KAHN:  I've got 69 through 97, but there's
20  two different dates.  One of them says draft, one's at
21  9:34 a.m., one's a 9:26 a.m.
22     MR. SNODGRASS:  All right.  So hold on.  Let's
23  stop right there.  So I emailed the court reporter this
24  morning.  You're doesn't start at 63?
25     MR. KAHN:  It starts at 69.

## Page 223

1      MR. SNODGRASS:  Okay.  Miss Court Reporter.
2  So I emailed pages 63 to 68 to your office this morning
3  and instructed them to insert that for Exhibit J.
4      THE COURT REPORTER:  Let me see if that's in
5  there.  I don't know.
6      MR. SNODGRASS:  So she received 63 through 68
7  was supposed to attach that to deposition Exhibit J.
8      THE COURT REPORTER:  Okay.  That must have
9  gone to the front.  63 through 69?
10     MR. SNODGRASS:  63 through 68, it went to
11  scheduling 3.  The scheduling 3.  You have it there?
12     THE COURT REPORTER:  Yeah.  I think we have
13  it.
14     MR. KAHN:  I will just -- so we are going to
15  change these pages but I do want to put on the record.
16     THE COURT REPORTER:  So this is added to which
17  exhibit?
18     MR. KAHN:  Added to Exhibit 7.
19     MR. SNODGRASS:  So is Exhibit 7 now 63 through
20  98?
21     MR. KAHN:  98.  And I would just make an
22  objection that it appears there is more than one
23  estimate in here, one of which is a draft.
24     MR. SNODGRASS:  That's fine.  As long as I've
25  got the sequential claim file numbers, that's fine.

## Page 224

1  Q    (By Mr. Snodgrass)  Okay.  So, Mr. Berryman, can
2  you -- from these documents, from State Farm's claim
3  file, can you identify for me where you're getting this
4  notion that State Farm notified Ms. Mitchell that it was
5  depreciating labor?
6      MR. KAHN:  Objection.  Form.
7      THE WITNESS:  Well, I think -- let's look at
8  67 PROD.  On line 3 for instance, flashing pipe jack.
9  Says two -- shows the unit price, and then depreciation.
10  And so I think it's common sensical that unit price
11  23.47 includes labor and material to place it on the
12  roof.
13  Q    (By Mr. Snodgrass)  Okay.  So let's just -- so the
14  3-tab 25-year composite shingle, you're looking at line
15  item 2; is that correct?
16  A    No.  I was looking at line item 3, flashing the
17  pipe jack.
18  Q    Flashing pipe jack.  So why would a lay person
19  understand that that wasn't referring to materials, like
20  flashing a pipe jack?
21     MR. KAHN:  Objection.  Form.
22     THE WITNESS:  Because I think, first of all,
23  there's no place on the estimate where labor to install
24  anything appears.  So to me it's common sensical and
25  I've known policyholders in the process to clearly

## Page 225

1  understand that when it says pipe jack, that's
2  everything it takes to get it up there; labor, material,
3  nails, everything that's involved.  The whole thing is
4  being depreciated.  So that's labor, material, nails,
5  everything that's involved in order to replace two pipe
6  jacks.
7  Q    (By Mr. Snodgrass)  All right.  And so can you
8  tell me how different this would look if this was
9  printed off with the depreciate nonmaterials option --
10     MR. KAHN:  Objection.  Form.
11     THE WITNESS:  I would --
12     (By Mr. Snodgrass)  What's the difference in
13  how this would look if we were depreciating labor and
14  not depreciating labor?
15     MR. KAHN:  Objection.  Form.
16     THE WITNESS:  I don't believe I've ever seen
17  that.
18  Q    (By Mr. Snodgrass)  In other words, it might be
19  you don't know one way or the other whether it looks
20  exactly the same if it's depreciating labor versus not
21  depreciating labor?
22     MR. KAHN:  Objection.  Form.
23     THE WITNESS:  I don't see how it could look
24  exactly the same.
25  Q    (By Mr. Snodgrass)  Well, I guess if you don't

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 226

1  know what the print options are, you wouldn't know.  So
2  what I'm saying is, have you ever played with the print
3  options on Xactimate?  Have you ever seen what they look
4  like when you depreciate labor versus don't depreciate
5  labor?
6          MR. KAHN:  Objection.  Form.
7          THE WITNESS:  I can't recall doing that.  No.
8  Q    (By Mr. Snodgrass)  Okay.  So maybe they look the
9  same, maybe they look different; right?
10          MR. KAHN:  Objection.
11          THE WITNESS:  I don't think  t would look
12  diff -- or I do think it would look different.
13  Q    (By Mr. Snodgrass)  You think?
14  A    (No response)
15  Q    So you also mention, I believe, painting.  That
16  they should know that painting was being
17  depreciated; right?
18  A    Yes.
19  Q    So what it's in line item number 10?  Was there
20  any depreciation for the painting going on on that line
21  item?
22  A    It doesn't appear so.
23  Q    So would a pol cyholder believe then that there
24  was not labor depreciat on for painting going on?
25          MR. KAHN:  Objection.  Form.

## Page 227

1          THE WITNESS:  Well, this has to do with the
2  paint minimum, which is a whole different category of
3  work and a whole different feature of the estimate.
4  Q    (By Mr. Snodgrass)  So I'm asking you right now,
5  do you know, looking at this, whether or not painting
6  was depreciated or not given the application of the
7  labor minimum?
8  A    When I look at item 10, I see that there was no
9  depreciation taken of labor or material.
10  Q    That's not my question.  Was painting depreciated
11  on this or not?
12          MR. KAHN:  Objection.  Form.
13          THE WITNESS:  You mean in this entire
14  estimate?
15  Q    (By Mr. Snodgrass)  Yeah.
16  A    Yes, it was.
17  Q    Did the labor minimum wipe that all out?  Do you
18  know?
19          MR. KAHN:  Objection.  Form.
20          THE WITNESS:  Wipe out the depreciation?
21  Q    (By Mr. Snodgrass)  Yes.  The labor depreciation.
22          MR. KAHN:  Objection.  Form.
23          THE WITNESS:  No, it didn't.
24  Q    (By Mr. Snodgrass)  Why would State Farm show no
25  depreciation for line item 10?

## Page 228

1          MR. KAHN:  Objection.  Form.
2          THE WITNESS:  I believe  t's because of the
3  way the Xactimate programming works with respect to
4  painting minimums, as they are called.  That number is
5  not necessarily labor or material.  That minimum charge
6  by Xactimate is a value that's imputed into the program
7  to cover start-up charges, if you fill, when the volume
8  of painting work and the estimate is deemed to be too
9  small to meet a pre-program threshold ins de the system.
10  Q    (By Mr. Snodgrass)  So let me ask you this, do you
11  know whether line item 4 is materials only?
12  A    My common sensical read of it is that it's labor
13  and materials and everything that's required to perform
14  that line item, whether it's nails, cleaning rags, a
15  ladder, labor, material, paper, whatever is necessary to
16  accomplish that work.
17  Q    Let me ask you this, can you tell me why painting
18  would be depreciated in line  tem 4, yet ceiling
19  wouldn't be depreciated in line item 8?
20          MR. KAHN:  Objection.  Form.
21          THE WITNESS:  It could be that the adjuster
22  dec ded not to take depreciation on that.  It could also
23  be that depreciation was overlooked on that line item.
24  Q    (By Mr. Snodgrass)  Is there anything on here
25  where you can tell me how much labor depreciat on was

## Page 229

1  depreciated in full?
2  A    No.  The total for labor depreciation does not
3  appear in this document.
4  Q    Can you turn to Page 92?
5  A    Okay.
6  Q    Can you tell from this document whether or not
7  there's an indication that there was depreciation of any
8  of the labor components described in the labor report?
9          MR. KAHN:  I'm going to object to form and on
10  the basis that this appears in the claim rough draft
11  section.  But you can answer.
12          THE WITNESS:  The answer is no.
13  Q    (By Mr. Snodgrass)  Mr. Kahn asked you, and to go
14  back into the report of Toby Johnson.  And I think you
15  might have changed some testimony around a little bit.
16  So I want to talk to you about that.  Would you get
17  Exhibit 5 out, please?
18  A    Okay.
19  Q    First he asked you about Paragraph 14, as well as
20  various categories of depreciation mandated by the
21  insurance company to be depreciated.  Do you see that?
22  A    Yes.
23  Q    Okay.  Now, if you turn to the screenshot that we
24  discussed earlier.  I believe it might be Exhibit 3?
25  A    Yes.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 230

1    Q    First off, do you know who mandates the setup of
2    these depreciat on categories?  Is this done by the
3    insurance company or is this done by the adjuster?
4         MR. KAHN:  Objection.  Form.
5         THE WITNESS:  I don't know.
6    Q    (By Mr. Snodgrass)  So when Mr. Johnson says that
7    var ous categories of depreciation are mandated by the
8    insurance company to be depreciated, you don't know one
9    way or the other whether or not he's right; correct?
10        MR. KAHN:  Objection.  Form.
11        THE WITNESS:  I don't know where he gets that
12   informat on.
13   Q    (By Mr. Snodgrass)  Well, you didn't read the
14   deposit on of Charlie Foster, d d you?
15   A    No.
16   Q    He testified that the insurance company made him
17   do it.  You don't remember Juan Guevara's declaration
18   very well, do you?
19        MR. KAHN:  Objection.  Form.
20        THE WITNESS:  Depends on what the question is.
21   Q    (By Mr. Snodgrass)  Do you remember how
22   Mr. Guevara declared that State Farm sets depreciation
23   settings for claims?
24        MR. KAHN:  Objection.  Form.
25        THE WITNESS:  I'd want to get  t back out and

## Page 231

1    look at it.
2    Q    (By Mr. Snodgrass)  Okay.  But as you sit here
3    right now, do you have any reason to believe what
4    Mr. Johnson said in Paragraph 14 about depreciation
5    categories, the categories we've been discussing on
6    Exhib t 3, is not entirely 100 percent accurate?
7    A    I don't have any reason to criticize it.
8    Q    And you don't have any factual basis to criticize
9    his statement then; right?
10        MR. KAHN:  Objection.  Form.
11        THE WITNESS:  Yes.  That's what I just said.
12   Q    (By Mr. Snodgrass)  All right.  So I want to talk
13   about time estimates again.  So Mr. Johnson claims that
14   he reviewed 150 claim files, and that it took, on
15   average, four to six minutes per claim.  Do you remember
16   that?
17        MR. KAHN:  Objection.  Form.  Mischaracterizes
18   testimony.
19        THE WITNESS:  Are you talking about his
20   deposition testimony?
21   Q    (By Mr. Snodgrass)  No.  I'm talking about his
22   report.
23   A    What number does that appear?
24   Q    You were talking about Paragraph 43.
25   A    What's your question?

## Page 232

1    Q    You have a new opin on now, not in your report,
2    that somehow Mr. Johnson's estimate of four to six
3    minutes per claim might be understated; right?
4         MR. KAHN:  Objection.  Form.
5         THE WITNESS:  Yes.  I believe it is
6    understated.
7    Q    (By Mr. Snodgrass)  Now, Mr. Johnson went through
8    a process where he took 150 claims that were randomly
9    sampled; so in other words, very simple claims, very
10   complex claims, went through the entire process and
11   opined that it took four to six minutes so long as he
12   did the interpretation that we advance; that is, that
13   actual cash value is minimum payment.
14        Now, you certainly didn't engage in that
15   process; right?
16        MR. KAHN:  Objection.  Form.
17        THE WITNESS:  I d d not examine 150 files.
18   Q    (By Mr. Snodgrass)  And some of the things that
19   Mr. Johnson said took only seconds was, for example, you
20   would note from Paragraph Number 2, that the class
21   excludes pol cies with form endorsement Form FE3650.  Do
22   you see that in Paragraph 2 of his report?
23   A    Yes.
24   Q    Do you even know what Form FE3650 is?
25   A    No.

## Page 233

1    Q    Okay.  Would that be kind of important for you in
2    order to try to attack Mr. Johnson on how quickly it can
3    take to analyze these files?
4         MR. KAHN:  Objection.  Form.
5         THE WITNESS:  No.  I don't think so because
6    I'm just reading his item 43 as it reads.  And I do have
7    experience with Xactimate ESX files.  And the statement
8    that he makes in 43, that's four to six minutes, I don't
9    think that's accurate based on my own experience.
10   Q    (By Mr. Snodgrass)  First off, he says without the
11   and Xactimate ESX files.  So he's not in Paragraph 43
12   even talking about the Xactimate ESX files.
13        But putting that aside, for example,
14   Mr. Johnson found that in a matter of seconds he could
15   eliminate dozens of claims from the analysis of the 150
16   because they contained form FE3650.  How long would it
17   take you to eliminate all the 150 claims that contained
18   Form FE3650?
19        MR. KAHN:  Objection.  Form.
20        THE WITNESS:  I don't know.
21   Q    (By Mr. Snodgrass)  Could it take you seconds if
22   you knew how to operate Excel spreadsheets?
23        MR. KAHN:  Objection.  Form.  Argumentative.
24        THE WITNESS:  I'm not sure.  I'd just have to
25   look into it and analyse it.

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 234

1  Q    (By Mr. Snodgrass)  So anyways, what Mr. Johnson
2  did is he took 150 claim files and he applied a very
3  strict set of objective criteria, and concluded  t took
4  four to six minutes, based on an analysis of Excel
5  spreadsheets and the claim file.  And because you don't
6  even know what Form FE3650, I suppose you would probably
7  tell me you don't even know if Form FE3650 is on an
8  Excel spreadsheet or not?
9         MR. KAHN:  Objection.  Form.
10        THE WITNESS:  Not without looking into  t.
11  Q    (By Mr. Snodgrass)  Okay.  Do you think that maybe
12  before you attack another professional, you might want
13  to look into it a l ttle bit more before you just pass
14  dispersion on his opinion?
15        MR. KAHN:  Object on.  Form.  Argumentative.
16        THE WITNESS:  Well, I'm not casting
17  dispersions.  I'm giving you my opinion after having
18  looked at claim files myself to determine the things
19  that we're trying to determine here today.  And I can
20  tell you it takes more than just two or three minutes.
21  Q    (By Mr. Snodgrass)  Well, he d dn't say two to
22  three minutes.  He said two to three minutes if he had
23  access to the ESX file and the electronic claims
24  management system.  He sa d four to six minutes if he
25  used hard copy.  And that included all of the random

## Page 235

1  sampling claims, and also the assumption that actual
2  cash value is a minimum payment owed.
3         Certainly you could go through that type of a
4  process to try to determine the amounts and the times at
5  issue; correct?
6         MR. KAHN:  Object on.  Form.
7         THE WITNESS:  I have not.  I have gone through
8  a similar process.  And I'm offering an opinion based on
9  my own experience.
10  Q    (By Mr. Snodgrass)  What about, how long did  t
11  take you to exclude the claims where the first claim
12  payment was made on or after June 23rd, 2014?  How long
13  did that take you to exclude all those claims?
14        MR. KAHN:  Object on.  Form.
15        THE WITNESS:  I'm not sure I understand what
16  you're asking.
17  Q    (By Mr. Snodgrass)  Do you see Paragraph Number 2?
18  A    Yes.
19  Q    Do you see that Mr. Johnson excluded claims where
20  the first claim payment would have been made on or after
21  June 23rd, 2014?
22        MR. KAHN:  Object on.  Form.
23        THE WITNESS:  Yes.
24  Q    (By Mr. Snodgrass)  Do you disagree with me if I
25  told you that it only took seconds to eliminate all of

## Page 236

1  those dozens of claims from the analysis?
2         MR. KAHN:  Object on.  Form.
3         THE WITNESS:  I wouldn't know w thout testing
4   t.
5  Q    (By Mr. Snodgrass)  So certainly if Mr. Johnson
6  did test  t and came up with his opin ons, you would
7  have basis to challenge him; correct?
8         MR. KAHN:  Object on.  Form.
9         THE WITNESS:  The only basis would be my own
10  experience in reviewing the claim files that I d d
11  review and how long it took me to do it.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 237

1  Q    Here's, I think, one of the big differences.
2  Because you've never handled or adjusted a claim before,
3  it took Toby Johnson under a second to realize this
4  claim wasn't in the class defin tion.  Why d d  t take
5  you so long?
6         MR. KAHN:  Objection.  Form.
7         THE WITNESS:  Because we're looking for two
8  different things.  He's got his mission.  And I'm
9  looking at measuring the impact of labor depreciat on.
10  Those are two different things.
11
12
13
14
15
16
17
18
19
20
21
22  Q    (By Mr. Snodgrass)  Well, you realize, and would
23  be able to qu ckly figure out, that this claim was never
24  in the class because this claim falls outside of the pay
25  period at issue; right?

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**



## Page 238

```
1        MR. KAHN:  Objection.  Form.
2        THE WITNESS:  Again,  t didn't make any
3   difference to the kind of analysis that I was going
4   through as to whether it was or wasn't in the class as
5   you described it.
6   Q    (By Mr. Snodgrass)  Did you ever wonder that maybe
7   this claim isn't even representative and State Farm's
8   attorneys had to find a claim way outs de the class
9   period to have you review it?
10       MR. KAHN:  Objection.  Form.
11       THE WITNESS:  On.  I did not think that.
12  Q    (By Mr. Snodgrass)  Do you know whether or not any
13  of the claims you reviewed were outside the class period
14  and could have been eliminated in seconds and --
15       MR. KAHN:  Objection.  Form.
16       THE WITNESS:  I didn't check because it wasn't
17  important to me whether they were in or out of the
18  proposed class.  It was more important to me to analyze
19  them to measure the impact, if any, of labor
20  depreciation.
21
22
23
24
25
```

## Page 239

```
1
2
3
4
5
6
7   Q    (By Mr. Snodgrass)  So this is back to your theory
8   that if State Farm underpays actual cash value
9   in tially,  t can become okay based on later events?
10       MR. KAHN:  Objection.  Form.  Mischaracterizes
11  testimony.
12       THE WITNESS:  No.  That's not what I've given
13  an opinion on today.
14  Q    (By Mr. Snodgrass)  Let me ask you this --
15       MR. KAHN:  Can I just ask how much longer you
16  anticipate?  We had about five or six minutes of
17  redirect.  You've been going for over half hour.
18       MR. SNODGRASS:  You know what you did.  That's
19  not how it works.
20       MR. KAHN:  You're sitting comfortably in
21  Minnesota.  I'm just asking if you make your way quickly
22  through what else you've got.  As a professional
23  courtesy, we need to make some flights.
24       MR. SNODGRASS:  I understand.  And I wouldn't
25  have done what you did.  I understand why you did it.
```

## Page 240

```
1   But I wouldn't have done what you d d if you had to make
2   flights.
3   Q    (By Mr. Snodgrass)  All right.  Back to the
4   quest ons.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 241

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Q    (By Mr. Snodgrass)  Okay.  Now, if State Farm had
```

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 242

1　made that payment and not withheld labor depreciation
2　from the ACV payment, would the policyholder have had to
3　pay any of this money back to State Farm?
4　　　　MR. KAHN:  Object on.  Form.
5　　　　THE WITNESS:  I think that would require a
6　policy interpretation.  And I don't interpret policies.
7　Q　(By Mr. Snodgrass)  Well, in your experience --
8　and I'm not asking you to interpret policy.  In your
9　experience, would the policyholder ever have had to send
10　that money back to State Farm?
11　　　　MR. KAHN:  Object on.  Form.  Calls for legal
12　conclusion.
13　　　　THE WITNESS:  I have not seen that in my
14　experience.
15　Q　(By Mr. Snodgrass)  So if in your experience State
16　Farm did not withhold labor depreciation, the
17　policyholder would, in fact, still have $166.22 in his
18　or her pocket; correct?
19　　　　MR. KAHN:  Object on.  Form.
20　　　　THE WITNESS:  They might.
21　Q　(By Mr. Snodgrass)  What do you mean might?
22　**A　They might have spent it.**
23　Q　Okay.  But at one time they would have kept it;
24　right?
25　　　　MR. KAHN:  Object on.  Form.

## Page 243

1　　　　THE WITNESS:  I'm not sure what they would
2　have done with it.
3　Q　(By Mr. Snodgrass)  Okay.  But they would have
4　received it from State Farm; right?
5　**A　Yes.  Under your scenario.  Yes.**
6　Q　And in your experience they would have never had
7　to pay that money back to State Farm; right?
8　　　　MR. KAHN:  Objection.  Form.  Calls for legal
9　conclusion.
10　　　　THE WITNESS:  As I've said, I've never seen
11　that happen.
12　Q　(By Mr. Snodgrass)  So we can say with certainty,
13　based on your experience, that by withholding labor,
14　State Farm has damaged the policyholder $166.22, because
15　again, based on your experience, the policyholder would
16　never have had to return a portion of its ACV payment to
17　State Farm; correct?
18　　　　MR. KAHN:  Objection.  Form.  Calls for legal
19　conclusion.
20　　　　THE WITNESS:  No.  I think that's incorrect.
21　Q　(By Mr. Snodgrass)  What's incorrect about that?
22　**A　The way you characterized it is incorrect.**
23　Q　What's incorrect about it?
24　**A　The whole thing.**
25　Q　Well, let's go through it then.  What's incorrect?

## Page 244

1　**A　The scenario as you posed it, the way you said it**
2　**is incorrect.**
3　Q　I understand that you think it's incorrect.  I
4　need to know why.



## Page 245

21　Q　Doesn't that give the insurance company a hell of
22　an incentive to underpay actual cash value and see how
23　the claim turns out?
24　　　　MR. KAHN:  Object on.  Form.  Argumentative.
25　　　　THE WITNESS:  I don't think so.

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 246

1  Q   (By Mr. Snodgrass)  Well, why not?  I mean,
2  wouldn't State Farm always benefit by underpaying ACV
3  and kind of hoping that the pol cyholder tries to
4  find -- use its own labor, hire unlicensed contractors,
5  get the cheapest repair possible.  Wouldn't State Farm
6  underpay all claims and kind of hope this worked out in
7  the end if your creat on was correct?
8      MR. KAHN:  Object on.  Form.  Argumentative.
9      THE WITNESS:  I have not seen evidence of that
10 in my career w th State Farm or any carrier.
11 Q   (By Mr. Snodgrass)  That wasn't the quest on.
12 Wouldn't that create an incentive though to underpay?
13 If there's no penalty for underpaying ACV, why not
14 underpay ACV and see what happens as time goes on?
15     MR. KAHN:  Object on.  Form.
16     THE WITNESS:  ACV is an estimate in the first
17 place.
18 Q   (By Mr. Snodgrass)  That's fine.  But does that --
19 the fact that --
20     MR. KAHN:  You're interrupting the witness'
21 answer.
22 Q   (By Mr. Snodgrass)  Okay.  Go ahead.
23 A   **ACV value is an estimated value.  And I have not**
24 **seen evidence of someone trying to manipulate that for**
25 **any reason.**

## Page 247

1  Q   That's fine.  But is there -- have you ever seen
2  an insurance company underpay an initial ACV payment?
3      MR. KAHN:  Objection.  Form.
4      THE WITNESS:  In my experience State Farm and
5  other carriers tender the estimated ACV.
6  Q   (By Mr. Snodgrass)  And when the carrier tenders
7  the ACV and issues an estimate, does the policyholder
8  have the right to agree to portions of the estimate?
9      MR. KAHN:  Objection.  Form.  Calls for legal
10 conclusion.
11     THE WITNESS:  By that do you mean come back
12 and say, hey, I think  t's enough for painting, but I
13 don't think  t's enough for roofing?
14 Q   (By Mr. Snodgrass)  Yeah.
15 A   **Sure.  That doors always open for discussion, and**
16 **reconciliation about the scope of work and proper extent**
17 **of damage and costs connected there with.  That's**
18 **typically what happens in the industry is that there is**
19 **a dialogue that moves the process forward once the**
20 **initial RCV and ACV are estimated.**
21 Q   Does the policyholder, in your experience in 40
22 years, does the pol cyholder have the right to just take
23 the actual cash value amount as opposed to having to
24 repair the property?
25     MR. KAHN:  Objection.  Form.  Calls for legal

## Page 248

1  conclusion.
2      THE WITNESS:  I think it would depend on what
3  the policy says but --
4  Q   (By Mr. Snodgrass)  No.  I'm asking about your
5  experience.  In your experience do sometimes the
6  policyholder says, you know what, I want to take the
7  option and just receive the actual cash payment?
8  A   **Yes.  I think that happens sometimes.**
9  Q   In those circumstances, does the policyholder have
10 the right to say, you know, I think that ACV payment for
11 painting is okay, but I think they underpaid me for the
12 roof.  Does the policyholder have that right?
13     MR. KAHN:  Objection.  Form.
14     THE WITNESS:  Yes.  I think so.
15 Q   (By Mr. Snodgrass)  Okay.  So if the policyholder
16 has that right, does the policyholder also have the
17 right to say, you know what, I think you did everything
18 fine on the scope and on the pricing, but I disagree
19 with the way you calculated depreciation.  Does the
20 policyholder have that right?
21     MR. KAHN:  Objection.  Form.  Calls for legal
22 conclusion.
23     THE WITNESS:  I hesitate to start talking
24 about what a policyholder's rights are.  But as I
25 expressed to you earlier, that there's often dialogue

## Page 249

1  between the pol cyholder and the insurance company that
2  through their adjuster on nuances, tweaks on scope,
3  tweaks on pricing, tweaks on depreciation or any  tem
4  that the policyholder wants to discuss.
5  Q   (By Mr. Snodgrass)  I'm not talking about
6  discussed, I'm talking about agreement.  Can a
7  policyholder agree to accept an Xactimate estimate, line
8  items 1 through 5 but dispute line  tem 6?
9      MR. KAHN:  Objection.  Form.  Calls for legal
10 conclusion.
11 Q   (By Mr. Snodgrass)  Have you seen that happen?
12 A   **Are you talking about permanently?  In other words**
13 **to take -- to take certain portions of the ACV but**
14 **continue to dispute others and perhaps go to an**
15 **appraisal process?**
16 Q   No.  My question is simple this, when the
17 insurance company issues an estimate, adjuster gets a
18 full and fair chance to investigate the claim all he or
19 she wants, issues the estimate.  Does the pol cyholder
20 have the right to say I agree with this part, this part,
21 this part and this part, but I dispute that part.  Does
22 the policyholder -- does that happen in your experience?
23     MR. KAHN:  Objection.  Form.  Calls for legal
24 conclusion.
25     THE WITNESS:  I don't know what their rights

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order - Deposition of Michael Berryman - 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 250

1    are under the policy. And second, I have not seen that
2    happen.
3    Q    (By Mr. Snodgrass) You've not seen a policyholder
4    and insurance company agree to portions of an estimate
5    but not others?
6    A    **Not in the manner that you described.**
7         MR. KAHN: Joe, we can give you about five
8    minutes we got to hit the road. Otherwise, unless you
9    want to agree to pay for a hotel and in new plane fare.
10   We agreed to start at 11 this morning. You've been
11   going for 45 minutes now.
12        MR. SNODGRASS: You shouldn't have reopened.
13        MR. KAHN: You got five minutes, Joe.
14        MR. SNODGRASS: You can leave if you want.
15   Let's go forward.
16        (By Mr. Snodgrass) What do you mean? You've
17   never seen policyholders and insurance companies agree
18   to portions of an estimate?
19        MR. KAHN: Objection. Form. Asked and
20   answered.
21        THE WITNESS: Not in the way you characterized
22   it.
23   Q    (By Mr. Snodgrass) I'm not characterizing it in
24   any way. I'm just asking, you've not seen a
25   policyholder and insurance company agree to portions of

## Page 251

1    an estimate?
2         MR. KAHN: Object on. Form. Asked and
3    answered.
4         THE WITNESS: Not in the way you characterized
5    it.
6    Q    (By Mr. Snodgrass) And how d d my last
7    quest on -- again, forgetting anything I sa d before.
8    My last question was, have you ever seen a pol cyholder
9    and insurance company agree to portions of an estimate?
10   Yes or no.
11        MR. KAHN: Object on. Form. Asked and
12   answered.
13        THE WITNESS: Sure. That gener cally, yes.
14   Policyholders and insurance companies have disagreements
15   all the time over portions of estimates. And those get
16   worked out.
17   Q    (By Mr. Snodgrass) Well, does the policyholder
18   have the right -- when an estimate is presented to a
19   pol cyholder, does the pol cyholder have to take the
20   whole thing or leave the whole thing? Or can he agree
21   to some parts and not the other?
22        MR. KAHN: Object on. From. Asked and
23   answered. Calls for legal conclus on.
24        THE WITNESS: I don't know because that
25   requires an interpretat on of the pol cy wh ch I'm not

## Page 252

1    capable of doing.
2    Q    (By Mr. Snodgrass) Have you seen that happen?
3         MR. KAHN: Object on. Form
4         THE WITNESS: I have not.
5    Q    (By Mr. Snodgrass) Have you ever worked for State
6    Farm in an appraisal?
7         MR. KAHN: Object on. Form. Asked and
8    answered.
9         THE WITNESS: Yes.
10   Q    (By Mr. Snodgrass) How often?
11   A    **Over 20 years perhaps approximately 20 times.**
12   Q    When was the last time you worked as a State
13   Farm's appraiser?
14   A    **Perhaps in the last year or two.**
15   Q    And where do you typically get hired out of when
16   you do appraisals?
17   A    **I'm not sure what you mean by that.**
18   Q    What location? What geography?
19   A    **States we've been talking about today. Maybe**
20   **even -- even other states.**
21   Q    So when you've been designated by State Farm to be
22   the appraiser, was that with the agreement of
23   pol cyholder or are you the party appraisal?
24        MR. KAHN: Object on. Form.
25        THE WITNESS: I was designated as the

## Page 253

1    insurance carrier's appraiser under the appraisal policy
2    provision.
3    Q    (By Mr. Snodgrass) Have you ever served as an
4    umpire?
5    A    **Yes.**
6    Q    When was the last time you served as an umpire?
7    A    **In the last one to two years.**
8    Q    What companies do you appraise for?
9    A    **State Farm, Farmers, Allstate. I'm sure there are**
10   **others.**
11   Q    List them, please.
12   A    **That's all I can remember as I sit here with**
13   **specificity.**
14        MR. SNODGRASS: All right. That's all I have.
15        MR. KAHN: We'll reserve signature. And can
16   we please make sure that the draft is marked
17   conf dential?
18        THE COURT REPORTER: Yes. So read and sign?
19        MR. KAHN: Yes.
20        (Signature required; w tness excused)
21              * * * * * *
22
23
24
25

**Benchmark Reporting Agency**
**612.338.3376**

**Confidential Pursuant to Protective Order – Deposition of Michael Berryman – 6/7/2018**
**Lorine Mitchell v. State Farm Fire and Casualty Company**

## Page 254

```
1              J U R A T
2       I, MICHAEL BERRYMAN, state under oath that I have
3   read the above and foregoing Deposition in its entirety
4   and that the same is a full, true, and correct
5   transcription of my testimony so given except for the
6   corrections noted.
7
8   (_____)     CORRECTIONS ATTACHED
9   (_____)     NO CORRECTIONS
10      _____
11           MICHAEL BERRYMAN
12
13      SUBSCRIBED AND SWORN TO BEFORE ME, the
14  Undersigned Notary Public in and for the State of
15  _____, on the _____ day of
16  _____, 2018.
17
18      _____
19           Notary Public
20
21  My Commission Expires:_____
22
23  Reported By:   Kimberly D. Idleman, CSR
24
25
```

## Page 255

```
1          E R R A T A   S H E E T
2   WITNESS:  MICHAEL BERRYMAN
3   DATE:     JUNE 7, 2018
4   STYLE:    LORINE MITCHELL -vs- STATE FARM FIRE &
5             CASUALTY, 17-cv-00170-MPM-RP
6
7   REPORTER:  KIMBERLY D. IDLEMAN, CSR
8
9   PAGE  LINE     CORRECTION
10  _____ _____   _____
11  _____ _____   _____
12  _____ _____   _____
13  _____ _____   _____
14  _____ _____   _____
15  _____ _____   _____
16  _____ _____   _____
17  _____ _____   _____
18  _____ _____   _____
19  _____ _____   _____
20  _____ _____   _____
21  _____ _____   _____
22  _____ _____   _____
23  _____ _____   _____
24  _____ _____   _____
25  _____ _____   _____
```

Page 256

1                    C E R T I F I C A T E

2       STATE OF OKLAHOMA       )

3                          ) SS:

4       COUNTY OF OKLAHOMA    )

5

6            I, KIMBERLY D. IDLEMAN, CSR for the State of

7       Oklahoma, certify that MICHAEL BERRYMAN was by me sworn

8       to testify the truth; that the deposition was taken by

9       me in stenotype and thereafter transcribed and is a true

10      and correct transcript of the testimony of the witness;

11      that the deposition was taken on June 7, 2018, at 11:00

12      am, at 520 Couch Drive, City of Oklahoma City, State of

13      Oklahoma; that I am not an attorney for or a relative of

14      either party, or otherwise interested in this action.

15           Witness my hand and seal of office on this the

16      22nd day of June, 2018.

17

18

19

20

21      _____

22           KIMBERLY D. IDLEMAN, CSR

23           Oklahoma Certified Shorthand Reporter

24           Certificate No. 1653

25           Expiration date:  December 31, 2018

26

ERRATA SHEET
CASE: *Mitchell v. State Farm*, No. 3:17-CV-170 (N.D. Miss.)
DATE: June 7, 2018
WITNESS: Michael Berryman

| PAGE | LINE | FROM | TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 42 | 10 | just says, what | just as it says, what | Transcription error |
| 63 | 21 | you're | your | Transcription error |
| 76 | 4 | property | a proper | Transcription error |
| 84 | 18 | easily | usually | Transcription error |
| 112 | 5 | I think, as I've | I think, what I've | Transcription error |
| 113 | 21 | what I see using | what I see people using | Transcription error |
| 118 | 22 | used that function to | used that function in my business to | Clarification |
| | | | | |
| 129 | 10 | damage | damaged | Transcription error |
| 135 | 25 | depreciate removal. | depreciate removal line items. | Clarification |
| 136 | 7 | Not depreciating removal | Not depreciating removal line items | Clarification |
| 140 | 5 | and | as it was | Clarification |
| 144 | 4 | No. | No, but I have determined the amount of labor depreciation from reviewing State Farm estimates. | Witness misspoke |
| 162 | 21-22 | that that is -- that is more than sufficient | that sometimes an ACV payment is more than sufficient | Clarification |
| 170 | 14 | analysation | analysis | Transcription error |
| | | | | |
| 196 | 24 | Then | They | Transcription error |

| PAGE | LINE | FROM | TO | REASON FOR CHANGE |
|------|------|------|-----|------------------|
| 205 | 8 | acquire | inquire | Transcription error |
| 210 | 18 | policy see was | policy was | Transcription error |
| 214 | 12 | experiences | expenses | Transcription error |
| 221 | 11 | stay | say | Transcription error |
| | | | | |
| 238 | 11 | On. | No. | Transcription error |

SIGNATURE: _Michael Berryman_       DATE: _7/19/18_

Subscribed and sworn to before me this _19th_ day of July, 2018.

_Delores L. Lightsey_
Notary Public

DELORES LIGHTSEY
NOTARY
# 14005172
EXP. 06/09/22
PUBLIC
STATE OF OKLAHOMA

2